UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

CONNECTIVITY SYSTEMS, LLC,

                            Plaintiff,

            -against-

THE TOWN OF RAMAPO, PLANNING BOARD OF
THE TOWN OF RAMAPO, THE ZONING BOARD OF
APPEALS OF THE TOWN OF RAMAPO,
THE TOWN OF RAMAPO BUILDING DEPARTMENT,
and THE TOWN OF RAMAPO DEPARTMENT OF
PUBLIC WORKS,

                            Defendants.

--------------------------------------------------------------------X

**COMPLAINT**

Docket No.  20-cv-5251

Plaintiff **CONNECTIVITY SYSTEMS, LLC** ("Connectivity"), by its attorneys, CUDDY & FEDER LLP (Joshua J. Grauer (4594) and Jordan Brooks, (0614)), as and for its Complaint against all Defendants hereinafter alleges as follows:

**<u>Nature of the Action</u>**

1.    Connectivity's long saga with the Town of Ramapo represents another sad chapter in the well-known annals of the corrupt development process employed by the Town. There is no other explanation for the number of times that the Town has strong-armed and strangled Connectivity with extortionate demands and penalties for non-compliance. Similarly, it is impossible for a Town as sophisticated as Ramapo, with so many zoning boards, administrative officials, planning consultants and attorneys to have made so many "innocent" mistakes on one project even after clear and unambiguous State Court Decisions very succinctly laying out the very basic zoning principles continually violated by the Town on Connectivity's development.

4481226.v15

2.     In short, this case presents a classic section 1983 scenario involving egregious abuse of municipal power inflicted upon Connectivity by policy making officials and those responsive to them under color of law.

3.     Accordingly, this action arises from the conscience-shocking, disparate and illegal treatment of Connectivity over the course of almost a decade by the Town of Ramapo, its highest policy making officials and those responsive to them including, inter alia, its Supervisors, Chief of Staff, Mona Montal, Town attorneys, administrative agencies, Town consultants, and department heads (collectively the "Town" or "Defendants"), all acting under color of law, which has deliberately obstructed completion and the legal right to use of Connectivity's mixed-use development known as "Hearthstone."

4.     Although Hearthstone is located on approximately 6.5 acres of prime property in a mixed-use zone in Monsey, NY, the Town's continuous abuse of its power in regard to Connectivity and Hearthstone has, at the bare minimum, violated Connectivity's substantive due process and equal protection rights while effectuating an unconstitutional taking that now enters its sixth year - with no end in sight.

5.     In fact, even with three state court rulings against the Town which have created a voluminous record of indefensible abuse of power by Defendants, with the most recent State Court Order having come down only weeks ago, Defendants' illegal and arbitrary restriction of Connectivity's constitutional rights persists with even more abusive misconduct.

6.     Here, Defendants have continuously acted in an unconstitutional manner in retaliation against Connectivity for, *inter alia*, refusing to succumb to the Town's illegal demands regarding Connectivity's use of its property, for exercising its constitutional rights, for defending its vested rights, and for refusing to "pay to play."

7.      The alignment of politics, payments and development approvals (and the opposite retribution for those who don't pay) is reflected in the two hats worn by the Ramapo Supervisor's Chief of Staff, Mona Montal, who also serves as the long term political kingmaker (chair) of the local Democratic Party and who has singled out Connectivity for a catch-22 "process".

8.      Specifically, it was Mona Montal, the Town Supervisor's Assistant and Purchasing Director who advised Plaintiff, in sum and substance, that she controlled the Town Planning Board and ZBA such that following her instructions were indispensable to those boards' timely approvals and conditions. Alternatively, she explained that there would be serious repercussions from those boards for not "playing ball" with Mona.

9.      As to the Hearthstone Project, Mona advised plaintiff that eliminating 39 parking spaces objected to by neighbors would yield dividends from those boards in the form of approvals, narrower approved parking spaces of 8 feet in width vs 9 feet and the benefits of a State DOT Surplus funding for project public sidewalks just like she had arranged for the Blueberry Commons project.

10.     Since Plaintiff rebuffed Mona's pressure Plaintiff learned, as described with precise factual detail herein, that Mona indeed had the power she claimed which she abused to the severe detriment of Plaintiff.

11.     The Town of Ramapo is known as a "pay to play" Town for real estate developers. Those who pay and take their orders from Mona prosper. Those who do not suffer. Connectivity has refused to pay for approvals and do as instructed by Mona. For this, it has been maliciously penalized by the Town.

12.     The Town's policy of beating Connectivity into submission was conceived and has been implemented by the Town's highest officials, including the former Town Supervisor,

4481226.v15

Christopher St. Lawrence, a convicted felon who received a thirty-one months prison sentence, and Mona Montal, who throughout the Town's systemic obstruction of Hearthstone has been, *inter alia*, chief-of-staff to both Town Supervisors.

13.   This policy persists under the stewardship of current Town Supervisor Michael Specht, Mona Montal, the ZBA, the Planning Board, the Town Building Department, the Town Department of Public Works, the Town Attorney's office, and others.

14.   In this regard, since 2012, Connectivity has tried ad nauseum, to obtain routine approvals, development or construction permits, and modest variances to complete Hearthstone.

15.   Despite Site Plan approval six years ago in 2014 (after ZBA Approval of minor area variances, CDRC Approval and a finding of no environmental significance), Defendants have maliciously engaged in an endless war of attrition to prevent the development of Hearthstone and drive Connectivity out of business.

16.   Toward this illegal and politically motivated goal, Defendants have in bad faith imposed irregular and unprecedented conditions, requirements, land use processes, and denials on Hearthstone that they have not inflicted on any of the other similarly situated developments in the same zone and in other commercial zones in the Town as well.

17.   Defendants have, *inter alia*, made unreasonable and vindictive demands of Connectivity— many of which Connectivity has reluctantly capitulated to in the hope of moving Hearthstone forward, all to no avail.

18.   The Town has crafted novel and fabricated "interpretations" of its own zoning code (and on several occasions changed earlier interpretations long after Connectivity had, at great expense, followed the original bona fide determinations) which were unlawful to force

Connectivity to unnecessarily return to the Planning Board and ZBA, thereby intentionally causing years of farcical delay.

19.     Defendants have flouted the law and delayed issuing and filing decisions on Connectivity's applications over a cumulative period totaling more than 6 years of delay. Each of the similar highly irregular delays reflect a pattern of singling out Connectivity for disparate and unequal treatment. There is not an agency or a department which required interface with the project that has not taken aim at Connectivity as part of the Town's war of attrition.

20.     The Town has assessed higher fees on Connectivity than it has on similarly situated projects. Defendants have refused to: 1) sign approved site plan maps (even after court ordered Site Plan Approval); 2) review architectural plans; 3) review building permit applications; 4) conduct inspections of drainage improvements; and, inter alia, 5) respond to FOIL requests. This is a very partial list of similar Town "games" and transgressions.  A more complete list would at a minimum triple the length of this Complaint.

21.     Defendants are so brazen that even after the state court rebuked Defendants on an application which should have been legally confined to the minor scope of the Amended Site Plan and for the Planning Board and ZBA in 2017 imposing irrational conditions lacking any basis in law or fact on Connectivity's site plan, the Planning Board and ZBA again repeated the exact same illegal conduct in 2019 when they, respectively,  imposed illegal conditions (ZBA) and wrongfully denied (Planning Board) Connectivity's application for an amended site plan (hereinafter called herein the "2019 ZBA and Planning Board Contempt" or "Defendants' 2019 Charade"). (A copy of the "2017 State Court Decisions /Orders" is annexed here to as Exhibit 1.)

22.     Despite the express Town Code provision restricting review of an amended plan solely to the scope of the amendment and notwithstanding the State Court ruling at Ex 1  rejecting

the Town's unlawful exercise of repetitive review, again, as if ab initio of the entire project, both the Town ZBA and Planning Board again ignored their own Town Code and the Court's clear Order (and their attorneys publicly announced statement of this ultra vires disregard of the law) in Defendants' 2019 Charade.

23.    The 2019 ZBA and Planning Board Contempt added more than another year of delay and expense to the previous six years of unlawful delay already inflicted upon Connectivity.

24.    Then, on May 13, 2020, the State Court again found that the Planning Board and ZBA acted illegally in and by their 2019 ZBA and Planning Board Contempt.

25.    To be clear, in 2017 both the Defendant ZBA and Planning Board illegally exceeded their lawful jurisdiction and their Resolutions were both overturned and then it was déjà vu all over again in Defendants' 2019 Charade with both the ZBA and the Planning Board illegally exceeding their lawful jurisdiction.

26.    These identical legal errors proscribed by the Town Code (which the ZBA and Planning Board knew) and which had been overturned by the Court in Exhibit 1, were not good faith mistakes when they first occurred and a fortiori when blatantly perpetrated again at the time of Defendants' 2019 Charade.

27.    Accordingly, the Court annulled the Planning Board's denial of Connectivity's amended site plan, ordered approval of Connectivity's amended site plan, and struck the ZBA's conditions. (A copy of the "2020 State Court Decisions/Orders" is annexed here to as Exhibit 2.)

28.    Altogether, Defendants' six years of bad faith interference with Hearthstone have earned the Town adverse decisions in three Article 78 proceedings adjudging Defendants' actions irrational, unlawful, arbitrary, and capricious.   (A fourth Article 78 proceeding concerning excessive fee schedule charges is pending.)

29.    Yet, even now Defendants' obstruction persists, with the Town still failing to perform the ministerial execution of the site plan that the State court approved in its May 13, 2020 Order.

30.    It is thus quite evident that Defendants will never stop their punitive, illegal and differential treatment of Hearthstone until Connectivity either surrenders to all of Defendants' demands, until Connectivity's business (and its principal's life) is destroyed or this Court awards damages to Plaintiff and orders the permanent end of Defendants' games.

31.    Over the past 6 years, every time Connectivity has yielded to one of the Town's demands and prevailed in <u>four</u> State Court actions, another new circular road leading nowhere lurks. In the words of the Second Circuit, "[t]he finish line will always be moved just one step away until [Connectivity] collapses." *Sherman v. Town of Chester*, 752 F.Supp.3d 554, 563 (2d Cir. 2014).

32.    One penultimate demand, which was delivered in-person by Michael Klein (the Deputy Town Attorney who resigned on June 7, 2018 after paying a $25,000 SEC fine and taking the fifth) and Montal to Connectivity's principal, Solomon Menche, was that Connectivity must eliminate all parking (39) spots on a large swath of its property to the rear of one of its mixed-use buildings. This parking area is located between the building and a large, landscaped buffer and screening which adjoins a street where a politically connected group of neighbors reside.

33.    Specifically, in February 2016, Montal threatened Connectivity's principal, Mr. Solomon Menche, that if Connectivity did not eliminate these 39 spots it would encounter further "delay and trouble" with its project.

34.    This threat is consistent with a surreptitious agreement dated February 28, 2016 reached between former Supervisor St. Lawrence and these same politically connected neighbors that St. Lawrence would cause the ZBA to eliminate these 39 parking spaces and compel

Connectivity to accede to an increased buffer. A copy of a letter from the neighbors to former Supervisor St. Lawrence confirming this concealed agreement (the "Supervisor/Neighbors' Deal") is annexed hereto as Exhibit 3.

35.    A copy of the Supervisor/Neighbors' Deal was obtained by Connectivity on March 14, 2019, only after the State Court ordered the Town to comply with Connectivity's long-outstanding FOIL search (see Ex. 1).

36.    Montal—the only senior official remaining from St. Lawrence's administration—made good on her threat. (Significantly, in an email produced also on March 14, 2019 in the same Court-ordered FOIL production, the former Deputy Town Attorney advised the neighbors not to reveal Montal as a recipient of a letter to the Town's Building Inspector which included the neighbors' demands and the Supervisor/Neighbors' Deal, as follows:

"The letter is okay. However, I do not believe you should have Mona on the letter."

A copy of this email is annexed hereto as Exhibit 4.)

37.    Incredibly, but clearly not a "coincidence," in 2019 the ZBA (illegally) conditioned the granting of minor variances on Connectivity's removal of these same 39 spots referenced in the Supervisor/Neighbors' Deal. The State Court in the 2020 Decisions/Orders at Ex. 2 annulled that condition because, inter alia, it was "not based on any evidence in the record" and noted "the boards may have been influenced by outside factors."

38.    Connectivity has spent more than $15 million on all aspects of developing Hearthstone. This includes obtaining studies, seeking approvals and variances, engaging in the Town's repetitive and abusive land use processes, challenging wrongful denials or illegal conditions, constructing foundations, building two of the four buildings, and installing drainage, sewer, and other infrastructure. (Photographs depicting the construction of both Building A to the

left and Building C to the right, partially completed pursuant to the original Site Plan Approval granted in 2014, are annexed hereto as Exhibit 5.)

39.    Yet, despite its vested rights acquired long ago from the 2014 Site Plan Approval, the Foundation and Building Permits and substantial improvements constructed in reliance thereon as is evident from Exhibit 5 and the $15 Million invested by Plaintiff in reliance thereon, the Town unlawfully stopped what should have been normal construction progress which Connectivity was legally entitled to continue six years ago, Connectivity's prime property still lays fallow, with Hearthstone virtually no closer to completion and final approval—but much closer to financial exhaustion—than it was six years ago.

40.    Connectivity simply cannot escape the selective, illegal, farcical, repetitive and bad faith "death by 1000 cuts" inflicted on it by Defendants—with no signs of it abating—that has resulted in multiple state court actions and reversals and robbed Connectivity of its ability to develop Hearthstone.

41.    In addition to the Town's illegal actions—of which there are many—identified in Exhibits 1-4, Defendants' obstructionist actions also include, *inter alia*:

- The Planning Board's exercise of jurisdiction over issues which were beyond its jurisdiction, even after it was specifically advised by its own counsel that it was venturing beyond its jurisdiction;
- The Town's imposition of general requirements of use—such as the number of units allowed per acre—on only Hearthstone and on no other similarly situated projects within the same MU-1 zone;
- Forcing only Connectivity, but not other similarly situated projects, to install a costly soundproof fence and to plant rows of expensive and dense evergreen trees and landscaping in an enlarged buffer between Hearthstone and a residential zone, even though the other similarly situated projects are closer and more visible to residences than Hearthstone;

- Consistently delaying—for shocking periods of time—issuance of decisions, approvals, or amended resolutions relating to Hearthstone, including, in one case, delaying 18 months for preparation and filing of the pro forma Resolution of ZBA approval, a delay which in turn caused another 18 months of further willful delay, all in bad faith under the Town policy aimed at derailing Connectivity and Hearthstone;

- Refusing to perform routine inspections or issue building permits in order to halt Connectivity's progress requiring the State Court to direct the Building Inspector to review Connectivity's building plans;

- Issuing administrative agency decisions unsupported by any of the Town's own consultants, any factually objective evidence, and wholly contradicted by the agency's prior findings;

- The new building inspector changing his predecessor's binding zoning law interpretation that two buildings with an underground connection were two separate buildings, and concluding that the same two buildings were one building, long after site plan approval as to those two buildings was approved, without any citation of the zoning law provision (which does not exist) allegedly relied upon; and

- Overall, issuing edicts untethered to fact or law, including just recently, directing that the storage space of the stores must be added to floor area ratio and for the Planning Board to determine the required number of parking spaces and obligating Connectivity to submit an "Action Plan," the latter of which has never been requested by the Town, let alone for Hearthstone over the past eight years which regardless is improper.

42.   Accordingly, Connectivity seeks enforcement of its federal constitutional rights—including under the equal protection clause and fifth amendment takings clause and its right to substantive due process—willfully trampled upon by Defendants.

43.   Connectivity also seeks damages in the sum of at least $25 million to compensate it for losses and damages incurred because of Defendants' bad faith and intentional violations of Connectivity's constitutional rights.

4481226.v15

**Parties**

44.   Connectivity was and is a limited liability company under the laws of the State of New York, with offices located in the County of Rockland and State of New York at 386 Route 59, Suite 200, Monsey, NY.

45.   Connectivity is the owner of real property located in the County of Rockland and State of New York at 146 Route 59, Monsey, NY, which property is known and designated on the Tax Map of the Town of Ramapo as Section 56.11, Block 3, Lot 53.6 (the "Property").

46.   Upon information and belief, Defendant the Town of Ramapo (the "Town") is a municipal corporation of the State of New York with offices located in the County of Rockland and State of New York at 237 Route 59, Suffern, NY.

47.   Upon information and belief, Defendant the Planning Board of the Town of Ramapo (the "Planning Board") is a board created by statute under, *inter alia*, NY Town Law Section 271 and Town Code Section 42-1 *et seq*., whose members are appointed by the Town Board.

48.   Upon information and belief, Defendant the Zoning Board of Appeals of the Town (the "ZBA") is an administrative and quasi-judicial body of the Town created by statute under, *inter alia*, NY Town Law Section 267 and Town Code Section 376-150 *et seq*. with offices located in the County of Rockland and State of New York at 237 Route 59, Suffern, NY.

49.   Upon information and belief, Defendant the Town of Ramapo Building Department (the "Building Department") was and is a municipal department of the Town with offices located in the County of Rockland and State of New York at 237 Route 59, Suffern, NY.

50.   Upon information and belief, Defendant the Town of Ramapo Department of Public Works (the "DPW") was and is a municipal department of the Town with offices located in the County of Rockland and State of New York at 237 Route 59, Suffern, NY.

4481226.v15

## Jurisdiction and Venue

51.     This Court has subject matter jurisdiction over claims under 28 U.S.C. § 1331 because Connectivity's claims under 42 U.S.C. § 1983 arise under federal law.

52.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because (i) both Connectivity and Defendants reside in this judicial district, and (ii) a substantial part of the events, actions and/or omissions giving rise to Connectivity's claims occurred in this judicial district.

## The Hearthstone Property and Project

53.     In 2000, Connectivity purchased the 6.532-acre Property in the Town. Having acquired a small, adjoining parcel in 2017, the Property presently encompasses 6.655 acres.

54.     Hearthstone, the mixed-use retail and residential development project Connectivity seeks to develop at the Property, consists of four buildings. The four buildings are referenced as Buildings "A," "B," "C," and "D". Connectivity pursued development of Hearthstone at the urging of the Town.

55.     The Town expressed that it needed a multi-use development at this location because it was close to its downtown designation. Also, the Town is one of the fastest growing towns in New York State, and there is a shortage of apartments for young married couples.

56.     The bottom floor of each of Buildings "A," "B," and "C" is commercial, with two floors of residences above it. Building "D" is solely commercial, with two floors of offices instead of residences atop the bottom commercial floor.

57.     The Property is desirably located, as it fronts New York State ("NYS") Route 59, a heavily traveled road, and is close to a major supermarket and several shopping centers.

58.     Jurisdiction over Route 59, including with respect to traffic signals, is vested solely in the NYS Department of Transportation ("DOT").

4481226.v15

**Rezoning of the Property**

59.     After performing all customary due diligence, in 2012 Connectivity applied for a rezoning of the Property to a "MU-1" zoning designation to accommodate Hearthstone.

60.     Among the uses permitted by right in the MU-1 zoning district are mixed use structures consisting of commercial and residential uses.

61.     On July 10, 2013 the Town Board issued a Negative Declaration finding that Hearthstone, as depicted on its site plan, would not have any adverse environmental impacts, including to surrounding properties.

62.     Since July 2013, Hearthstone's Site Plan—including the footprint of all the Buildings—has remained virtually unchanged.

63.     On the same date, the Town Board rezoned the Property to a MU-1 zoning designation.

**The Planning Board selectively requires
Hearthstone's compliance with general use standards**

64.     In August 2012, Connectivity submitted its proposed site plan for Hearthstone.

65.     Unlike other similarly situated developments in the MU-1 Zone, the Town mandated that Connectivity include the MU-1 general use requirements on its site plan as part of the Bulk Table.

66.     These MU-1 general use requirements imposed only on Connectivity include minimum buffers and side and rear yard setbacks, ratio of commercial to residential use, a limit of 8 units per acre, minimum distance of a structure from an interior road, a maximum of 16 units per building, minimum of two loading spaces, and prohibition of parking in the front yard.

67.     For all other similarly situated projects, including those that are more intensely developed, the Planning Board did not require compliance with the MU-1 general use

13

requirements, allowing those projects to receive site plan approval from the Planning Board without ever seeking variances (other than for parking requirements) from the ZBA for aspects of their developments that did not comport with the use requirements.

68.     The inclusion of these use requirements on Connectivity's site plan required it—and only it amongst similarly situated MU-1 developments—to seek several area variances.

69.     Accordingly, the Planning Board referred Connectivity's site plan application to the ZBA for those variances.

**In Comparison To All Other MU-1 Projects**
**The ZBA imposes unprecedented and burdensome conditions on Connectivity**

70.     On May 29, 2014, Connectivity appeared before the ZBA.

71.     Although the ZBA granted many of the minor area variances sought, it did so with several unprecedented and illegal conditions (the "First ZBA Conditions").

72.     None of the First ZBA Conditions has been imposed on any other project approved in the MU-1 zone or any other residential or commercial site in the Town.

73.     Over the past several years, the Town has approved numerous developments in the MU-1 zone that are similarly situated to Hearthstone.

74.     Yet, neither the Planning Board nor the ZBA imposed any of the conditions on any other of these similarly situated projects that it did on Hearthstone – a pattern that continues to this day.

75.     Hearthstone abuts commercial zoning to the west, residential zoning to the north, dense residential to the east, and mostly commercial zoning to the south. It received zoning variances on March 14, 2014 and planning board approval on October 21, 2014. Through the May 13, 2020 State Court Article 78 Decision, it received final site approval of its third amended site plan.

4481226.v15

76.     Situated upon Plaintiff's 6.65 acres are 4 Buildings where the bottom floor of three of the buildings are exclusively commercial, with 2 floors of residences above the commercial. The 4th building is exclusively commercial.

77.     Another MU-1 similarly situated project but located on only 3.5 acres as the Monsey Mall (the "Monsey Mall") is located at 100 Rt. 59, Monsey, New York, approximately 1,500 feet from Hearthstone. It abuts dense residential development to the north, and MU-1 to other sides. The site plan for Monsey Mall was approved by zoning variances granted on June 1, 2012, and planning board granted final site plan approval on February 16, 2017. The Monsey Mall building configuration is the same as Hearthstone, with stores on the first floor and residential use above.

78.     Another similarly situated MU-1 project on only .75 of an acre, "A&B Market" ("A&B Market"), is located at 3 Second Avenue, Monsey, New York, approximately 1,300 feet from Hearthstone. It abuts properties zoned MU-1 to its west and south. Its western boundary is located only five (5) feet from a private home and it is flanked by dense residences to the east, and commercial to its north. It received zoning variances, was granted site plan approval on May 2, 2014 and planning board final site plan approval on November 19, 2017. Like Hearthstone, A and B Market has commercial stores and offices on the lower or ground level with residential use above in one apartment.

79.     In the beginning from 2010-2017, the Defendants' Boards were composed of mostly the same members with each expressing similar views on Town matters. In short, there is no reasonable explanation on this record for the completely different treatment of Plaintiff.

80.     Three indicators that define project utilization or overutilization are: the floor area ratio ("FAR"), that is, the relationship of the total usable floor area of a building relative to the

4481226.v15

total area of the lot; the development coverage, that is, percentage of the lot covered by buildings and paved impervious surfaces; and parking provided as compared to required parking.

81.     A higher ratio or larger percentage is indicative of a high utilization of the property.

82.     Hearthstone has a FAR of .41 as compared to .93 for Monsey Mall and .56 for AB Market.

83.     Hearthstone has a development coverage of .74 as compared to .98 for Monsey Hall and .89 for AB Market, where only up to .75 development coverage is allowed.

84.     Hearthstone requested a parking variance of .25%, and received 33% after the 39-spot removal, while Monsey Mall received a 49% variance and AB Market received a 50% variance (the variance marks the percentage by which parking spots were reduced from the required amount).

85.     Despite Monsey Mall's and AB Market's closer proximity to residences than and otherwise being similarly situated to Hearthstone, the Town required only Hearthstone to (a) provide 8' soundproof walls (while Monsey Mall and AB Market were required to provide only a six (6') foot transparent chain-link fence) and a costly landscaped buffer with trees, (b) restrict parked cars for residences use only, (c) eliminate 39 parking spaces adjoining residential use despite complying with all setback requirements of the Town zoning law, and (d) install two loading docks, while Monsey Mall and A&B Market do not have any is required.

86.     A comprehensive chart illustrating the vast differential treatment of Connectivity as compared to several commercial projects in the MU-1 Zone and other commercial projects (collectively the "Comparators")—including with respect to required buffer, landscaping, trees, and other amenities-is annexed hereto as Exhibit 6.

4481226.v15

87.     The chart highlights the fact that the Town's reputation as a developer-friendly haven is well-deserved except, of course, in regard to Connectivity and its less intense development endorsed by all professionals and consultants, as an excellent and valuable project with no adverse environmental impact.

**The ZBA denies Connectivity's request for a variance to construct 56 residential units**

88.     In 2014 the ZBA denied Connectivity's request for a variance to construct 56 residential units at the Property, to be spread over Buildings "A" (16 units), "B" (16 units) and "C" (24 units).

89.     Under the general use requirements set forth on the Bulk Table, Connectivity was entitled as of right to 53 units (calculated at 8 units/acre over 6.53 acres) or, at the bare minimum, 48 units (16 units/building).

90.     In stark contrast, on June 1, 2012, the Town approved Monsey Mall's site plan application which included 69 residential units in only one building—when per acre it was entitled to only 26 units, and per building it was allowed only 16 units—without even referring Monsey Mall to the ZBA for a variance.

91.     When Connectivity's principal, Mr. Menche, informally inquired with the ZBA Chairman why Connectivity was denied a de minimis variance for three additional units in an exceptionally underdeveloped site plan clearly needed by the community, and with merely smaller units utilizing the same foot floor print, where another project on the same agenda called Blueberry Commons was granted a mammoth building density increase, the Chairman remarked: "Your project will not be receiving any variances because of the opposition to it." (*See* Exs. 1 and 2.)

92.     In addition, the ZBA, represented by counsel, well knew that "community opposition" is not a legal basis to deny an application.

4481226.v15

93.     Blueberry Commons, however, also faced staunch opposition, demonstrating, in hindsight, that something more sinister concerning Hearthstone was afoot.

94.     Most recently the high profile and high-density Bluefield Extension and Pascack Ridge projects received final approval with colossal variances despite tremendous public opposition.  See Exhibit 7, infra.

### The ZBA unconscionably delays 18 months in filing its written decision with the First ZBA Conditions

95.     NY Town Law Section 267-a(9) requires a ZBA to file its decision in the office of the town clerk within five (5) business days after it is rendered.

96.     Despite the ZBA having rendered its decision at the May 29, 2014 public hearing on Connectivity's variance application, the ZBA did not file its decision memorializing its granting of the variances with the First ZBA Conditions until November 2015 – an unconscionable and unprecedented delay of eighteen (18) months.

97.     This delay was not accidental.

98.     In the interim, the Planning Board approved Connectivity's first site plan ("Original Site Plan") within three months and an amendment to that site plan ("First Amended Site Plan") within four months. It did so within short periods of time (three and four months)—something that would change dramatically after 2014.

99.     The only change in the First Amended Site Plan from the Original Site Plan was the relocation at the request of the Town of a 300' sewer line from a location under the Property to a location off the Property under the Route 59 right-of-way because the relocation was advantageous for the Town.

100.     Because of the ZBA's 18-month delay, however, those Site Plans did not incorporate the First ZBA Conditions.

101.    Accordingly, Connectivity had to submit yet another amended site plan to incorporate the First ZBA Conditions on its site plan.

**The Town applies further unprecedented dilatory "requirements" upon Connectivity**

102.    Connectivity submitted an amended proposed site plan including the First ZBA Conditions that also included a plan to construct 84 units (a Negative Declaration pursuant to SEQRA previously had been approved for 56 units).

103.    The Town planner, Frederick P. Clark & Associates ("FPC"), not only independently concluded that the 84-unit plan would not have any adverse environmental impacts, but it also endorsed the plan, finding "that a comparison at this proposed development, with the Original Site Plan Approval, does not indicate a significant increase in site traffic generation." The Town CDRC did not suggest any changes to the plans and finding that there were no adverse environmental issues or concerns approved Hearthstone to appear on the Planning Board agenda for site plan approval.

104.    After FPC had approved and endorsed the 84-unit plan and the CDRC approved an appearance to the Planning Board agenda, the Town pressured FPC to change its opinion and issue a draft of a "Positive Declaration" indicating that 84 units at Hearthstone *would* result in a significant adverse environmental impact.

105.    In the Town Board conference room, Mr. Menche challenged David Stolman, President of FPC, regarding its preparation of a draft Positive Declaration, a radical change from the earlier FPC memo that endorsed Hearthstone.

106.    In response, Stolman apologetically admitted that he had been instructed by Town leadership to "toe the line" and that he therefore had no choice in reversing course and preparing the draft of a Positive Declaration.

4481226.v15

107.    In sum, the Town refused to grant anything more than 48 units by threatening to impose a manufactured Positive Declaration that would essentially strip Connectivity of its rights and thereby keep Hearthstone at bay for many years.

108.    Given the Town's abuse of power as aforesaid, Connectivity was compelled to withdraw its 84-unit plan.

### The Town compels Connectivity to file another "revised" site plan application

109.    Approval by the Planning Board of the incorporation of the First ZBA Conditions into the First Amended Site Plan should had have been a <u>ministerial</u> adjustment approved by the Planning Board and signed by the Chairman within a matter of weeks.  Such manner of handling was the customary ministerial and expeditious process of such a minor change in the Town.

110.    But instead of expeditiously approving the amended site plan incorporating the First ZBA Conditions, the Town deliberately mired Connectivity in a protracted approval process.

111.    On February 1, 2016 Connectivity applied to the Planning Board for approval of an amended site plan incorporating the First ZBA Conditions (the "Second Amended Site Plan").

112.    Because Connectivity sought to amend the First Amended Site Plan only by incorporating the First ZBA Conditions, the Town Building Inspector and Deputy Town Attorney initially informed Connectivity that its application would be treated as a "miscellaneous" application—that is, the Planning Board would schedule the matter as a "miscellaneous" item and authorize the Planning Board Chairman to sign the revised site plan without the necessity of a formal application or public hearing.

113.    Connectivity is unaware of any other occasion in the Town where an application for such a pro forma minor plan change was not designated as a "miscellaneous" matter and signed and filed without any delay.

4481226.v15

114.    The only other "change" in the Second Amended Site Plan was the relocation of the underground sewer pipe to underneath the Property in the exact same location where the pipe was shown on the previously approved Original Site Plan, another *de minimis* issue.

115.    For any other project, the relocation of the sewer pipe to underneath the Property in the location originally approved would have been deemed a "field change"—that is, a change or adjustment to an approved site development plan, due to field conditions that will not substantially alter the intent, layout or design of the approved plan.

116.    Under normal circumstances, within mere weeks the Planning Board Chairman would have simply signed—without a formal application process or public hearing—the Second Amended Site Plan.

117.    Instead, Connectivity's application for approval of the Second Amended Site Plan was placed on the Town's July 26, 2016 agenda—nearly six months after Connectivity's submission of this de minimis and straightforward application.

118.    Simultaneous with its informal application for the Second Amended Site Plan, Connectivity applied to the Building Department for a building permit for Building "C," for which it had already obtained a foundation permit <u>and</u> constructed the basement of Building "C".

119.    In derogation of law and furtherance of the already developing pattern of obstruction and delay, the Building Inspector did not act on the application (until required by the Court)

**Spearheaded by the Town Supervisor and Montal, the Town pressures**
**<u>Connectivity to accede to outrageous demands regarding further changes to its Property</u>**

120.    From when Plaintiff submitted its architectural plans in February of 2016 for review and approval until the Court's October 2017 Decision at Ex. 1 — to the actual issuance of the

Building Permit (the application for which the Court had ordered the Town to determine), in September of 2018, involved a delay of approximately 2.5 years.

121.    While Connectivity was waiting nearly six months to be heard on, let alone gain approval for, its simple application for the Second Amended Site Plan, policymaking Town officials themselves and those responsive to them, led by Montal, threatened Connectivity's principal, Mr. Menche, with further delay and trouble with the development of Hearthstone if he did not acquiesce to the Town's demands for additional changes to the Property.

122.    This did not mark the first time Mr. Menche faced outrageous demands and threats from the Town.

123.    At several meetings with Town personnel prior to 2016, the Town made numerous other demands of Connectivity on behalf of itself and politically connected Town residents residing near the Property for whom the Town was doing their bidding.

124.    Connectivity yielded on most of the ransom demands (except for "pay to play" payments), in the spirit of courteous community accommodation and to try to move Hearthstone forward.

125.    Over the years Connectivity agreed to, *inter alia*, donate land valued at $650,000 for a Town park—that the Town has still not built—as a condition of the MU-1 rezoning, redesign the site layout of Building "C" at the behest of the Treetop neighbors. In addition, Plaintiff agreed to construct an eight foot fence – along the Treetop property line, a request never imposed on any other development. Furthermore, while Plaintiff's Site Plan was approved with the construction of only a 30 foot sewer line, Plaintiff agreed to build at its expense a 300 foot sewer line with drainpipes upon the Plaintiff's property. These three examples are only a partial list of Plaintiff's efforts to cooperate with the Town and the neighbors.

126.    In Connectivity's meetings in early 2016 with Montal and Town Supervisor Michael Klein, both insisted that Connectivity eliminate all 39 parking spaces located behind Building "C".

127.    When Connectivity first presented its plan to the Town in 2012, no parking spaces were present behind Building "C," with that Building set back 20 feet from the Property boundary per the Zoning Law.

128.    The only reason the 39 parking spots exist behind Building "C" is because Connectivity agreed to a request made by neighbors that Connectivity relocate Building "C" 80 feet from the Property line.

129.    The movement of the Building "C" footprint an additional 60 feet from the Property line caused Connectivity to relocate parking spaces that previously existed in front of Building "C" to the rear of Building "C".

130.    Moving the location of Building "C" cost Connectivity precious time and over $100,000 in engineering costs.

131.    So even after Connectivity, at significant cost, fulfilled the Neighbors' demand to relocate Building "C", the Town continued to coerce Connectivity into further concessions to pacify the Neighbors who were post factum dissatisfied with the very appeasement they demanded.

132.    Unbeknownst to Connectivity at the time, the Town's 2016 demand that Connectivity remove all 39 spots was consistent with a secret agreement reached between a group of Town residents, who adopted the moniker "the Treetop Lane Neighbors" (the "Neighbors"), and St. Lawrence and Montal.

133.    In a letter dated February 28, 2016, the Neighbors wrote approvingly at Ex. "3", supra, that they and St. Lawrence had already agreed on:

The elimination of the entire line of parking that borders Treetop Lane, establishing the first 20 feet as a buffer with evergreen trees that are high enough and dense enough to completely block our view of the 8-foot fence behind it.

134.    The Supervisor/Neighbors' Deal as reflected in the Town's concealment of Exhibit 3, supra, until the Court Ordered FOIL production at Exhibit 1, supra, which was only recently discovered by Plaintiff on March 14, 2019 reveals the extent of the corruption permeating Ramapo's pay to play politically controlled development process.

135.    The fact that the Supervisor/Neighbors' Deal was cut after Plaintiff had already been granted Site Plan Approval in 2014 and approval of its foundation construction with architectural plans under review highlights how egregious the Town's continuous, farcical, abusive and blatantly illegal treatment of Plaintiff has been.

136.    Although the Supervisor has no authority over the ZBA, the letter further stated (albeit inaccurately at the time but prophetically given the future actions of the ZBA) that "it was agreed that this is what the ZBA ordered as a condition for the development." (See Ex. 3, supra.)

137.    Unwilling to be bludgeoned into removing all 39 spaces after, among other things, having already incurred over $100,000 to move the footprint of Building "C" forward, Connectivity eventually offered to eliminate the portion of the 39 spots that faced Treetop Lane.

138.    The Town rejected Connectivity's proposal, with Montal making Connectivity's "choice" clear: Either remove all 39 spots or suffer further significant delay and expense in attempting to develop Hearthstone. To its severe detriment, but consistent with its legal rights, Connectivity refused to relent.

139.    Of course, based on the Town's *modus operandi* of constantly shifting the goal line for the development of Hearthstone, if Connectivity had acceded to remove the 39 parking spaces the Town would have simply manufactured another reason why Hearthstone could not proceed.

4481226.v15

**As payback, the Town stalls for months on Connectivity's
application for approval of the Second Amended Site Plan**

140.    As promised, at the direction of Montal, the Town and its various agencies retaliated again against Connectivity for failing to assent to every single one of the Town's and the Neighbors' quasi-extortionate demands championed by the Town and for not paying to attain the Town's adherence to the rule of law.

141.    The Planning Board, Town Attorney, and Department of Public Works ("DPW") struck first at the July 26, 2016 hearing.

142.    In particular, the Planning Board and Town Attorney recanted their commitment to treat Connectivity's ministerial amended application as "miscellaneous." So too, the DPW improperly refused to classify the relocation of the sewer pipe to its original location as a "field change," even though the Building Inspector and initially the Deputy Town Attorney had both correctly determined that it was merely a field change.

143.    Absurdly, the Town's "messengers" farcically determined that the underground relocation of the sewer line to its previously approved location was a project "design" change.

144.    As a result, the Planning Board adjourned the matter. But while it adjourned other matters on the July 26, 2016 calendar for less than a month to August 23, 2016, the Planning Board intentionally adjourned Connectivity's site plan application for another three months to October 2016.

145.    Shifting the goal line yet again and without any warning, at the October 2016 meeting, the Planning Board advised Connectivity that it now deemed the Second Amended Site Plan a "Revised" Site Plan requiring a formal application and not just a "design" change as they had previously opined at the July 26, 2016 meeting.

146.    This further postponed a decision and caused Connectivity to incur additional costs.

4481226.v15

**The Planning Board imposes illegal conditions on the Second Amended Site Plan**

147.    On January 10, 2017, almost one year after Connectivity submitted its application for approval of the Second Amended Site Plan, the Planning Board held the public hearing.

148.    Following the closure of the public hearing, the Planning Board approved the Second Amended Site Plan, but prohibited commercial vehicles from the rear of Building "C" which faces Treetop Lane and required the planting of expensive trees instead of "landscaping" (collectively the "Planning Board Conditions").

149.    The Town's vengeance did not cease with the Planning Board Conditions.

150.    Rather, in seeking to stymie development in every way conceivable, upon the advice of the Town Attorney the DPW refused to sign the Second Amended Site Plan, even with the Planning Board Conditions, forcing Connectivity to commence an Article 78 proceeding to compel execution. (Only after Connectivity prevailed (Ex. 1, supra), did the DPW sign the Second Amended Site Plan.)

151.    Without a signed Second Amended Site Plan, Connectivity was unable to receive utility permits and Town Building Permits, further inhibiting development.

152.    Defendants' vindictive actions also included: (a) declining to issue the Building "C" building permit applied for in February 2016, (b) refusing to issue a sewer permit, (c) prohibiting Connectivity from continuing to install site improvements, including drainage improvements while refusing to perform necessary and routine drainage inspection, and (d) completely ignoring Connectivity's FOIL requests aimed at discovering more information about the Town's policy to bury Hearthstone.

153.    The delay to the Second Revised Site Plan was, from the time of submission, greater than one year.

4481226.v15

**Connectivity prevails in its Article 78 proceedings challenging, *inter alia*,**
**the Planning Board Conditions and the Town's refusal to issue a building permit**

154.    Connectivity commenced successive Article 78 proceedings against the Town

seeking, *inter alia*, annulment of the Planning Board Conditions and an order compelling (a) the

Planning Board Chairman to sign the Second Amended Site Plan following DPW signature, (b)

the issuance of the building permit for Building "C", (c) compliance with its FOIL requests, and

(d) the Town to conduct long-overdue inspections.

155.    By Decision and Order dated October 16, 2017, the Supreme Court, Rockland

County, granted all the relief requested in Connectivity's petitions to the extent it was not mooted

(the "2017 Article 78 Decision") (Ex. 1.)

156.    In that Decision, the court framed the issue concerning the Planning Board

Conditions as follows:

> The central issue which must be determined is whether the Planning Board has the
> authority to impose two conditions – namely the planting of trees instead of
> "landscaping" along Treetop Lane and the prohibition of commercial traffic from
> the rear of the Building.  In connection with the Amended Site Plan application
> which specifically sought (i) approval and relocation of the sewer line and (ii) the
> implementation of the ZBA landscaping conditions set forth on May 29, 2014, in
> connection with the application for area variances.

157.    The court then stressed that under the Town Zoning Law, on an application for an

amended site plan "only those site development plan elements proposed to be modified or

changed"—here, the First ZBA Conditions and the return of the sewer pipe to its original

location— "need be presented, except where such modification or changes have a material and

substantial impact on the balance of the site development plan and functioning of the site."

158.    The court highlighted that in the Planning Board's own decision imposing the

Planning Board Conditions, the Planning Board acknowledged that "the only relevant issues are

the landscaping and the location of the previously approved sewer line…" and the Town Zoning

4481226.v15

Law "explicitly restricts the review authority of the Planning Board herein only to those elements that have changed . . . ."

159.    The fact hat the Planning Board itself in its unlawful decision cited the Town Code provision limiting their decision to the changes made in an Amended Site Plan and the State Court determined that the Planning Board proceeded to disregard the very code they cited places their repetition of the same transgression at the time of Defendants' 2019 Charade in a glaring and magnified light which prevents Defendants from palming off their intentional conscience-shocking misconduct as a good faith "mistake".

160.    The court concluded that none of the proposed amendments would have a "material and substantial impact."

161.    The court then skewered the Town for taking the position that despite the limited review—recognized in the Planning Board's own decision—that a Planning Board may undertake of an amended site plan, it was entitled to do whatever it pleased to stop Hearthstone:

> Essentially Respondents argue that "nothing" prohibits them from imposing conditions to an amended site plan, even if completely unrelated to the proposed changes.  However, they fail to cite any relevant case law or statutory authority to support such a broad proposition.

162.    The court also reprimanded the Planning Board for applying conditions in 2017 that, if they were sincere and not pretexts, could have been imposed in its review of the Original Site Plan to address purported traffic, noise, or other "community issues":

> In the instant matter, the Planning Board granted final site plan approval on October 21, 2014, and presumably could have and/or did consider issues such as commercial traffic, noise, fencing and screening, and other community concerns at such time. Likewise, at that time, it could have required the planting of "trees," as opposed to "landscaping," on the property line bordering Treetop Lane, as it specifically did with respect to the property line with Augusta Avenue and the green recreation area designated "Area A" on the map.  Respondents chose not to do so. The March 8, 2017, decision also makes clear that the engineer testified that the plan reflects the ZBA's resolution of approval showing fences and landscaping along the Treetop

4481226.v15

property boundary and trees on the August side, and that during at least two CDRC meetings, there were no suggested changes to the plans from the Town Staff. In fact, the CDRC approved the landscaping plan as submitted by Petitioner on January 22, 2017.

Where a modified site plan application is used to impose additional burdens on petitioner to satisfy perceived problems previously before the Board, such actions are arbitrary and capricious and requires that its decision be set aside.

163.    In annulling the Planning Board Conditions, the court admonished the Planning Board and found that:

> the record itself does not provide any factual support for the changes required by the Planning Board. The imposition of conditions which have no objective factual basis in the record, but instead rest on "subjective considerations such as general community opposition" are improper, arbitrary and capricious (citation omitted). In the instant matter, the community objections were not supported by any of the [Town's] consultants and/or are contradicted by the negative SEQRA declaration previously adopted by the Board (citation omitted).

164.  The Court also (a) admonished the Town for failing "to offer any explanation for their refusal to sign the amended site plan"; (b) directed the Town "to sign [the amended site plan] within ten (10) days of service of the Order with Notice of Entry."; (c) chided the Town for arrogantly failing "to offer [even to the Court] any explanation for why [it has] not issued a decision on the building permit other than that the site plan has not been signed" (not to mention never proffering any reason for their failure to sign the Site Plan in the first place!); (d) directed the Building Inspector to make a determination on the building permit application within 30 days; (e) concluded that the Town failed "to offer an explanation for why they have refused to conduct inspections of drainage improvements required to be installed as depicted and approved on the initial site plan approval and amended site plans" and ordered such inspections shall be made forthwith so that construction may resume in the absence of problems or issues revealed during the inspection; and (f) ordered the Town to comply with Connectivity's FOIL requests.

165.  Rather than being deterred by the 2017 Article 78 Decision which rejected every Town excuse, the Town repeated the same intentional misconduct for which it was previously upbraided by the court. It also became more emboldened in its bad faith effort to destroy Hearthstone.

166.  Specifically, Building A as seen at the left building in the photographs at Ex. 6 took more than one year to obtain a building permit; for Building C which is on the right in Ex. 6, since September of 2018 Plaintiff has not passed the framing inspection, while Building B is denied building inspector review because the Planning Board has yet to sign the Court approved Site Plan which the Building Inspector deems a condition precedent to plan review for Plaintiff's building permit.  This catch-22 renders Plaintiff's court ordered approvals and substantial construction a "sinking" project with very substantial damages due and owing herein.

**The Town imposes larger fees on Connectivity than on similarly situated projects**

167.  In further retaliation for Connectivity's exercise of its legal rights, the Town assessed larger fees for permits against Connectivity than against the Comparators.

168.  That the Town targeted only Hearthstone with higher fees is evidenced by, *inter alia*, the fact that beginning in 2016, the Town changed its fee schedule three (3) times over the course of just over a year (December 2016 – February 2018), when it had not previously revised its fee schedule since 1995.

169.  In addition, the Town double dipped charging Connectivity twice for a foundation permit fee. It charged Connectivity a foundation permit fee in 2016, when the Building "C" foundation was constructed, and then again charged a foundation permit fee in 2018 for the same basement but this time under the higher 2018 fee schedule. It did the same for Building "A".

4481226.v15

170.  Most egregiously for Plaintiff and only Plaintiff, the Town increased its construction fee schedule illegally to a rate for Plaintiff's commercial property which is five times the residential rate. This is unprecedented; no other local municipality comes close.

**In October 2017, Connectivity applies for a Third Amended Site Plan to
address an invented new interpretation of the Zoning Law by the new Building Inspector**

171.  Buildings "A" and "B" share a basement and are technically "connected."

172.  Since Connectivity's first application to the Town, though, the Town and its Building Inspector (and the ZBA and Planning Board) deemed Buildings "A" and "B" to be two separate buildings. Therefore, each building was by right approved for 16 units.

173.  Since no provision of the Town Zoning Law supports a contrary determination, there was no conceivable legal basis to ever revisit the original building inspector's determination.

174.  In or about the spring of 2016, though, the Town's new Building Inspector advised Connectivity that because Buildings "A" and "B" share a basement, a "connection" which as aforementioned existed from day one, he considered them to be one building, and not two.

175.  As a result of this abrupt and manufactured new interpretation, Connectivity was forced to apply for yet another amendment to the already-approved Second Amended Site Plan and seek another variance from the ZBA to allow 32 units in a "single" building instead of the prior approved 16 units in two buildings.

176.  Although Connectivity requested that the Building Inspector, Ian Smith, substantiate his determination in the Zoning Code, he has never done so.

177.  Because it was again constrained to return to the ZBA, anyway, in or about October 2017, Connectivity applied to the Planning Board for a Third Amended Site Plan to reflect, *inter alia*, the following minor changes for which variances would be required:

i.   32 residential units in Buildings "A" and "B" per Smith's novel "interpretation," a ministerial change having no impact on the layout, footprint, or placement of those Buildings;

ii.   A total of 24 smaller residential units, rather than 16 larger units, in Building "C," for a total of 56 units at Hearthstone, only three more than the 53 units Connectivity is entitled to as-of-right under the Zoning Law (8.4 units/acre);

iii.   An eight (8') foot fence instead of a six (6') foot fence to accommodate the Neighbors' request for additional screening; and

iv.   A 25% reduction in parking spaces (453 to 342), a waiver the Planning Board was authorized to grant as of right, and an uncontroversial request considering, the mixed-use nature of the development and the fact that the ZBA on average granted 48% reductions to the Comparators and other commercial projects.

178.   Although the amendments were de minimis, the Planning Board delayed hearing the application for ten months by procedurally treating the amended plan as a brand-new application requiring a new SEQRA determination. This decision was particularly arbitrary considering that on July 10, 2013 this very same board issued a Negative Declaration determining that 56 residential units did not pose any "significant adverse impact on the environment."

179.   Finally, on August 21, 2018 by a unanimous 5-0 vote, the Planning Board adopted a Negative Declaration, concluding that the amendments and requested variances would not have a significant adverse impact on the environment, including with respect to traffic and neighborhood character.

180.   At meetings conducted in August and September 2018, the CDRC did not raise any concerns.

181.   The Planning Board referred the matter to the ZBA to consider the modest variances, including the 25% parking waiver that the Planning Board was authorized to, but did not, approve without referral to the ZBA.

**In granting the variances, the ZBA imposes several irrational and retaliatory conditions**

182.  Although Connectivity applied to the ZBA in September 2018, the ZBA did not hold a public hearing until January 31, 2019, adding a needless four-month delay.

183.  At that public hearing, the Neighbors, represented by counsel, appeared *en masse* to oppose Connectivity's application for variances that would, ironically, benefit the Neighbors—*i.e.*, less parking, smaller residential units in the same footprints, and a higher fence.

184.  The public hearing was adjourned for another month and a half to March 14, 2019.

185.  In rendering its decision at that hearing, the ZBA continued the Town's discrimination and arbitrary and capricious conduct against Connectivity by coupling the variances that the Board members themselves opined were not substantial with several invalid conditions that were not substantively related to the variances sought.

186.  Most strikingly, the ZBA required Connectivity to fulfill the two promises St. Lawrence had illegally made in February 2016 to the Neighbors.

187.  First, the ZBA mandated that Connectivity eliminate the 39 parking spaces behind Building "C"—the same 39 spaces that in February 2016 St. Lawrence had promised the Neighbors the Town would eradicate and that former Town Attorney Michael Klein and Montal tried to strong-arm Mr. Menche into removing lest he encounter "trouble" with Hearthstone (the "39 Spot Condition").

188.  Second, showing utter contempt to the 2017 Article 78 Decision invalidating the Planning Board's condition that Connectivity plant one row of Leyland Spruce evergreens along the entire Treetop Lane property line, the ZBA now required that Connectivity plant two rows of Leyland Spruce evergreens along the entire Treetop Lane property line (the "Evergreen Condition").

4481226.v15

189.   The ZBA thus made good on the Town's vow to the Neighbors that the Town would "establish the first 20 feet as a buffer with evergreen trees that are high enough and dense enough to completely block [the Neighbors'] view of the 8-foot fence behind it."

190.   The other conditions imposed were: (a) Requiring 10 extra feet of buffer along the Property/Treetop Lane border, which would cause Connectivity to move the existing wall 10 feet forward at significant expense; and (b) Dedication of fifteen parking spots to the east of Building "C" for residential parking only. (Collectively, with the 39 Spot Condition and Evergreen Condition, the "Second ZBA Conditions.")

191.   The ZBA's counsel, Alyssa Slater, Esq., cautioned the ZBA against imposing conditions, such as the 39 Spot Condition, that were unrelated to the variances sought.

192.   Also, at the January 31, 2019 ZBA hearing, Attorney Slater responded to a question from a ZBA member inquiring if they were "allowed to impose conditions . . . to remedy something that was done in the past": "It would have to be related to the variances that are in front of you, right now . . . not to variances that may have been before you."

193.   Yet, the ZBA ignored the advice of counsel and persisted in the "improper, arbitrary, and capricious" conduct of imposing "conditions which have no objective factual basis in the record, but instead rest on 'subjective considerations such as general community opposition.'"

194.   The ZBA members' words speak for themselves.

195.   Here are ZBA member Mr. Berkowitz's first words at the meeting regarding his aim to fulfill the Neighbors' desire to eliminate parking and increase a buffer near Treetop Lane:

> I believe the solution to the some of the neighbors' issues would be . . . to increase the buffer, whether it's on the east side, on this side, here, or even this side, here. Well, the residential parking may- - I'm not certain we're gonna *[sic]* take away some spaces, but if we take away some of the spaces, and I believe we will—we will take care of traffic flow and – and take care of some of the concerns the neighbors have. That's the point . . . . Mr. Lefkowitz, you have an idea?

34

196. Mr. Lefkowitz did have many "ideas" – succumb to the Neighbors, uphold the promises made by St. Lawrence and the Town years earlier, and follow through on Montal's threat to Connectivity. In this regard, here is Mr. Lefkowitz: "We should take away the spaces from where it will benefit for larger bulk *[sic]* that is between the property and Tree Top Lane. This is the most concern."

197. Mr. Berkowitz reiterated his commitment to stripping parking from behind Building "C" and increasing the buffer: "My comment was predicated on our conversation that we remove some of the parking to increase some of the buffer," this comment clearly reflecting the Supervisor/Neighbors' Deal and Montal's warning that absent the elimination of these parking spots Hearthstone would sit forever.

198. Prior to the meeting, Mr. Berkowitz was either determined or instructed, or both, to remove the 39 spots.

199. Despite Building "C" having the same footprint as it did years earlier when three of the six ZBA members previously granted variances for Hearthstone without the 39 Spot Condition, the Second ZBA Conditions were unanimously approved by the ZBA, reeking of foul play.

200. Conversely, the ZBA granted Monsey Mall and A&B Market even larger parking variances (Monsey Mall, .49, A&B Market, .50) without imposing any conditions and did not require any buffer, trees, landscaping, or removal of parking spaces.

201. Because of the absence of any MU-1 general use conditions on their site plans, Monsey Mall were also not required to seek any variance to construct more than eight (8) units per acre or sixteen (16) units per building. And while the 2019 ZBA members agreed that the smaller 56 units "won't cause a detrimental effect to the neighborhood – or it's not substantial" and

remarked that smaller units translate to "less kids and younger kids," the ZBA still imposed the Second ZBA Conditions to punish Connectivity.

**The Planning Board wrongfully denies approval of the**
**Third Amended Site Plan incorporating the Second ZBA conditions**

202.   Akin to Connectivity's February 2016 application for the Second Amended Site Plan, the Planning Board failed to treat Connectivity's application for approval of the Third Amended Site Plan incorporating the variances and Second ZBA Conditions as "miscellaneous" and required a formal application and public hearing.

203.   On May 14, 2019, the Planning Board held a public hearing on the application.

204.   Because the underlying site plan had been approved on three prior occasions, under the Town Zoning Law and as the Planning Board well-knew, the Planning Board's scope of review was limited solely to the proposed amendments to the site plan.

205.   Dennis Lynch, Esq., the Planning Board's attorney, reiterated to the Planning Board the limited scope of review, stating: "My opinion is that you're bound by your prior precedent" and "my opinion is that you can only do what's before you."

206.   Yet the Planning Board contumaciously denied the application by a unanimous 6-0 vote.

207.   Even though virtually nothing about Hearthstone had changed over the course of five (5) years (except conditions or variances necessitated by the Town only against Hearthstone and no other Comparator), all three of the Planning Board members who remained from the Board that in 2014 unanimously approved the Original Site Plan voted to deny the Third Amended Site Plan.

208. In trying to justify its premeditated denial, Planning Board Member Gobioff ("Gobioff") erroneously declared "You can always so no at final, you always have that right at final to say no."

36

209.  Even more disturbing than the unanimous denial is the fabricated pretexts upon which it was based.

### Pretext No.1: The phantom bus stop on Route 59

210.  First, the Planning Board claimed that Hearthstone was unsafe because to get to the school bus stop children were purportedly going to have to cross "an entire parking lot with stores."

211.  This is an utter fabrication unmoored from the record.

212.  The bus stop is in the same place it always has been since Connectivity initially applied for site plan approval in 2012 and received same in 2014: On Grove Street, a residential road behind the Buildings. In fact, from the outset Hearthstone was praised for its unique design whereby children walk through a park area to reach their bus.

213.  Because the residences open to green space (the parcel donated by Connectivity on which the Town is to build a park), the school children will merely have to walk through that parcel until they reach Grove Street. They will not have to cross "an entire parking lot with stores."

214.  By using the "bus stop" as a reason to deny site plan approval, the Planning Board did exactly what the state court in the 2017 Article 78 Decision declared it could not: use an application for an amended site plan to address purported issues that were or could have been considered during previous review. Here, this plan reflecting the same bus stop was repeatedly reviewed and approved by the same Planning Board and the CDRC.

### Pretext No. 2: The traffic light over which the Planning Board has no jurisdiction, the DOT, Town Board and CDRC had already determined was of no moment

215.  Second, the Planning Board denied the application on the misguided basis that it "always has that right at final to say no" –  a purported reaction to its dissatisfaction with the DOT decision that a traffic light at the intersection of the Property and Route 59 was inappropriate.

216.  Specifically, in trying to articulate this purported rationale, Gobioff wrongfully declared:

> You always have that right at final to say no, and we wanted that final because we understand we drive the roads and we know Monsey streets Town of Ramapo streets and we know that it is going to be, I mean turning, making a left-hand turn out of this. I mean, we knew this and we were waiting for the traffic light even though it wasn't required, so based on safety traffic patterns I'm suggesting that we, I make a motion that we deny it.

217.  The denial based on the amorphous "right at final to say no" and the absence of a traffic light was not only irrational, but unconscionable.

218.  When the Property was initially rezoned in 2013 to MU-1, the Town Board issued a Resolution approving the rezoning subject to "[i]nstallation of a traffic light at the site entrance on Route 59 . . . subject to approval by the" DOT.

219.  The installation of the traffic light was "subject to approval" by the DOT because the DOT has exclusive jurisdiction over Route 59 and decisions regarding signalization.

220.  In exercising its sole jurisdiction, by letter dated July 2017, the DOT related that it had: "Concluded that, as proposed, the benefits of a signal at this location [the Property entrance on Route 59] would be outweighed by the disadvantages. Consequently, a traffic signal cannot be approved at this time." (the "DOT Decision.")

221.  Based on the DOT Decision, reports from Connectivity's traffic expert and the Town's own planning consultant concurring that ingress to and egress from the site would "function satisfactory without a traffic light signal and without turning restrictions," on June 7, 2018 the Town Board adopted (a) an Amended Negative Declaration for Hearthstone without a traffic light and (b) a Resolution annulling and deleting the Rezoning Resolution condition that a traffic light be installed at the entrance to the Property off of Route 59. Of course, it took eleven

4481226.v15

(11) months for the Town Board to issue the Amended Negative Declaration and Resolution, with it doing so only after Connectivity commenced a third Article 78 proceeding to compel such action.

222.    Moreover, this same Planning Board already reviewed the Third Amended Site Plan that did not contain a traffic signal and based thereon unanimously issued its August 21, 2018 Negative Resolution finding no adverse environmental impacts flowing from the DOT Decision. They were not entitled to revisit the issue of a traffic light.

223.    Given the fact that the Town Board amended its original rezoning resolution to eliminate a traffic light as part of Plaintiff's project on June 7, 2018 with its own Negative Declaration and the Planning Board agreed with the Town Board in their own SEQRA Negative Declaration adopted on August 21, 2018 regarding the traffic light elimination and related traffic issues, these two actions should have been the end any traffic "issues."

224.  However, at the May 14, 2019 public hearing, the Neighbors produced an "expert" (an architect) touting the unsafe traffic issues. In response, Attorney Lynch emphasized that the Neighbors' so-called traffic/safety proffer was neither expert testimony nor probative evidence i.e. representing nothing more than the conclusory generalized community opposition the State Court had previously rejected on the law.

225.  When all was literally said and done, the Planning Board had no jurisdiction or factual basis upon which to cite the lack of a traffic light as a ground to deny the application.

226.  With the traffic light becoming a focus at the hearing, Town Attorney Lynch reminded the Planning Board of their lack of jurisdiction over the traffic signal, stating, "the traffic light was something that I believe the applicant has asked DOT to approve. DOT, as I understand, did not approve. My opinion is that that issue is not before you."

227.  Indeed, in the 2017 Article 78 Decision, the Supreme Court had already reproached the Planning Board for considering issues outside of the amendments being sought to the site plan and that were previously before the Board.

228.  Yet, to block Hearthstone, the recidivist Planning Board intentionally committed the same transgression in denying the Third Amended Site Plan.

## Pretext No. 3: Smaller residential units

229.    On August 21, 2018, the Planning Board adopted a Negative Declaration for the Third Amended Site Plan including 56 residential units.

230.    On March 14, 2019, the ZBA granted a variance permitting 56 smaller residential units, finding that the smaller units "won't cause a detrimental effect to the neighborhood" and would lead to "less kids and younger kids."

231.    Yet, in denying Connectivity's application, the Planning Board disregarded the entire record including its own Negative Declaration issued on August 21, 2018, feigning that "it's unclear" that smaller units "are actually appropriate at this site" and they "may not be what's best for this town."

232.    Connectivity brought its fourth (out of five) Article 78 proceeding challenging the denial of the Third Amended Site Plan and seeking to invalidate the Second ZBA Conditions.

233.    The full public record of the four Article 78 proceedings in Supreme Court, Rockland County, filed under Index Numbers 001261/2016, 000561/2017, 032491/2018 and 032893/2019, respectively, are respectfully incorporated by reference and relied upon in support of this action.

4481226.v15

**The Supreme Court again reverses the Planning Board and the ZBA,**
**approving the Third Amended Site Plan and annulling the Second ZBA Conditions**

234.    By Decision and Order dated May 13, 2020 (the "2020 Article 78 Decision"), the Rockland County Supreme Court annulled the Planning Board's denial of the Third Amended Site Plan and annulled the Second ZBA Conditions. (*See* Ex. 2.)

235.    In so doing, the state court pointedly noted that the decisions of the Planning Board and ZBA "demonstrate that . . . the boards may have been influenced by outside factors."

236.    In annulling the Planning Board's denial of the Third Amended Site Plan, the state reprimanded the Planning Board for ignoring its own August 21, 2018 Negative Declaration "concluding that the proposed variances created no undesirable changes and no adverse physical or environmental impact."

237.    In further addressing the Planning Board's wrongful denial, the state court highlighted that the primary reason Connectivity had to even seek area variances in connection with its Third Amended Site plan was because of Smith's bogus interpretation of the Zoning Law deeming Buildings "A" and "B" to be one building.

238.    Specifically, the state court stated:

The site plan was referred to the ZBA to consider the area variances necessitated in substantial part by the changed interpretation of the zoning code.

239.    And just as it did in the 2017 Article 78 Decision when it invalidated the Planning Board Conditions, in annulling the Second ZBA Conditions—including the 39 Spot Condition—the state court stressed that "the conditions were unrelated to the impact of the amendments and not based upon any evidence in the record."

240.    The delay in the Third Amended Site Plan was 19 months from submission to denial and 2.5 years from the last approved site plan.

4481226.v15

**The Town still refuses to sign the judicially approved Third Amended Site Plan**

241.    In its 2020 Article 78 Decision, the State court approved the Third Amended Site Plan.

242.    So, on May 14, 2020, Connectivity attempted to have the Building Inspector sign the Third Amended Site Plan.

243.    But Connectivity was rebuffed by Smith, who informed Connectivity that he cannot review the site map for signature until he receives direction from the Town Attorney's office; this is absurd and not a zoning code provision or requirement.

244.    It is already almost two months after the Court Approved Site Plan and Connectivity is still waiting for the Town to sign the Third Amended Site Plan.

245.    Without this Court's intervention Defendants will never stop their abuse of power.

246.    Because of Defendants' intentionally arbitrary, retaliatory, and bad faith treatment of Connectivity, it is entirely unable to perform any work, including construction of Buildings and installation of infrastructure, at the Property.

247.    Additionally, the County Health Department will not issue a utility permit for water, electric or gas until the Planning Board signs the Third Amended Site Plan. Connectivity has waited an astounding seven years for this utility permit.

248.    Further, the Town Building Department will not review Building B until a signed Site Plan Map is produced – another catch-22.

249.    Adding insult to injury, even though Connectivity has been unable to use Hearthstone for the past six years, this past year the Town substantially increased Connectivity's taxes on the Property.

4481226.v15

250.    The development of Hearthstone remains crippled. And it will remain that way until this Court compels Defendants to cease depriving Connectivity of its right to equal protection of the laws and its right to substantive due process and compensates Connectivity for its millions of dollars in damages proximately caused by Defendants.

### The Town of Ramapo's Development Process and Path to Zoning Approvals is For Sale to the Highest Bidder and Politically Influential Developers

251.    As described in detail hereinabove and in the voluminous public record of the four Article 78 proceedings, the actions and inaction which repeatedly violated Connectivity's constitutional rights are business as usual in Ramapo's corruptly operated politically controlled club.  This "pay to play" reputation and, *inter alia*, Montal's prominent role therein, is highly publicized and hardly a secret. *See* Lohud Newspaper articles collectively annexed as Exhibit 7.

252.    A revealing excerpt from a September 2017 Lohud article details Montal's involvement in "political games":

> A Preserve Ramapo activist and former supervisor candidate argued before a state appeals panel that town officials played political games with a 2014 ward system vote, almost secretly allowing unregistered voters to turn the tide against the change in government representation.
>
> An anti-ward system group with ties to town government said it raised about $130,000— with a good chunk coming from developers and consultants—toward defeating the referendums to add two more Town Board seats and create election districts. The effort was led by Ramapo Democratic Party Chairwoman Mona Montal, the town purchasing director.

253.    Further bespeaking the Town's "pay to play" scheme relative to developers is the following excerpt from another article within Ex. 7:

> Land records show that [the developer] Karniol's companies have spent nearly $12 million on 24 properties in Ramapo and Spring Valley . . . . While plans were not available for eight of the properties, the remainder all for construction of at least 135 condominiums and accessory apartments.
>
> Karniol acknowledged contributing $40,000 to the political committees of Town Supervisor Christopher St. Lawrence, Ramapo Democrats, and Samuel Tress, but

said he was not a political person. He denied any connection between the
donations and the approvals for new homes he was seeking, saying he made the
contributions simply because he was asked.

254.    Ramapo is known to be controlled by block voting and, by reason of economic
necessity arising from one of the highest growth rates in the entire State of New York, a very
friendly and favorable arena for most developers.

255.    Typically, variances and zone changes are granted liberally, especially on the
applications of favored and influential property owner-developer applicants.

256.    Community opposition is given short-shrift with respect to the influential and
favored developers who heed Montal's call for political contributions. In this regard, despite
vigorous opposition Bluefield Commons, 146 Maple, Bluefield Extension, Pascack Ridge,
Blueberry Commons and Patrick Farms were approved for numerous variances with the help of
powerful Town officials. See Ex. 7, supra, Lohud, January 31, 2020 "Bluefield Extension gets go-
ahead despite Judge's ruling" and Lohud, February 26, 2020 "Ramapo Town Board approves high-
density housing zone for Pascack Ridge despite opposition".

257.    The striking contrast between business as usual in Ramapo (and, at the bare
minimum adherence to basic and elementary rules of state law and the Town's own Zoning Code)
with the irreconcilable and unequal treatment of Connectivity is undeniable.

258.    Given that Hearthstone was and is a beautiful development which the Town's own
professional planner acknowledged served an important need not being met, namely, smaller
affordable housing for young families in close proximity to the Town hub, and the further fact that
its environmental impact was negligible as always recognized by every professional and Town
agency (Planner, Town Board, ZBA, Planning Board and CDRC) the extraordinary and calculated
convergence of so many virulent and extensive challenges from every powerful official and agency

which interfaced with Plaintiff and those responsive to them presents irrebuttable proof of the Town's abuse of power and illegal policy toward Connectivity under color of law herein.

259.    Each action complained of herein and in the <u>four</u> State Court proceedings incorporated by reference herein, when viewed in tandem represent simply too many irregular abuses of power and illegal actions to feign ignorance about or chalk up to good faith errors by public servants.

260.    Among the many additional instances of abuse by the Town, broken down by administrative agency and/or officials responsive to the Town's policymakers are the following:

### **Department of Public Works**

i.    Delayed sign-off on Connectivity's approved First Revised Site Plan for 11 months and then again delayed sign-off on Connectivity approved Second Revised Site Plan for 18 months;

ii.    Exceeded its jurisdiction and "overruled" Building Inspector's determination from a relocated sewer line to the originally approved location was not a minor field change, absurdly requiring return to the Planning Board for full blown review and approval of an "Revised" plan;

iii.    Failed to respond to Connectivity professionally, refused to answer emails, and insisted that DOT approval was required before signing map when, in fact, the Planning Board voted otherwise;

iv.    Routinely interfered with construction progress by unlawful usurpation of non-existent powers well beyond any conceivable interpretation of DPW jurisdiction;

v.    Failed to perform routine inspections despite payment of all inspection fees;

vi.  Wrongfully withheld standard DPW letter known as a "Happiness Letter" to deprive Connectivity of its ability to obtain a County Sewer Permit, another material and costly delay;

vii. Withheld approval of the same infrastructure plan (design and materials) submitted by the same exact engineer which the same DPW had just approved on a nearby project;

viii.   Tried to compel Connectivity to illegally construct a walkway in another abusive exercise of ultra vires "power" wholly beyond the scope of its limited jurisdiction;

ix.  Attempted to influence the decision of DOT with respect to a project traffic light despite the clear absence of DPW jurisdiction over traffic and planning issues; and

x.  Demanded certification from Connectivity as a condition precedent to the use of recycled material despite the Town's own use of recycled material and the Town's approval of other nearby project's use of the same material without any certification. The "certification" demand is another special rule selectively invented only for Connectivity.

### **ZBA Senior Clerk**

i.  In yet another Kafkaesque development, the Town's ZBA Clerk allegedly "lost" Connectivity's ZBA petition application, failing to locate same for a period of 15 months; and

ii.  Despite follow-up by Connectivity, the ZBA Clerk did not acknowledge the whereabouts of Connectivity's application she had "misplaced" in her drawer. Ultimately, the ZBA Clerk acknowledged that Deputy Town Attorney had directed her to store Connectivity's application in her drawer.

4481226.v15

**Building Department**

i. Imposing on Hearthstone requirements and edicts unprecedented in the Town, which
include, contrary to law:

    a. Reversing the predecessor building inspector determination and deeming
Buildings "A" and "B" to be one building, and squandering 2.5 years of
Connectivity's development time thereby requiring the need for the third
revised plan;

    b. Ruling that storage space on a commercial floor requires a Planning Board
meeting to determine the number of parking spots required for such space and
that such space must be included in the FAR calculation for which we had to
redo the site plan and redo the bulk tables; and

    c. Requiring an "Action Plan," a totally absurd and unprecedented demand
never seen by Plaintiff's engineer in his 50 years of experience working in the
Defendant Town.  In this regard, Leonard Jackson P.E. confirmed to Plaintiff
as follows:  "there is NO code requirement whatsoever…This is unheard
of…The applicant's plan of addressing the Planning Board is none of the
Director's business and requires no submission to the Director."  This "Action
Plan" requirement imposed on Plaintiff forms a part of the unconscionable
process and abuse of Plaintiff in this record.

ii. Deliberating denying Connectivity to due process by routinely misplacing its
applications, regularly placing Connectivity last on an agenda and holding it over,
scheduling formal hearings and placing Hearthstone on the agenda for a formal

4481226.v15

hearing where the normal practice was either to bypass board review altogether or handle the application as an expedited miscellaneous matter;

iii. Charging duplicative fees for the same aspect of Hearthstone (including foundation permit fees), and forcing miniscule plan changes routinely handled by Town Boards expeditiously as miscellaneous matters to be scheduled for and eventually heard as cumbersome and extended public hearings which unlawfully reopened de novo review of the entire plan instead of the very limited and modest amendment;

iv. Refusing to accept—and thus review—architectural plans until Hearthstone's map was signed, well-aware that the DPW purposefully delayed signing same without reason;

v. Failing to timely issue, and otherwise obstructing the issuance of, building permits for Buildings "A" and "C";

vi. Subjecting Hearthstone to unparalleled scrutiny and unequal treatment;

vii. Directing in a framing inspection memo that Connectivity must pay fees by June 13, 2020, when the Town Board had approved and extended the time to pay fees, falsely demanded per town law;

viii. Routinely failing to respond to emails and calls from Connectivity;

ix. Requiring Connectivity to adhere to a several decades-old signage law that no other developer has been made to comply with; and

x. At the June 18, 2020 ZBA hearing on Plaintiff's appeal of the building inspector's imposition of excessive and duplicative fees upon Plaintiff, the Building Inspector denied that the Town had double dipped for Plaintiff's foundations fees by making a distinction between a building's foundation and basement (no such distinction exists).

48

Plaintiff also objected to the Building Inspector's use of the wrong fee schedule, to excessive permit fees and to use of unfair fee schedules against Plaintiff. Instead of addressing each of the very specific points detailed by Plaintiff in its appeal to the ZBA, the Building Inspector in conclusory fashion glossed over all issues and simply stated that Plaintiff was treated correctly. The Town's zoning counsel assisted the Building Inspector's presentation by preventing Plaintiff from posing questions to the Building Inspector. This created a sham process which was contrary to the Town ZBA typical appeal hearing practice.

### Town and Town Clerk

i.  Falsely representing to Connectivity and the State Court that it lost digitalized files Connectivity sought in a FOIL request, and then three years later admitting they had not lost those files and otherwise taking years to produce readily accessible FOIL'd documents;

ii. Facilitating the State's provision of sidewalks for projects around Hearthstone, leaving only Hearthstone as the lone island project without a sidewalk. The town notified Plaintiff that the DOT had a budget surplus for 2018 which would enable the inclusion of the first stone sidewalks and island, and that it was necessary for the Town to act quickly on Plaintiff's behalf. In dangling this carrot, the Town again tried to extract Hearthstone's capitulation on the 39 Spot Condition by representing that it would navigate expeditiously through the DOT for Hearthstone's benefit. Upon Plaintiff's refusal, the Town advised Plaintiff that it would have to pay for its own sidewalk engineering and construction costs. Then, the Town claimed that the DOT would not pay for the sidewalks, since the Hearthstone project "was initiated."

In reality, the Town was imposing retribution upon Plaintiff while the Town had been instrumental in securing for Blueberry Commons the DOT grant to pay for engineering costs and sidewalk construction despite the fact that Blueberry Commons was also "already initiated". Mona as Purchasing Director was active in selecting where the DOT surplus funding went to those developers who paid as per her and her agent's direction.

261.    Given the malicious abuses of power aforementioned, Connectivity has incurred engineering fees alone of more than $1,200,000 and traffic consultant fees of more than $750,000.

**The Town deliberately denies Connectivity**
**any forum for review of its Fourth Amended Site Plan**

262.    Because the Fourth Amended Site Plan is virtually identical to the already-approved Second Amended Site Plan, which was approved in January 2017 save for minor technical changes (it did not include the additional eight, smaller units in Building "C" that the ZBA already approved), the Planning Board should have approved it within weeks as a miscellaneous item because there are no issues that require public input. On the law and facts, it would have been impossible to deny approval.

263.    But owing to a series of transparently dilatory tactics undertaken by the Planning Board and Town—including the last-minute removal of the application from agendas, delay in submitting Town consultant comments—in the year since this submission the Planning Board still has not held a public hearing, let alone issued a decision, on Connectivity's application.

264.    While Connectivity's application for the Fourth Amended Site Plan was rendered moot by the state court's annulment of the Planning Board's denial of the Third Amended Site Plan, this most recent episode highlights the Town's malicious, abusive and unconscionable

4481226.v15

conduct toward Hearthstone and Connectivity. This protracted process actually exposes the continuation of the Town's abuse of power and ongoing pattern of delay.

265.    With the Article 78 proceeding challenging, *inter alia*, the Planning Board's May 2019 denial still pending, on July 1, 2019, Connectivity applied for a Fourth Amended Site Plan.

266.    After the Town Planning Board illegally and unanimously denied to Connectivity Site Plan Approval of its Third Amended Site Plan on May 14, 2019 Connectivity again elected to exercise its legal remedies under Article 78, this time to overturn in its entirety the Planning Board denial.

267.    Simultaneously, and in recognition of the potential for another protracted and costly period until the State Court's decision vacating and reversing the Site Plan denial, Connectivity prepared a Fourth Revised Site Plan premised upon the earlier 2017 approved plan but with deference to all Town administrative decisions and directives regardless of their legitimacy (or lack thereof).

268.    Succinctly stated, the Fourth Revised Site Plan conformed to the previously approved 2017 Site Plan updated in ministerial and immaterial respects.

269.    Connectivity's instructions to its engineer was to bend over backwards to provide the Town on the Fourth Revised Site Plan with literally anything they wanted.

270.    Connectivity's engineers accordingly submitted the site plan pointedly noting Connectivity's full compliance with the already approved 2017 Third Revised Plan.

271.    Connectivity's Fourth Revised Site Plan boxed the Town in, leaving them no conceivable lawful means of withholding the expeditious approval thereof.

272.    Nonetheless, Defendants elected to "run out the clock" by never providing Connectivity with a forum to be heard on its application.

273.    Connectivity's scheduled Planning Board forum of September 4, 2019 was aborted by an eleventh-hour change of Connectivity's agenda position to dead last instead of previous posting of 6 of 10 and, of course, closing of that night's meeting before reaching Connectivity's application.

274.    Next, on September 18, 2019 when Connectivity was slated to be heard at that evening's Planning Board meeting "new" pretextual rules were farcically manufactured to eliminate Connectivity from that evening's agenda and compel application – to the ZBA for a never before "required" variance.

275.    Specifically, in all of the 7 prior years of seeking in vain to achieve approval not once did a single Town agency or any official ever even intimate that retail storage imposed additional parking requirements and therefore necessitates a new parking variance to include storage space in a brand new FAR calculation.

276.    Throughout the balance of 2019 and first half of 2020, until the State Court approved Connectivity's Fourth Revised Site Plan was never heard by the Town Planning Board.

277.    Instead of providing the hearing to which Connectivity was legally entitled to approximately one year ago, the Town Defendants provide a never-ending piecemeal series of comments and invented requirements, the very obvious purpose of which was to strangle Connectivity and deprive Connectivity of the economic benefits of Connectivity's Property.  The excruciating details of the Town's purposeful delay are set forth in the chronology prepared by Plaintiff's engineer, Leonard Jackson, in Exhibit 8 annexed hereto and made a part hereof.

4481226.v15

**Plaintiffs Donated Open Space Land Earmarked for Park Land Must**
**Be Preserved For Its Intended and Agreed Use of Park Land**

278.     The Defendant Town also enjoys an infamous reputation for its wheeling and dealing with respect to public park land.  Absent judicial relief the Town cannot be trusted to preserve Plaintiff's donated land for its intended park land purpose.

279.     There have been many instances where the Town has actually sold designated park land, thereby evading the donor's intent and the Town's acceptance of the donation for such exclusive purpose.

280.     The Town is selling surplus properties which they spent an estimate $100 million on land purchases for land preservation.  Town officials have differentiated between public and park land. The St. Lawrence administration said resolutions buying land for preservation had automatic protections – which is turning out not to be true.

281.     In a recent Court decision published in a Lohud article "The State has backed a claim by neighbors that Ramapo town is trying to sell 5.64 acres of land to a developer even though it's part of the Manny Weidler Town Park."

282.     The Plaintiff donated park land in back of the development to be used as a path to bus parking and for the Town to build a park.  Since the Town is marketing parkland for sale as if it were unencumbered Town surplus property the Plaintiff's donated land for parkland preservation is deserving of judicial protection lest the Town continue its contumacious conduct.

## AS AND FOR A FIRST COUNT

### (Taking of Private Property in Violation of The
### Fifth Amendment of The United States Constitution)

283.     Connectivity repeats and realleges all of the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

4481226.v15

284.    Connectivity has and had a constitutionally protected property right to reasonably use the Property and develop Hearthstone, which includes a protected right to the approval of the Third Amended Site Plan or Fourth Amended Site Plan, issuance of variances without illegal conditions, timely hearing of and decisions on land use applications, timely issuance of permits, timely inspections, and the absence of illegal and unprecedented actions and directives by the DPW and Building Department to deliberately cause Connectivity harm and delay.

285.    Defendants, acting under color of law, have taken and deprived Connectivity of its property rights without legal or factual basis, and without due process, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

286.    Through their discriminatory acts and conduct detailed in this Complaint in furtherance of the Town's official policy of preventing development of Hearthstone, Defendants have taken the Property without just compensation.

287.    Defendants' discriminatory conduct detailed in this Complaint, including the imposition of the Planning Board Conditions, covert agreement with the Neighbors to compel Connectivity to eliminate the 39 parking spaces and install a larger buffer, denial of the Third Amended Site Plan, and intentional delay in hearing or deciding applications, in furtherance of the Town's aforesaid official policy, have significantly devalued the Property and have had an adverse economic impact on Connectivity.

288.    Connectivity had the reasonable investment-backed expectation that it would be able to develop the Property for Hearthstone, a mixed-use development.

289.    Defendants' discriminatory conduct detailed in this Complaint in furtherance of the aforesaid Town official policy has interfered with Connectivity's investment-backed expectations

4481226.v15

to date, and because of Defendants' conduct and policy, Connectivity has not been able to develop Hearthstone at the Property.

290.     The character of Defendants' actions in furtherance of the aforesaid Town policy are discriminatory, inequitable and illegitimate.

291.     Defendants' actions described in the Complaint constitute an illegitimate and inequitable attempt to prevent Connectivity from developing the Property.

292.     Defendants have permanently prevented the development of Hearthstone through illegal means not applied to others who cooperate with the corrupt Town development "pay to play" instructions and political rules.

293.     Defendants have rendered the Property economically unusable for the purpose for which it is zoned and for which site plan approvals were previously issued and vested rights acquired pursuant to lawful construction of partially completed buildings, completed foundations of buildings and Plaintiff's $15 Million investment in reliance thereon.

294.     Defendants' actions have converted the Property for purported public purposes for which Connectivity is constitutionally entitled to just compensation for the taking of all the Property.

295.     Defendants have not paid Connectivity just compensation for the regulatory taking.

296.     Connectivity should be awarded just compensation for the taking of its Property, together with all other damages deemed just and proper by the Court, including experts' fees, and attorneys' fees, interest, costs, and disbursements.

### AS AND FOR A SECOND COUNT
#### (Substantive Due Process)

297.     Connectivity repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

4481226.v15

298.    Connectivity possesses a protected property interest in the issuance of the Third Amended Site Plan Approval or, alternatively, the Fourth Amended Site Plan Approval and the 2019 Variances without the Second ZBA Conditions because it has obtained legally issued foundation permits, site plan approvals, variances, and signed site plans.

299.    Connectivity has demonstrated a commitment to developing Hearthstone and constructing the structures and infrastructure authorized thereby, to the extent development was not stymied by Defendants.

300.    In this regard, Connectivity has expended more than $15 million on developing Hearthstone. Buildings "A" and "C" are already substantially built. The basement for Building "B" was dug over four years ago. And all site work including drainage, sewer, retaining walls, and even some paving is complete.

301.    Based on the substantial work performed and applicable law, Connectivity has and had a constitutionally protected property right to reasonably use and develop Hearthstone, with a protected right to the Third and Fourth Amended Site Plan and the 2019 ZBA Variances without the illegal Second ZBA Conditions as declared in the 2020 Article 78 Decision.

302.    Connectivity has a constitutionally protected right to be free from predetermined, pretextual and continually changing reasons for the denial of approvals or imposition of costly and illegal variances motivated solely by the official Town policy to prevent development of Hearthstone. It also has a constitutionally protected right to be free from illegal and unprecedented actions and directives by the DPW and Building Department aimed at deliberately causing Connectivity harm and delay.

303.    Connectivity's applications for variances and the Third and Fourth Site Plans fully complied with applicable law and their approval was supported by the record.

4481226.v15

304.    Based on the record before the ZBA and the nature of the variances sought, the ZBA lacked any discretion to impose the Second ZBA Conditions, and the State Court so held.

305.    Based on the record before the Planning Board, the Planning Board lacked any discretion to deny Connectivity's application for approval of the Third Amended Site Plan, and the State Court so held.

306.    The Town's, Planning Board's and ZBA's conduct in depriving Connectivity of approval of the Third Amended Site Plan and the Fourth Amended Site Plan and issuing the Second ZBA Conditions was so outrageously arbitrary as to be a gross abuse of governmental authority.

307.    The Town's conduct in depriving issuance of the Third Amended Site Plan after its approval in the 2020 Article 78 Decision was so outrageously arbitrary as to be a gross abuse of governmental authority.

308.    The Town Defendants' discriminatory acts as set forth in this Complaint were performed under the municipal and/or governmental policy of the Town in that discriminatory practices of municipal officials were so persistent and widespread as to constitute a custom or usage with the force of law.

309.    The conduct alleged herein is arbitrary and capricious in the strict sense.

310.    The conduct alleged herein is oppressive in a constitutional sense.

311.    The conduct alleged herein is irrational and not designed to advance a legitimate governmental interest and shocks the conscience.

312.    The conduct alleged herein violates Connectivity's substantive due process rights.

313.    But for Defendants' unlawful, irrational, and arbitrary delay, denial of the Third and Fourth Amended Site Plans, refusal to issue the Third Amended Site Plan even after it was approved by the State Court, imposition of the Second ZBA Conditions, and illegal and

4481226.v15

unprecedented actions and directives (including by the DPW and Building Department) aimed at deliberately causing Connectivity harm and delay, all undertaken under the aforesaid Town policy, Connectivity would have been able to lawfully further develop and complete Hearthstone long ago.

314. The actions of Defendants as aforementioned have severely and adversely economically impacted Connectivity in that Connectivity has been prevented from completing Hearthstone while, at the same time, being required over a period in excess of eight years to pay the carrying costs of the Property without receiving income while the construction costs increased by virtue of the unreasonable delays and selective and illegal conditions imposed by Defendants

315. Connectivity's losses attributable to Defendants' misconduct total not less than $25 million, excluding interest.

316. Defendants' discriminatory acts described in this Complaint have been improperly and maliciously motivated, and involve an intentional plan to permanently deprive Connectivity of its ability to reasonably use the Property in an economically viable manner.

317. Plaintiff has been intentionally and maliciously treated differently from others similarly situated exactly as threatened by Montal (who directed Town agents and employees to perform unlawful acts against Connectivity and Hearthstone).

318. Accordingly, Connectivity asks that the Court direct Defendants and their agents, employees, and representatives to permit completion of the Hearthstone project in the ordinary course and under law without disparate or irrational treatment of Connectivity and Hearthstone (the "Permanent Injunctive and Declaratory Relief").

319. The Court should also award Connectivity damages against Defendants for violation of Connectivity's substantive due process rights in the amount of not less than $25

million, together with interest, Connectivity's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b), and such other relief that the Court deems equitable and just.

## AS AND FOR A THIRD COUNT
### (Equal Protection – Class of One)

320.    Connectivity repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

321.    Connectivity has the right to be treated like any other property owner in the Town.

322.    Defendants' illegal acts and other misconduct as described in this Complaint deprived and continue to deprive Connectivity of its right to equal protection of the laws.

323.    Defendants' discriminatory acts were performed under the municipal and/or governmental policy of the Town in that discriminatory practices of municipal officials were so persistent and widespread as to constitute a custom or usage with the force of law.

324.    Connectivity has been intentionally treated differently from others similarly situated.

325.    Defendants' discriminatory conduct and acts described in this Complaint have infringed upon Connectivity's rights by, *inter alia*, (a) discriminating against and targeting Connectivity and its project Hearthstone for disfavor; (b) imposing additional conditions and costs on Connectivity that have never been imposed on similarly situated property owners or developers, including through illegal and unprecedented actions and directives by the DPW and Building Department aimed at deliberately causing Connectivity harm and delay; (c) plotting with neighbors and threatening Connectivity with further delay and trouble with Hearthstone unless it surrendered entirely to the Town's unreasonable and extortionate demands; (d) compelling only Hearthstone's compliance with general use requirements applicable to the MU-1 Zone; (e) applying land use

regulations in an unlawful and discriminatory manner; and (f) manufacturing new interpretations of the Town Zoning Code to further embroil Connectivity in a repetitive and protracted land use process; and (g) denying use and expanded development with more units and more commercial space as are customarily granted to other developments in Ramapo.

326.    Defendants, acting under color of law, have treated Connectivity differently than the Comparators based on bad faith motives and to cater to politically connected neighbors of Hearthstone.

327.    As twice held by NYS Supreme Court, Rockland County and as is evident from the record, there was and is no rational basis for the difference, let alone the stark difference, in treatment of Connectivity as compared to the Comparators as detailed in this Complaint.

328.    Defendants have applied their facially neutral policies regarding, *inter alia*, mixed-use development, issuance of building permits, and issuance of site plan approval and variances, in an intentionally discriminatory manner to Plaintiff.

329.    The conditions imposed by the ZBA and Planning Board (and Defendants' 2019 Charade) were unauthorized, unrelated to the applications before the boards, irrational, unsupported by any germane evidence in the record, and related to previously disposed of issues, and were imposed to punish Connectivity for its refusal to capitulate to every single one of the Town's demands and force Connectivity to abandon the project.

330.    Defendants' disparate treatment of Connectivity as aforementioned was and is irrational.

331.    Defendants' disparate treatment of Connectivity as aforementioned lacks any legitimate basis for such dissimilar treatment.

60

332.    Defendants' disparate treatment of Connectivity as aforementioned was undertaken for improper motives unrelated to any legitimate public purpose.

333.    Defendants' disparate treatment of Connectivity as aforementioned was undertaken with the intent to inhibit or punish the exercise of constitutional rights by Connectivity.

334.    Defendants actions as aforementioned constitutes a class-of-one equal protection violation of the Equal Protection Clause.

335.    Accordingly, Connectivity asks that the Court issue the Permanent Injunctive and Declaratory Relief.

336.    The Court should also award Connectivity damages against Defendants for violation of Connectivity's right to equal protection of the laws in the amount of not less than $25 million, together with interest and Connectivity's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b) and such other relief that the Court deems equitable and just.

## AS AND FOR A FOURTH COUNT
### (Equal Protection – Selective Enforcement)

337.    Connectivity repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

338.    As set forth in this Complaint, compared with the Comparators, Connectivity has been selectively treated by Defendants.

339.    Defendants' selective treatment of Connectivity was and is based on Defendants' intent to inhibit or punish the exercise of Connectivity's constitutional right of free speech in seeking to pursue development of Hearthstone as permitted under the law.

340.    Defendants' selective treatment of Connectivity was and is based on a malicious and/or bad faith intent to injure Connectivity and prevent development of Hearthstone.

4481226.v15

341.    Defendants have treated Connectivity differently than the Comparators, which are similarly situated in all material respects to Connectivity as described in this Complaint.

342.    Defendants have singled out Connectivity for an impermissible motive not related to legitimate governmental objectives, including personal or political gain and retaliation for the exercise of constitutional rights.

343.    The selective treatment imposed on Connectivity was under color of law and pursuant to accepted municipal policy, practice, custom and procedure.

344.    Defendants' disparate treatment of Plaintiff as aforementioned lacks any legitimate basis for such dissimilar treatment.

345.    Defendants' actions as aforementioned violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.

346.    Defendants' actions as aforementioned constitute selective enforcement in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

347.    Accordingly, Connectivity asks that the Court issue the Permanent Injunctive and Declaratory Relief.

348.    The Court should also award Connectivity damages against Defendants for violation of Connectivity's right to equal protection of the laws in the amount of not less than $25 million, together with interest, Connectivity's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b), and such other relief that the Court deems equitable and just.

**WHEREFORE**, Plaintiff **CONNECTIVITY SYSTEMS, LLC** respectfully asks for:

4481226.v15

1.     On Plaintiff's First Count, issuance of an Order awarding to Plaintiff damages against Defendants as just compensation for the taking of Plaintiff's Property, together with interest at the lawful rate from the date of the taking of Plaintiff's Property;

2.     On Plaintiff's Second, Third, and Fourth Counts, the issuance of an Order (a) directing Defendants and their agents, employees, and representatives to permit completion of the Hearthstone project in the ordinary course and under law without disparate or irrational treatment of Connectivity and Hearthstone, including through the immediate signing, filing, and issuance of the approved Third Amended Site Plan, (b) appointing an outside professional special building inspector on behalf of Defendant Town of Ramapo to serve as the special inspector through the completion of construction for all inspections, testing and permitting required up to and including the completion of Hearthstone and issuance of final C of O's pursuant to the broad powers of the Court to fashion the complete relief to which Plaintiff is entitled; and (c) awarding to Plaintiff compensatory damages against Defendants, jointly and severally, in the amount of not less than $25 million, together with interest and Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b).

3.     On all Counts, awarding to Plaintiff such other, further and different relief as to the Court may seem just and proper.

Dated:   White Plains, New York
         July 8, 2020

CUDDY & FEDER LLP
*Attorneys for Plaintiff*
*Connectivity Systems, LLC*
445 Hamilton Avenue - 14th Floor
White Plains, New York 10601
(Tel.) (914) 761-1300

By: _/s/ Joshua J. Grauer_
     Joshua J. Grauer (JG4594)
     Jordan Brooks (JB0614)

4481226.v15