UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
CONNECTIVITY SYSTEMS, LLC,

                                    Plaintiff,

                    -against-                                       **SECOND AMENDED
                                                                    COMPLAINT**

THE TOWN OF RAMAPO,                                                 Docket No. 20-CV-5251(CS)

                                    Defendant.
---------------------------------------------------------------------X

        Plaintiff **CONNECTIVITY SYSTEMS, LLC** ("Connectivity" or "Plaintiff"), by its

attorneys, CUDDY & FEDER LLP, as and for its Second Amended Complaint against Defendant

THE TOWN OF RAMAPO (the "Town" or "Ramapo"), hereinafter alleges as follows:

## Introduction

        1.    This action arises from a taking by the Town of Plaintiff's real property on which

Plaintiff seeks to complete development of its fully approved "Hearthstone" project, as well as the

Town's substantive due process and equal protection[1] violations, and, retaliation against Plaintiff

in violation of the First Amendment.

        2.    A classic section 1983 action, Plaintiff's ongoing, over eight-year odyssey to develop

Hearthstone results from a malicious abuse of power under color of law by policy making Town

officials and those responsive to them.

        3.    As will become clear from this non-fictional history of Plaintiff's dealings with

Ramapo, the Town has crafted a fail safe offensive and defensive strategy aimed at preventing the

lawful use of plaintiff's private property and defeating its investment backed expectations. First,

---

[1] The Town has applied a farcical and irregular process to Plaintiff; if it treated others in like fashion there would be no development in the Town.

4950835.v2

it has implemented a process whereby it can always keep plaintiff occupied with one agency, board or official despite site plan approval in October of 2014. In this regard the process created and applied only to plaintiff "required" endlessly returning to the different boards while simultaneously failing to perform the ministerial steps which for all others obviates any such further board appearances and approvals. Further, a material component included denying plaintiff any space on the board the Town sent plaintiff back to. In short the Town kept plaintiff always "busy" with one mission or another after site plan approval, so much so that it's approval became a status in name only which the Town stripped of its normal meaning and legal status.

4.     As a second line of attack to guarantee that if plaintiff broke through and ever finished all of the Board missions (like the pilot in catch-22), there would be no light at the end of the tunnel because virtually every town official charged with the performance of ministerial non-discretionary duties arising from simple and routine code requirements regularly refused to perform their responsibilities. This included the planning board chairman who wouldn't sign the approved site plan, the building inspector who wouldn't review the building permit application and plans, the DPW who wouldn't inspect drainage improvements, the Town Clerk who withheld FOIL documents, the Clerk who wouldn't process plaintiffs appeal to the ZBA and the numerous times the Town refused to perform as per the norm until plaintiff filed an action - and only then relented - as if the Town was playing a game.

5.     The sheer volume of times that the Town engaged in this two pronged line of attack renders it impossible that plaintiff was just an unlucky victim of "errors" as distinguished from an unmistakable pattern which presents strong proof that something here involving the Town was very wrong.

2

6.      Every time Plaintiff has either yielded to one of the Town's demands and performed highly irregular "missions" as demanded, or, successfully challenged in an Article 78 proceeding the Town's illegally imposed conditions to development and intentional refusal to perform ministerial non-discretionary duties unambiguously required by the Town's own code and routinely performed for all other similarly situated developers, the Town manufactures new obstacles to development in response to which Plaintiff must either relent, or, again seek judicial intervention to undo. In the words of the Second Circuit, "[t]he finish line will always be moved just one step away until [Plaintiff] collapses." *Sherman v. Town of Chester*, 752 F.Supp.3d 554, 563 (2d Cir. 2014).

7.      For this reason, *inter alia*, Plaintiff's investment backed expectations have been frustrated by the Town while Plaintiff has been forced to liquidate $18 million in income producing properties (and the principal and his spouse's IRA savings) just to hold onto the property on which Hearthstone would have been built out and rented years ago but for the Town's nearly decade of relentless illegal and obstructionist conduct.

8.      As will be demonstrated, this case is not a land use dispute in the sense of a developer who was unable to obtain approval of his project. To the contrary, the project was approved in October of 2014 and, over the past almost 8 years the Town has taken away from Plaintiff that which the Town had no right to take and intentionally prevented use and enjoyment thereof without any purpose other than to cause Plaintiff damage and ruin.

9.      To the extent the Town's illegal policy included efforts AFTER Site Plan Approval to coerce Plaintiff to surrender prime property approved as a material part of its development site in October of 2014 for 39 parking spots (valued at $2 million) the Town had the same "rights" to that private property (i.e. none) as it did to the remainder of Plaintiff's private property.

4950835.v2

10.   Certainly before the ZBA and the Planning Board's approvals in 2014 the Town had no right to treat Plaintiff irrationally and unequally despite its ability to attempt to insulate itself from liability under the cloak of the "discretionary" nature of the approvals then being pursued and required by Plaintiff.

11.   After Plaintiff had its ZBA and Planning Board approvals including most significantly its approved Site Plan in the Fall of 2014, the Town lost the ability to hide behind any feigned cloak of "discretion".

12.   As a result of the Town's discriminatory, unconstitutional, and retaliatory conduct targeted at Plaintiff, which includes retaliation against Plaintiff for, *inter alia*, (i) its refusal to be bullied into making political contributions at the demand of and as directed by Chief of Staff, Purchasing Director and Town Democratic Party Chair Mona Montal ("Montal"); (ii) petitioning in the state court and this Court for redress[2]; (iii) directly supporting local candidates instead of through the auspices and control of Montal; (iv) vocally speaking out[3] against the injustice and unequal treatment presented herein; and (v) the alleged defamation of Montal by Plaintiff (e.g. its principal) by the publication of the privileged allegations of this action, Plaintiff has suffered damages of at least $40 million, with such damages continuing to increase daily.

## The Second Amended Complaint

13.   In this Second Amended Complaint ("SAC") Plaintiff demonstrates that, as obviously messaged by Montal's own written words at Exhibit 11, infra, to keep Ramapo "developer friendly," those developers with the "wherewithal" and "incentive" to provide political

---

[2]Montal retaliated for Plaintiff's filing of this action against the Town by filing a summons against Plaintiff's principal (a member of the same local community as Montal) in the local Rabbinical Court or "Bet Din," alleging in that forum a defamation claim based on the critical privileged allegations set forth in this action.
[3]The day after Plaintiff's principal's speech to the Town Board, the Town slapped Plaintiff with a retaliatory Stop Work Order in connection with work performed 6 weeks before the speech.

4950835.v2

contributions who responded positively to solicitations from Montal and her minions would be and in fact were treated preferentially.

14.     The meaning of Montal's term, "incentive," is obvious both from the content of Ex. 11, infra and from a comparison of the timing and amounts of the political contributions made by the MU-1 comparators listed in the Comparator Chart at Exhibit 6, infra, such as Monsey Mall's Michael Tauber, with the corresponding benefits those contributions seemingly facilitated from the Town.

15.     Specifically, Plaintiff presents below in a succinct narrative and timeline format at paragraphs 50 through and including 101 the dates and amounts of political donations by donor, project by project, by several identified comparators made in each case in temporal proximity to the special paths to approvals their generous donations assuredly yielded.

16.     Thus, the nexus between the significant benefits received by the developers, such as the similarly situated Monsey Mall, Town Square Retail, and 14-16 Main St., who made contributions in response to Montal's incentive based solicitations, jumps off the page of the Comparator Chart, especially when contrasted with the harsh and punitive treatment reserved for Plaintiff, whose principal refused to "play ball" like Messrs. Tauber, Brachfeld, Gross/Ullman et al.

17.     Further, in the SAC Plaintiff updates the Complaint to include events which transpired since the filing of the original Complaint, including, *inter alia*, another successful Article 78 proceeding's court decision ordering the Town to refund an improper overcharge of a building permit fee premised upon a false building inspector's affidavit, and, additional unequal and irregular treatment to again hamstring Plaintiff and stop the project.

4950835.v2

18.    Lastly, the SAC amplifies its Selective Enforcement Claim (4th Count) with respect to Plaintiff's "pay to play" allegations and adds a 5th Count for the Town's retaliation in violation of the First Amendment.

### The Parties

19.    Connectivity was and is a New York limited liability company with a principal place of business at 386 Route 59, Suite 200, Monsey, NY.

20.    Connectivity is the owner of 6.65 acres of real property known and designated on the Tax Map of the Town of Ramapo as Section 56.11, Block 3, Lot 53.6 (the "Property").

21.    The Town is a municipal corporation of the State of New York with offices located in the County of Rockland and State of New York at 237 Route 59, Suffern, NY.

22.    The former and current Town Supervisors, Town Board members, Town Zoning Board of Appeals ("ZBA") members, and Town Planning Board members are all policy making officials of the Town.

23.    Montal leads the local Democratic Party and in that capacity controls the election of the Town Board. The Town Board appoints the members of the Planning Board and ZBA. So, in essence, Montal controls the Town Board, Planning Board, and ZBA.

24.    Montal also selects the East Ramapo local school district and judicial candidates and other appointed candidates.

25.    The Town Board, Planning Board, and ZBA are policy making Boards of the Town.

26.    The Town is the responsible party for the violations committed by the Boards and officials identified herein and those responsive to them.

27.    Plaintiff's claims are pleaded against the Town of Ramapo for the official Town Policy involving the abuse of governmental power described in detail in the allegations of

4950835.v2

Plaintiff's Second Amended Complaint, exhibits thereto, public records incorporated by reference and the codes and laws of the Town of Ramapo and State of New York.

## Jurisdiction and Venue

28.    This Court has subject matter jurisdiction over claims under 28 U.S.C. § 1331 because Connectivity's claims under 42 U.S.C. § 1983 and the Fifth Amendment of the United States Constitution arise under federal law.

29.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because (i) both Connectivity and the Town maintain their principal offices in the Southern District of New York, and (ii) a substantial part of the events, actions and/or omissions giving rise to Connectivity's claims occurred in this District.

## The Property and Hearthstone

30.    In 2000, Connectivity purchased the Property. Having acquired a small, adjoining parcel in 2017, the Property presently encompasses 6.655 acres.

31.    Hearthstone, the mixed-use retail and residential development project Connectivity has sought to develop at the Property, consists of four buildings. The four buildings are referenced as Buildings "A," "B," "C," and "D". Connectivity pursued development of Hearthstone at the urging of the Town almost one decade ago.

32.    Thus, 10+ years ago the Town expressed to Plaintiff that it needed a multi-use development at this location because it was close to its downtown hub and requires smaller rental units and stores and offices.

33.    The Town is one of the fastest growing towns in New York State, and Hearthstone was conceived to serve a recognized shortage of small apartments for young married couples with

4950835.v2

one-stop shopping to be also provided on-site and downtown, a short stroll in easy walking distance.

34.    The Town is normally very solicitous of development given its acute shortage of affordable housing for young families and acknowledged need to support its tax base.

35.    The bottom floor of each of Buildings "A," "B," and "C" is commercial, with two floors of residences above it. Building "D" is solely commercial, with two floors of offices instead of residences atop the bottom commercial floor.

36.    The Property is desirably located, as it fronts New York State ("NYS") Route 59 and is within easy walking distance or a short ride to a major supermarket and several shopping centers.

37.    Jurisdiction over Route 59, including with respect to traffic signals, has always been and is exclusively vested solely in the NYS Department of Transportation ("DOT").

**Rezoning of the Property**

38.    After performing all customary due diligence, in 2012 Connectivity applied for a rezoning of the Property to an "MU-1" (mixed use of residential and commercial) zoning designation to accommodate Hearthstone.

39.    On July 10, 2013 the Town Board issued a Negative Declaration finding that Hearthstone, as depicted on its site plan, would <u>not</u> have any adverse environmental impacts, including to surrounding properties.

40.    The Town's Negative Declaration for the zoning was based on at least 64 units (more than ultimately approved) and even more commercial square footage than ultimately approved. This is just another piece of evidence pointing to the sham nature of the positive SEQRA recommendation subsequently made by the Town's consultants under very suspicious circumstances during Plaintiff's saga with the Town.

4950835.v2

41.   At the same meeting, the Town Board rezoned the Property to an MU-1 zoning designation permitting commercial and residential mixed use as of right.(A copy of the Rezoning Resolution and Negative Declaration are collectively marked Exhibit 1.)

42.   But the Town Board imposed the following two conditions in connection with the rezoning: (a) Plaintiff had to convey a parcel of land to the Town ostensibly to be used as a park; and (b)The placement of a traffic light at the entrance on Route 59, subject to the State DOT approval.

43.   Neither of these conditions was ever required before or since by the Town in connection with a rezoning or any other type of land use approval.

44.   Since its original approval in 2014, Hearthstone's Site Plan—including the footprint of all the buildings—has remained virtually unchanged.

45.   Despite conditioning its rezoning 8± years ago upon a donation of very valuable development land for a playground and park, the Town has not lifted a finger to create this phantom park.

46.   The Town's commitment to create and build this park was a representation made by the Town Board before Plaintiffs parkland donation was induced and the very reason the deed of donation was entitled "Parkland".

**The Planning Board selectively requires only Hearthstone's compliance with all general use bulk table standards; the politically connected comparators who "paid to play" received special accommodations and different rules**

47.   In August 2012, Connectivity submitted its proposed site plan for Hearthstone.

48.   Unlike all other similarly situated developments in the MU-1 Zone such as Monsey Mall, A&B Market and Town Square Retail (*see* the Comparator Chart at Exhibit 6, infra), the

4950835.v2

Town mandated that <u>only</u> Connectivity include the MU-1 general use requirements on its site plan as part of the Bulk Table.

49.    As a note, the 14-16 Main St. MU-1 development had partial requirements on the bulk table but was not required to even apply for a variance to exceed the critical 8 units per acre of the Bulk Table which the Town DPW even pointed out in their file memo was required by code for MU-1 projects and the Town simply disregarded.

50.    The Comparator Chart annexed as Exhibit 6, infra, also highlights residential and commercial development projects developed by those developers who provided the political contributions noted hereinbelow by donor, amount and date of contribution and date of approval, project by project, and the vastly different and very favorable treatment accorded to them.

51.    One of the most glaring examples of the vastly disparate treatment of the preferred donor – applicants involves the absence of conditions imposed upon the Comparators, a fact which stands in irreconcilable contrast with the highly unusual, irregular conditions imposed on Plaintiff every step of the way and stricken by the Courts throughout the <u>years</u> of Plaintiff's selective and unequal mistreatment.

52.    Thus, all "connected" developers and the major donors received many "free passes" from the Town, while Plaintiff was selectively required to perform "missions" not required of the Comparators and was abused and punished at every twist and turn throughout this 8+ year catch-22 saga.

**Michael Tauber's Monsey Mall is rewarded with, *inter alia*, approval for 69 units on less than half the size of Plaintiff's property, a Negative Declaration, and exemption from the MU-1 Bulk Table <u>Requirements In Temporal Proximity to His Contributions</u>**

53.    Mr. Tauber is a member in good standing of the favored developers for whom special treatment is afforded.

10

54.     Between on or about March 29, 2011 and October 23, 2013, Michael Tauber, Monsey Mall's developer generously made local political contributions aggregating in excess of $25,000.

55.     In 2011 alone, <u>before</u> Monsey Mall's ZBA approval on February 16, 2012, Mr. Tauber made six separate contributions totaling $6,000.

56.     Next, during the 2012 timeframe when Monsey Mall was an active pending project, Mr. Tauber made a total of at least 9 additional contributions totaling $9,000.00.

57.     Then, on March 5, 2013, he wrote three checks in the amounts of $2,500, $1,500, and $1,000, respectively—a total in one day of another $5000.

58.     All of Mr. Tauber's 2013 contributions totaling $10,500.00 <u>preceded</u> his Monsey Mall CDRC "green light."

59.     On September 11, 2013, the Town CDRC issued a favorable endorsement of Monsey Mall.

60.     On January 7, 2014, and in only <u>one</u> night and appearance before it, the Planning Board granted Site Plan Approval to Monsey Mall.

61.     The Town's expeditious and very generous approval of Monsey Mall absent any obligation by Monsey Mall to comply with MU-1 bulk requirements (or to even seek a variance for such exemption) stands in sharp contrast to the harsh fate faced by Plaintiff's on its less intense and less dense project situated in very close proximity to Monsey Mall on the same Route 59.

62.     In this regard, Monsey Mall obtained a Negative Declaration and Planning Board approval on January 7, 2014 for 69 units, while in 2015 Plaintiff was slapped with a Positive Declaration recommendation for seeking only 84 units *on more than double the acreage* than Monsey Mall.

63.   The equal or comparable treatment of Plaintiff to Monsey Mall would have recognized no environmental impacts of approximately 140± units for Plaintiff without MU-1 Bulk Table compliance and without the torrent of illegal conditions and the 8+ year "adventure."

64.   Toward the end of 2014 (October 30, 2014 to be precise), Mr. Tauber contributed at least another $4,000.00 to the local Democratic party.

65.   Thereafter, on March 13, 2015 the Town expeditiously granted to Monsey Mall amended site plan approval without a public hearing.

66.   2015 is the same year Plaintiff was called on the carpet by Montal's minions for making a $500 contribution directly to a political candidate and not via the Montal controlled machine.

67.   The sizable distinction between (a) Mr. Tauber's contributions of at least $29,500 in temporal proximity to and through the time of Monsey Mall's Planning Board Site Plan approval and Amended Site Plan approval and (b) Plaintiff's contributions of just $1,000 through 2015 (Plaintiff made two $500 contributions in 2015), and Plaintiff's refusal to pay the large sums policited by Montal and her agents, undergirds the swift and preferential approvals granted to Monsey Mall and the harsh and irregular treatment (and denials) faced by Plaintiff.

68.   Herewith a summary recap of the timeline of Mr. Tauber's contributions and approvals:

   a.   March 29, 2011-August 30, 2011: Contributions totaling at least $6,000;
   b.   February 16, 2012-ZBA Approval;
   c.   May 17, 2012-October 23, 2013: Contributions totaling at least $12,500;
   d.   2013 Contributions before 9/11/13: $10,500;
   e.   September 11, 2013: Town CDRC endorsement;
   f.   January 7, 2014: Planning Board approval with a negative Declaration for 69 units on first appearance;
   g.   2014: Contributions totaling at least $4,000; and
   h.   March 13, 2015: Amended site plan approval without a public hearing.

12

69.   For Plaintiff, the most ministerial change to its approved Site Plan was met with exhaustive and prolonged public hearings, highly irregular processes which were unrelated to deminimis "changes" and decisions with irrational conditions pulled out of thin air to serve the vindictive town policy.

70.   Time and again the Town's decisions for Plaintiff were held to be lacking in reason, violative of hornbook procedures and clearly far too frequent to be accidental or unintended errors.

71.   For Plaintiff, the overturned decisions of the Planning Board frequently overlapped with similar illegal, dilatory, irrational and irregular actions of:

1. The Town ZBA
2. The Town Building Inspector
3. The Town DPW
4. The Town Planners
5. The Town Clerks and
6. The Town Attorneys Office

72.   Also joining in the very irregular and inexplicable punitive treatment of Plaintiff was the Town's Planning Consultant, Frederick P Clark.

**Joseph Brachfeld's contributions yield
extraordinary benefits for his two Town Square developments**

73. Between April 11, 2013 and July 3, 2019 Mr. Brachfeld and his affiliated companies (collectively, "Mr. Brachfeld") contributed the grand total of $80,385 to the local Democratic Party via Montal's political machine.

74. This timeframe coincided first with his MU-1 retail addition and, thereafter, his adjacent office building development.

75. Collectively, the contributions below garnered him highly favorable treatment from the Town for both of his "Town Square" projects.

13

76. During the period of April 11, 2013 through May 2, 2016, Mr. Brachfeld contributed

the sum of at least $34,100 to the local Democratic Party, as follows:

| | |
|---|---|
| 4/11/2013 2Evergreen Kosher, Llc 1250 Broadway New York NY 10001 United St | $1,250.00 |
| 4/11/2013 2M3 Management, Llc 1250 Broadway New York NY 10001 United Sta | $1,250.00 |
| 5/29/2014 2Evergreen Supermarket 59 Route 59 Monsey NY 10952 United Sta | $2,000.00 |
| 6/6/2014 2M3 Management, Llc 1250 Broadway  Suite 1203 New York NY 1000 | $1,000.00 |
| 3/30/2015 J Ccb Management, Llc | $4,800.00 |
| 4/2/2015 2M3 Management, Llc 152 West 57th Street New York NY 10019 Unit | $4,800.00 |
| 10/26/2015 2Ccb Management 152 W 57th St New York NY 10019 United States | $7,000.00 |
| 3/28/2016 2Ccb Management Llc 152 West 57th Street New York NY 10019 Unit | $3,000.00 |
| 5/2/2016 2Alfons M Melohn 145 W. 57th Street - Fl. 9 New York NY 10019 Unit | $9,000.00 |
| **Total** | **$34,100.00** |

77. On July 12, 2016, the Town approved Mr. Brachfeld's Town Square retail addition

(sometimes, the "Retail Addition"), located in the MU-1 Zone.

78. In approving Mr. Brachfeld's MU-1 Retail Addition, the Town, among other things,

completely disregarded the parking and other bulk table requirements applicable to all

developments in the MU-1 Zone.  Further, Mr. Brachfeld commenced construction openly and

notoriously before final site approval. (The extent to which the Town, *inter alia*, unlawfully

exempted the Retail Addition from bulk table requirements is detailed in Exhibit 6, infra, and

below in this Complaint.)

79. Following the approval of the Retail Addition, Mr. Brachfeld continued his prudent

investment in Montal's "incentive" based system for maintaining a "developer friendly"

environment (See Montal's own words at Exhibit 11, infra), knowing that his contributions would

secure his next Town Square development equally favorable treatment.

80. Mr. Brachfeld's post-July 2016 contributions, totaling $46,285.00, flowed on the

following dates in the following amounts:

| | |
|---|---|
| 9/22/2016  2Ccb Management Llc 152 West 57th Street New York NY 10019 Unit | $2,000.00 |
| 10/27/2016 2Ccb Management Llc 157 West 57th Street New York NY 10019 Unite | $3,000.00 |
| 12/20/2016 2Ccb Management Llc 152 West 57th Street New York NY 10019 Unit | $13,785.00 |
| 8/5/2017 2Evergreen Supermarket 59 Route 59 Monsey NY 10952 United State | $5,000.00 |
| 11/16/2017 2Ccb Managment Llc 152 West 57th New York NY 10019 United State | $5,000.00 |
| 7/3/2018 2Evergreen Supermarket 59 Rt 59 Monsey NY 10952 United States | $1,500.00 |

14

| | | |
|---|---|---|
| 7/10/2018 2Evergreen Supermarket 59 Rt 59 Monsey NY 10952 United States | | $500.00 |
| 1/22/2019 2Arcadian Cap Group 96 Chestnut Ridge Road Montvale NJ 07645 Un | | $5,000.00 |
| 1/22/2019 2Capri Equities Llc 96 Chestnut Ridge Road Montvale NJ 07645 United | | $5,000.00 |
| 1/22/2019 2Ccb Managment Llc 96 Chestnut Ridge Road Montvale NJ 07645 Uni | | $5,000.00 |
| 7/3/2019 2Joseph H Brachfeld 19 Arcadian Drive Spring Valley NY 10977 United | | $500.00 |
| | Total | $46,285.00 |

81. In fact, Mr. Brachfeld's strategy seemingly yielded, in record time, very significant benefits in connection with his Town Square office building development.

82. As elaborated on in <u>Exhibit 6</u>, infra, and further below in this Complaint, the Town Square office building, which at seven (7) stories will be by far the tallest building ever approved in the Town, plowed through the approval process in just seven months, from July 24, 2019 through February 11, 2020, with multiple <u>same-day</u> approvals from different boards.

83. The same day multiple approvals for Mr. Brachfeld is nothing short of a miracle as the various procedural requirements of the different boards render it virtually impossible to even be scheduled on the agendas of the different boards on the same day because each board depends upon the prior decisions of the other agencies.

84. For example, as per the normal and lawful procedure, only after CDRC approval can an applicant be scheduled to be seen by the next board.  Then, to be placed on the next board's agenda the applicant is placed in the line or cue and upon receiving a date only then can the required public notices be submitted and published.

85. Here is a summary of the timeline of Mr. Brachfeld's contributions and approvals:

a. <u>April 11, 2013-May 2, 2016</u>: Contributions totaling at least $34,100;
b. <u>July 2016</u>: Approval of the Retail Addition in disregard of MU-1 bulk table and parking requirements;

_____    _____    _____    _____    _____    _____

c. <u>September 2016-July 2019</u>: Contributions totaling at least $46,285.00;
d. <u>July 2019-February 2020</u>: Expeditious approval of the 7-story office building with multiple same-day approvals.

4950835.v2

86.     The Final Approval in 7 months of Mr. Brachfeld's 7 story structure audaciously demonstrates the rewards that can be acquired in Ramapo from the pay to play incentive system.

87.     Adding insult to injury, Mr. Brachfeld's 7 story building was "excused" from parking requirements <u>and</u> approved with 96 undersized parking spots without a variance.

**Messrs. Gross and Ullman's substantial contributions**
**<u>resulted in favorable treatment for their 12-14 Main St. development</u>**

88. Messrs. Lessar Gross and Yitzchak Ullman (collectively, "Messrs. Gross/Ullman") are the developers of the 14-16 Main St. three-story, mixed-use development located in the MU-1 Zone.

89. During the period of 2013-2017, Messrs. Gross/Ullmann contributed the following sums to the local Democratic party on the dates referenced:

| | | |
|---|---|---|
| 10/30/2013 2Cong. Ahavas Chaverim 4 Ribier Ct Monsey NY 10952 United States | $1,500.00 | ullman |
| 10/25/2013 2Friends Of Yitzy Ullman Po Box 213 Tallman NY 10982 United States | $5,000.00 | ullman |
| 6/3/2013 2Friends Of Yitzy Ullman Po Box 213 Tallman NY 10982 United States | $135.00 ullman | |
| 10/25/2013 2Lesser  Grs 9a Laura Pl Spring Valley NY 10977 United States | $2,500.00 | gross |
| 7/22/2015 2Lesser  Gross 9a Laura Place Spring Valley NY 10977 United States | $500.00 gross | |
| 11/1/2017 2Lazerbearm Acreage Llc 9 Laura Pl Spring Valley NY 10977 United States | <u>$1,000.00</u> | gross |
| Total | $10,635.00 | |

90. In exchange therefor, in 2019, 14-16 Main St. received swift approval to construct eight residential units on just.325 acres, where just two units are permitted under the bulk table requirements.

91. The Town also granted 14-16 Main St. major variances, including permission to use its neighbor's eleven parking spots and loading dock even though the neighbor itself has neither sufficient parking nor a loading dock it can legally "share." (See Comparator Chart at <u>Exhibit 6</u>, infra, for even more details.)

92. Yet, neither the ZBA nor Planning Board imposed any conditions on 14-16 Main St.'s variances.

16

93. When Plaintiff applied to construct 84 units at its Hearthstone project situated on 6.65 acres, the Town abruptly issued a SEQRA Positive Declaration.

94. The Town did not issue a Positive Declaration in connection with 14-16 Main St.'s application to construct eight units on only .325 of an acre, when only two were permitted as of right under the MU-1 bulk table restrictions.

95. Equal or comparable treatment of Plaintiff would have yielded 163± units with a Negative Declaration for Plaintiff's much larger site.

96. The Town did not even require that 14-16 Main St. obtain a variance for those excess units.

97. To place these figures in context, had the Town treated Hearthstone equally to 14-16 Main St., Plaintiff would have been permitted to construct 163 units with a Negative Declaration and other significant concessions and without a variance accompanied by a torrent of illegal conditions.

98. In fact, the DPW even confirmed in writing that 14-16 Main required a variance for its eight residential units—but all the Town's professionals, including the Building Inspector and all boards - simply ignored this Town Code requirement.

99. Mr. Tauber's, Mr. Brachfeld's, and Messrs. Gross/Ullman's respective contributions allowed them to escape what Plaintiff has suffered at the hands of the Town as set forth in this Second Amended Complaint and Exhibit 6, infra.

100. The totality of circumstances, facts and events of many years set forth herein all arise in whole or in part from Plaintiff's exercise of its First Amendment rights and Town retaliation therefor.

4950835.v2

101.  Plaintiff's direct support of a candidate for political office, refusal to pay for preferential treatment, vocal public criticism of the Town and pursuit of its judicial remedies were all met with vindictive and malicious retaliation in violation of the First Amendment.

**The ZBA imposes unprecedented and burdensome conditions on Connectivity**

102.  The MU-1 general use requirements singularly and selectively imposed in their entirety _only_ on Connectivity amongst similarly situated MU-1 developments required Plaintiff to obtain variances from: (a) Minimum buffers and side and rear yard setbacks; (b) The ratio of commercial to residential use; (c)The limit of 8 units per acre; (d)The minimum distance of a structure from an interior road; (e)The maximum of 16 units per building; (f)The minimum of two loading spaces; and(g) The prohibition of parking in the front yard.

103.  The inclusion of these MU-1 special general use requirements on Connectivity's Site Plan required it—and only it amongst similarly situated MU-1 developments—to seek several area variances.

104.  As outlined in _Exhibit 6_, infra, other MU-1 developments have had to seek only parking variances and did not have to seek the variances required of Plaintiff.

105.  In addition, as reflected in the Comparator Chart at _Exhibit 6_, infra and described in detail herein the Town's many different and varied levels of professionals, departments and consultants ignored and "overlooked" the applicable and very basic code requirements for such special and favored developers.

106.  Accordingly, the Planning Board referred Connectivity's site plan application to the ZBA for the variances required _only_ of Plaintiff amongst the MU-1 comparators.

107.  On May 29, 2014, Connectivity appeared before the ZBA.

18

108.  Although the ZBA purportedly granted many of the minor area variances sought, including 24 units in Building C (i.e. 12 units on each of the two residential floors instead of the 8 units per floor permitted as of right), it did so with several unprecedented and illegal conditions (the "First ZBA Conditions") as follows: (a) Trees shall be planted along the property line with Augusta Avenue; (b) A six foot high fence and landscaping shall be installed along the property line with Treetop Lane, and where on a slope the fence shall be eight feet high to provide six feet of screening, and the landscaping and fence shall be built or installed facing Treetop Lane, with the landscaping installed closest to Treetop; (c) a portion of the Property shall be completed as a green recreation area with benches, with a six foot soundproof fence and trees screening it, (d) Building "C" shall be permitted to have eight (8) units on the second and third floors, respectively, for a total of 16 units, even though Connectivity had applied for a total of 24 units and received the conditions imposed because of the density variance. (A copy of the Minutes of the ZBA Approval and First ZBA Conditions is annexed hereto as Exhibit 2.)

109.  Simply stated, the ZBA conditions applicable to the 12 units per floor in Building C remained, but, the unit variance itself was taken away by ZBA condition (d).

110.  As the smaller units would use the same footprint, there was no logical reason to reject the minor variance.

111.  *A fortiori*, given that the MU-1 Comparators were simply allowed additional units without ever seeking a variance.

112.  In any event, none of the First ZBA Conditions has ever been imposed on any other project in the MU-1 zone or on any other residential or commercial site in the Town.

4950835.v2

113.   After its ZBA Approval, Hearthstone next received Planning Board Site Plan Approval on October 21, 2014. (A copy of the November 18, 2014 Resolution of Site Plan Approval is marked <u>Exhibit 3</u>.)

114.   Given the ZBA and Planning Board approvals Plaintiff anticipated that construction of its approved project was ready to go.

115.   In early 2015, Plaintiff was rushing to complete any minor items needed for signing of the approved map and the construction of the project in earnest.

116.   By this 2015 timeframe, 6-7 <u>years</u> ago, Plaintiff's development was fully approved.

117.   Thus, Plaintiff even asked in 2015 if it could start construction before signing of the approved Site Plan since the ministerial tasks remaining were pro forma and believed by everyone to be imminent.

118.   Unlike Mr. Brachfeld's Town Square Retail Addition, the Town demurred, refusing to permit Plaintiff to begin actual construction until the signing of the approved map.

**Hearthstone is treated unfavorably as compared to similarly situated**
**<u>MU-1 projects Monsey Mall, A&B Market, Town Square, and 14-16 Main St.</u>**

119.   Over the past several years, the Town has approved numerous developments in the MU-1 zone that are similarly situated to Hearthstone.

120.   Yet, neither the Planning Board nor the ZBA imposed any of the conditions on any other of these similarly situated projects that it did on Hearthstone – a pattern that continues to this day.

121.   Hearthstone abuts commercial zoning to the west, residential zoning to the north, dense residential to the east, and mostly commercial zoning to the south.

4950835.v2

122.   A similarly situated mixed-use project, known as Monsey Mall (the "Monsey Mall"),is located on 3.25 acres at 100 Rt. 59, Monsey, New York, approximately 1,500 feet from Hearthstone. It abuts dense residential development to the north, and MU-1 to other sides. The site plan for Monsey Mall was approved for 69 units where 26 are allowed, on a parcel less than half Hearthstone's size.

123.   The Monsey Mall building configuration is the same as Hearthstone, with stores on the first floor and residential use above.

124.   Another similarly situated MU-1 project on only .75 acres, "A&B Market" ("A&B Market"), is located at 3 Second Avenue, Monsey, New York, approximately 1,300 feet from Hearthstone.

125.   It abuts properties zoned MU-1 to its west and south and also abuts dense residential development to the east and commercial to other side. Its western boundary is located only five (5) feet from a private home and it is flanked by dense residences to the east. There are private homes on the south and west. It received site plan approval on or about November 19, 2017.

126.   Like Hearthstone, A&B Market has commercial stores on the first floor, a social hall in the basement, and offices on the top two floors with an apartment.

127.   A&B Market received many favorable concessions including not being required to pursue variances like Plaintiff.  Its basement, for example, has only 992 sq. ft. out of a basement space of 5500 sq. ft.

128.   The Town records reviewed disclose no concern with respect to the use of the remainder of the basement space, while for Hearthstone extreme measures were taken to address an unrelenting focus with respect to completely unfounded speculation as to the potential access

4950835.v2

to and future use of attic space. This included requiring Plaintiff to have its professionals sign every page of its attic plan, another targeted and irregular "requirement."

129.  The Building Inspector's harassment with respect to the attic was perhaps outdone by his obsession over a standard truss obtained from the same lumber company in Town used by 99 percent of all builders. He could not be satisfied, requiring more and more certifications by engineers and the truss manufacturer - so much so that again the involved supplier and professionals all remarked that this treatment evidenced the obvious; to wit:  the Town was "out to get you."

130.  This pattern repeated itself throughout, including hundreds of comments on plans, followed by hundreds more after the first series were addressed.

131.  Although bordered by a private residence only 5 feet away from its boundary, no special restrictions or conditions were imposed on A& B Market such as the 8-foot fence and the soundproof fence imposed only on Hearthstone.

132.  14-16 Main Street, another similarly situated MU-1 project, consists of a three-story building comprising commercial and retail space on the first floor and residential space on the second and third floors above (exactly the same as Hearthstone and Monsey Mall), MU-1 to the south and east, high density residential to the north and MU-1 to the west.

133.  For MU-1 14-16 Main Street, a politically connected developer, Lessar Gross, a known partner of Mr. Yitchak Ulmann, a prior Town Board member and former Acting Supervisor (and current tax collector), received major concessions including 8 units where only 2 are permitted.  Of course, this project was not required to seek such variances.

4950835.v2

134. Using 14-16 Main Street as a guideline for the calculation of unit count, Hearthstone would have been in the range of 163 units, a far cry from the 56 units it had to fight for and 84 units shut down by the Town.

135. 14-16 Main Street did not receive a positive declaration while Hearthstone was punitively signaled out for a sham positive declaration upon seeking a mere 84 units on its 6.65 acres.

136. In fact, DPW confirmed in writing that 14-16 Main Street required an 8 unit per acre variance and they and the code were ignored by the Building Inspector and all boards.

137. MU-1 Town Square Retail is an expansion retail project with MU-1 surrounding to the north and west and CS to the east and R-15A to the south.

138. For this favored development although common knowledge that the retail parking calculations require one parking space per 150 sq. ft. of retail, the Town, including the Building Inspector, Town Engineer and all boards allowed the use of the clearly inapplicable 200 sq. ft. formula to avoid any variance requirement for Mr. Brachfeld.

139. Town Square Retail also was able to commence construction before Site Plan Approval on the highest profile and most visible location in the entire Town.

140. Town Square Office(CS) is a new commercial mammoth seven-story (75 foot) office building CS project approved in a town which allows a maximum of three stories or 30 feet.

141. Town Square Office was granted huge variances without any conditions in disregard of the customary parking calculation and FAR standards.

142. Three indicators that define project utilization are: the floor area ratio ("FAR"), that is, the relationship of the total usable floor area of a building relative to the total area of the lot;

4950835.v2

the development coverage, that is, percentage of the lot covered by buildings and paved impervious surfaces; and parking provided as compared to required parking.

143.  A higher ratio or larger percentage is indicative of a high utilization of the property.

144.  Hearthstone has a FAR of .41 as compared to .93 for Monsey Mall, .56 for A&B Market, .49 for 14-16 Main St. and .26 for Town Square (which was recently acquired and is now adding a new office building).

145.  So too, Hearthstone has a development coverage of .74 as compared to .98 for Monsey Mall, .89 for A&B Market, .95 for 14-16 Main St. and .94 for Town Square.

146.  The governing bulk table standards in the MU-1 Zone permit only up to .75 development coverage.

147.  Hearthstone received a parking variance of 33%, while Monsey Mall received a 49% variance, A&B Market received a 50% variance, and 14-16 Main St. a 43% variance. Further, 14-16 Main St. was "approved" with the alleged use of 11 spots situated upon a neighbor's property which required its own variance and did not have enough parking for his own property let alone an extra 11 spots to "give away"!

148.  The parking variance marks the percentage by which parking spots were reduced from the required amount.

149.  Despite Monsey Mall's, A&B Market's, and 14-16 Main St.'s closer proximity to residences than Hearthstone and otherwise being similarly situated projects, the Town required only Hearthstone to, *inter alia*:(a) provide 8' soundproof walls (while all others were required to install only a six (6') foot transparent chain-link fence)and a costly landscaped buffer with trees; (b)restrict parked cars for residence use only in contravention of the fundamental purpose of its MU-1 (mixed use) zone; (c) eliminate 39 parking spaces adjoining residential use despite

24

complying with all setback requirements of the Town Code (discussed below); (d) install two loading docks; (e) limit its residences to only eight apartments per acre;(f) be on the agenda for public hearings for minor administrative items; (g) prepare more traffic studies than could ever rationally be justified for a low FAR underutilized MU-1 project in a Town known to have a large population who do not drive;(h) comply with substantive and unique conditions, all of which were rejected by the courts upon challenge (see Comparator Chart at Exhibit 6, infra); and (i) only Hearthstone was required to seek all variances needed by MU-1 Special Requirements.

150.  A comprehensive chart illustrating the vast differential treatment of Connectivity as compared to several commercial projects in the MU-1 Zone and other commercial projects (collectively the "Comparators") is at Exhibit 6, infra (the "Comparator Chart").

**The ZBA denied Connectivity's request for**
**a variance to construct only 56 residential units—3 above that allowed as of right**

151.  One such example of the Town's disparate and unconstitutional treatment of Plaintiff is the ZBA's 2014 denial of Connectivity's request for a variance allowing a mere eight (8) additional units to construct 56 residential units at the Property, to be spread over Buildings "A" (16 units), "B" (16 units) and "C" (24 units).

152.  While the Town allowed both Monsey Mall and 14-16 Main St. to exceed the number of units by right without the required variance or any conditions whatsoever, the Town initially permitted Hearthstone to have only 48 units.

153.  Only years later at an additional ZBA meeting that the Town was forced to hold did the Town allow Hearthstone to have 56 units, a pittance of three units above the as of right number of 53.

4950835.v2

154.  Yet, Monsey Mall and 14-16 Main St. were permitted to far exceed the allowable number of units under the MU-1 bulk table—without any conditions and without having to apply for or be granted the required variances.

155.  When Connectivity's principal, Solomon Menche, informally inquired with the ZBA Chairman why Connectivity was denied a *de minimis* variance on an exceptionally underdeveloped site plan clearly needed by the community, where another project on the same agenda called Blueberry Commons was granted a mammoth building density increase the same night, the Chairman remarked: "Your project will not be receiving any variances because of the opposition to[4] it."

156.  The chairman's pretextual excuse was meritless given its immaterial nature and false, as the Town routinely gives community opposition short shrift as they did on Patrick Farms, Viola Commons, Pascack Ridge, Avon Garden and Blueberry Commons. The Town even helped Bluefield Extension fight the community opposition to its project and an adverse state court ruling.

157.  As to the reason of "Community Opposition" proffered for the illegal conditions imposed on Plaintiff, several of the other projects, also faced staunch opposition. Yet, they still received huge density area and site variances unaccompanied by any onerous conditions and were not required to mitigate the variance granted as demanded from Hearthstone. Most recently the high profile and high-density Patrick Farms, Bluefield Extension and Pascack Ridge projects received final approval with substantial variances despite tremendous public opposition and the court challenges they face.

---

1.   "It is hornbook law that "community opposition" is not of any weight or relevance to the legal criteria for zoning approvals.

4950835.v2

158.   In fact, the Town has frequently assisted developers opposed by the community and worked to circumvent court decisions.  This presents yet further evidence that the Town's policy toward Hearthstone was both atypical and infected with illegality and abuse of power.

### The ZBA unconscionably delays 18 months in filing its written decision with the First ZBA Conditions

159.   NY Town Law Section 267-a(9) requires a zoning board of appeals to file its decision in the office of the town clerk within five (5) business days after it is rendered.

160.   At most under extenuating circumstances or when dealing with a very lengthy decision, it could take a month or even two for preparation of a further decision.  Eighteen (18) months for this Decision with only a few items cannot be explained on any basis other than pure malevolence.

161.   Despite the ZBA having rendered its decision at the May 29, 2014 public hearing on Connectivity's variance application (which contained the First ZBA Conditions), the ZBA did not file its decision until November 2015 – an unprecedented delay of eighteen (18) months.

162.   In the interim, the Planning Board approved Connectivity's site plan ("Original Site Plan") within three months and a ministerial amendment to that site plan ("First Amended Site Plan") within four months. It did so within these customary short periods of time with the traditional waiver of public hearing on the minor First Amended Site Plan—something that would change dramatically after 2014.

163.   The only change in the First Amended Site Plan from the Original Site Plan was the relocation at the request of the Town of a 300' sewer line from the original approved location under the Property to a location off the Property under the Route 59 right-of-way because the relocation was advantageous for the Town. (A copy of the First Amended Site Plan Resolution which expeditiously approved same and waived any public hearing is annexed hereto as Exhibit 4.)

4950835.v2

164.   Because of the ZBA's 18-month delay in preparing their own Approval Resolution, the Original and First Amended Site Plans did not incorporate the First ZBA Conditions.

165.   Once the ZBA finally, after its 18 month delay, filed its Resolution embodying its May 29, 2014 decision, the Town forced Connectivity to submit yet another "amended" site plan application to incorporate the First ZBA Conditions, instead of treating it as a miscellaneous PB matter for fast pro forma action as per the norm in the Town.

**The Town applies further unprecedented**
**"requirements" upon Connectivity**

166.   In 2015, Connectivity submitted a proposed amended site plan including the First ZBA Conditions that also included a plan to construct 84 units.

167.   On the merits, the Town Planner, Frederick P. Clark & Associates ("FPC"), was clearly headed toward their independent conclusion of a negative declaration as documented in their memo that the 84-unit plan would not have any adverse environmental impacts,

168.   In fact, FPC went further, endorsing Plaintiff's plan in very laudatory terms and finding "that a comparison of this proposed development, with the Original Site Plan Approval, does not indicate a significant increase in site traffic generation." (A copy of the Town Planner's traffic report is annexed hereto as Exhibit 5.)

169.   Based on the residential density approved for Monsey Mall and 14-16 Main Street, each pursuant to a Negative Declaration, the equal treatment of Plaintiff would have translated to a range between 140± and 163± units.  For a complete comparison of Plaintiff's unequal treatment see the Comparator Chart marked Exhibit "6" annexed hereto and made a part hereof.

170.   Nonetheless Plaintiff hit a brick wall pursuing 84 units on its much larger site and was held down even further to only 56 units.

28

171. Of note, the Town CDRC also did not suggest any changes to the plans, finding that there were no adverse environmental issues or concerns. The Town CDRC therefore approved Hearthstone to appear on the Planning Board agenda for amended site plan approval of 84 units with no suggestion whatsoever of a positive declaration recommendation. (A copy of the CDRC comments is annexed hereto as Exhibit 7.)

172. Next, however, despite both the Town Planner and CDRC finding of no environmental impacts in connection with Plaintiff's proposal for 84 units, without any note or indication as to a need for a SEQRA Positive Declaration (there was none), the Town clearly pressured the Town Planner to change its true professional opinion and issue a sham draft Positive Declaration indicating that 84 units *would* result in a significant adverse environmental impact.

173. This "about face" was proximately caused by the Town policy to harm Plaintiff undertaken under color of law pursuant to abuse of power and malevolence.

174. In sharp contrast, Monsey Mall, which was granted 69 units on only 3.25 acres, which would be 21.23 units per acre, in comparison to Hearthstone's proposed 84 units on 6.65 acres which should be allowed 141± units, did not receive a draft Positive Declaration.

175. 14-16 Main St., which has 2.61 units per acre, i.e. even more units per acre (the equivalent percentage would have yielded approximately 163 units for Hearthstone), and which received larger parking variances, allegedly uses its neighbor's parking and loading docks (which they were not allowed to share) and playground, and the same water and sewer as Hearthstone also did not receive a proposed positive declaration; nor did A&B Market, or Town Square—all of which are far more intense developments than Hearthstone.

176. When challenged by Plaintiff's principal, Mr. Menche, regarding its abrupt preparation of a draft Positive Declaration that defied its previous laudatory endorsement of

4950835.v2

Hearthstone's proposed 84-units, the President of the Town Planner(FPC) apologetically admitted that he had been instructed by Town leadership to "toe the line" and that he therefore had no choice but to prepare the draft Positive Declaration.

177.   The Town's punitive directive regarding the draft Positive Declaration proximately caused Plaintiff to forgo what should have been a readily approved and conservative 84-unit project.

178.   Pursuing the 84-unit plan in the face of a Positive Declaration would have tacked on an additional two years or more to the development of Hearthstone to get through the Positive Declaration. Already armed with foundation permits for Building "C" and Building "A" and with construction underway in earnest, Plaintiff scrapped the 84-unit plan, losing in the process the substantial difference in the value between the 84 units deserved on the merits and 56 units the Town ultimately held Plaintiff down to as part and parcel of its unequal and punitive treatment herein.

179.   Since the Buildings' structural design was easily able to accommodate the 84 units applied for (and on less than half the land Monsey Mall had obtained 69 units), Plaintiff anticipated a fast approval on the merits.

180.   In the process, the Town deprived Plaintiff of a substantial number of units, thereby maliciously causing a very large monetary loss and damage to Plaintiff.

181.   Not content with unlawfully preventing 84 units the Town's abuse of power and illegal Town policy unconscionably treated Plaintiff's existing Site Plan Approval as if it did not exist.

4950835.v2

**The Town compels Plaintiff to file**
**<u>another "revised" site plan application</u>**

182.  The Town's policy and actions (as well as inaction) toward Plaintiff always involved sending the message that the Town was above the law, it could do anything it wanted when it wanted and resort to judicial remedies or vocal protestations to the Ton Board would have the opposite effect.

183.  Approval by the Planning Board of the incorporation of the First ZBA Conditions into the First Amended Site Plan should had have been a ministerial matter approved administratively by the Planning Board and signed by the Chairman within a few days or at most 2+weeks.

184.  But instead of expeditiously and administratively approving the "amended "site plan and merely incorporating the extremely delayed First ZBA Conditions thereon, the Town deliberately mired Connectivity in an irregular, protracted, and convoluted process without any rational basis.

185.  The Town so proceeded despite the fact that the CDRC and all Town professionals confirmed that Plaintiff's plans were completely in order i.e. that the extensively delayed ZBA resolution conditions had been duly added.

186.  On February 1, 2016 Connectivity was <u>forced</u> to apply to the Planning Board for approval of an "amended" site plan incorporating the First ZBA Conditions (the "Second Amended Site Plan").

187.  Incredibly and irrationally this coerced application was merely to document a tree, wall and bench onto Plaintiff's already approved Site Plan, i.e. a "scrivener's" ministerial task and confirmation.

4950835.v2

188.  Because Connectivity sought to amend the already approved First Amended Site Plan only by incorporating the First ZBA Conditions, the Town Building Inspector and Deputy Town Attorney initially informed Connectivity (consistent with the normal and customary Town process) that its application would be treated as an expedited "miscellaneous" application—that is ,the Planning Board would schedule the matter as a "miscellaneous" item and authorize the Planning Board Chairman to simply sign the revised site plan without a formal application or public hearing.

189.  Connectivity is unaware of any other occasion in the Town where the ministerial addition of Resolution notes (like a tree or a bench) or conditions on an already approved Site Plan was not designated as a "miscellaneous" matter and signed and filed without any delay or public hearing.

190.  A fortiori, where the Town itself delayed preparation of the Resolution for an extraordinary period of 18 months.

191.  The only other "update" in the Second Amended Site Plan was the de minimis relocation of the underground sewer pipe to underneath the Property where it was originally approved on the Original Site Plan and moved f/b/o the *Town*.

192.  Evidencing the highly irregular and farcical process applied to Plaintiff herein, and the Second Amended Site Plan in particular, when the sewer line of the already approved Site Plan was previously proposed for relocation, the Planning Board did not conduct a public hearing, instead, approving the *de minimis* item expeditiously as per the norm with a waive of public hearing. See Exhibit 4, supra.

193.  For any other project, the relocation of a sewer pipe to underneath the Property in the location originally approved would have been deemed a "field change"—that is, a change or

32

adjustment to an approved site development plan due to field conditions that will not substantially alter the intent, layout or design of the approved plan—or, a miscellaneous agenda item involving a *de minimis* plan adjustment, pro forma and very rapidly approved.

194.  Both the Building Inspector and the Town Attorney originally approved this sewer relocation as a field change consistent with the normal procedures in the Town.

195.  For Hearthstone, it took DPW and the Town Attorney another 18+ months to finally admit to this; yet Plaintiff was still forced to proceed to a public hearing before the Planning Board.

196.  Under customary procedures and circumstances, within a few weeks the Planning Board Chairman would have signed the Second Amended Site Plan as a miscellaneous item per the norm—without a formal application process or public hearing.

197.  Instead, Connectivity's application for approval of the Second Amended Site Plan was placed on the Town's July 26, 2016 agenda—nearly six months after Connectivity's submission of this Site Plan.

198.  Simultaneous with its informal application for the Second Amended Site Plan, Connectivity applied in February of 2016 to the Building Department for a building permit for Building "C," for which it had already obtained a foundation permit in 2015 <u>and</u> had already constructed the basement of Building "C". The same was done for Building "A".

199.  In derogation of law and consistent with the escalating Town policy and pattern of obstruction, the Town Building Inspector did not act on the application within the allotted Town Code timeframe of 30 days or anything close to that timeframe.

200.  In fact, the Town Building Inspector ignored Plaintiff's application altogether, doing nothing for <u>years</u> until he was ordered to act by the state court in the first Article 78 Decision discussed below.

4950835.v2

201.  <u>It thus took Plaintiff over 34 months to obtain approval of the Construction or Architectural Plans for only one (1) of Hearthstone's four (4) buildings</u>.

202.  This was part and parcel of the official lawless policy of the Town toward Plaintiff.

203.  As is clear from the Article 78 record and state court decisions in the 2017 Article 78, the Town had no reason it could even enunciate to the Court for this policy.

204.  This project (and no similar projects), originally approved in 2014, could survive at this 34-month pace of approval after court order, building by building, and the Town was well aware of same.

205.  The Town's policy and process for Plaintiff required and still requires regular, frequent and ongoing resort to Article 78 and mandamus relief with no end in sight for the performance of ministerial non-discretionary tasks.

206.  The Town's process creates for Plaintiff a Catch-22 without means of escape.

207.  The endless and repetitive resort to Article 78 is not an effective remedy and does not provide damages for the Town's constitutional violations and/or just compensation for the Town's taking.

208.  In the majority of cases, Article 78 would provide all the relief necessary to conclude one's project and an action for damages could be maintained separately.

209.   Here, the Town policy and process invites Article 78's in perpetuity, assuming that eventually they can win a war of attrition and escape any accountability to Plaintiff or the Courts.

210.  By this action, Plaintiff seek the recovery of damages and/or just compensation and an end to the Town's abusive policy and process.

4950835.v2

**Spearheaded by the Town Supervisor and Montal, the Town pressures
Connectivity to accede to outrageous demands regarding further changes to its
Property**

211.  At several meetings with Town personnel prior to February 2016, the Town made numerous demands of Connectivity on behalf of itself and the Treetops Neighbors.

212.  Connectivity yielded even after the 2014 Site Plan Approval on many of the Town's ransom demands both in the spirit of courteous community accommodation and to try to move Hearthstone forward without more illegal Town interference.

213.  Merely by way of example, since 2014 Connectivity has agreed to, *inter alia*, (a) donate land valued at over $650,000 for use as a Town park(which the Town has still not built and has recently advised Plaintiff it will not construct even if it is required to do so), (b) construct an eight-foot soundproof fence along the Treetop property line, a request never imposed on any other developer, (c) build at its expense a 300-foot sewer line with drainpipes upon the Property for the sole convenience of the Town, (d)upgrade an 85 foot sewer line on Augusta Avenue at Plaintiff's expense, and (e) install a DOT drainage pipe of the Property at Plaintiff's expense.

214.  Then, in or about early February, 2016 through May of 2016(and again on or about February 2, 2018 and November 18, 2018) Montal communicated to Plaintiff that to assuage a group of constituents who adopted the moniker "the Treetop Lane Neighbors" (the "Neighbors"), Plaintiff must "donate" from its already approved property and signed Site Plan 39 parking spots located behind Building "C" abutting the Property's boundary line.

215.  These 39 spots were already approved on the 2014 Site Plan and First Amended Site Plan, signed as approved by all required Town officials and duly filed.

216.  Plaintiff valued those already approved spaces at $2 million.

35

217. To reiterate, the 39 spots were already fully approved and a material part of the signed and filed Site Plan Map.

218. When the Town insisted that Plaintiff essentially create another "park" or green space out of these 39 spaces, Building "C" had already been approved, there was parkland dedication already noted on the deeded and donated parkland and construction was well underway under the Foundation Permit issued in 2015 for Building C.

219. Ironically, when Connectivity first presented its plan to the Town back in 2012, no parking spaces were present behind Building "C," with that Building set back 20 feet from the Property's boundary line as required under the Town Code.

220. The only reason the 39 parking spots are located behind Building "C" as approved in Plaintiff's 2014 Site Plan and First Amended Site Plan is because Connectivity agreed to a request from the Town that Connectivity relocate Building "C" 80 feet from the Property boundary line.

221. The movement of the Building "C" footprint an additional 60 feet from the Property boundary line caused Connectivity to relocate parking spaces that previously existed in front of Building "C" to the rear of Building "C".

222. Moving the location of the Building "C" footprint cost Connectivity over $100,000 in engineering costs and resulted in six (6) months of delay.

223. Unbeknownst to Connectivity at the time, the Town's demand that Connectivity remove all 39 spots was consistent with a concealed[5], surreptitious "understanding' reached

---

[5] The Supervisor/Neighbor Deal was always subject to Plaintiff's FOIL search which the Town intentionally ignored until ordered to be produced by the Court (see Ex. 13, infra). Only when finally produced, did Plaintiff see that the Town's Attorney had tried to conceal Montal's involvement in the Supervisor/Neighbor's Deal.

between the Neighbors, on the one hand and the then-Town Supervisor Christopher St. Lawrence and Montal on the other.

224.  In a letter dated February 28, 2016 (long after site plan approval), the Neighbors wrote approvingly to St. Lawrence that they and St. Lawrence had already agreed on:

The elimination of the entire line of parking that borders Treetop Lane, establishing the first 20 feet as a buffer with evergreen trees that are high enough and dense enough to completely block our view of the 8-foot fence behind it.

(A copy of this February 28, 2016 letter confirming the Supervisor/Neighbor's <u>illegal</u> Deal and Town Attorney's letter to the Neighbors saying not to copy Montal is collectively annexed as <u>Exhibit 8</u>.)

225.  The fact that the Supervisor/Neighbors' Deal was cut two years <u>after</u> Plaintiff had already been granted Site Plan Approval in 2014 and First Amended Site Plan Approval as well, and had constructed Buildings "A" and "C"'s foundations and other improvements under, inter alia, the 2015 and 2016 Foundation Permits, highlights how egregious the Town's treatment of Plaintiff  has been.(A copy of Plaintiff's Foundation Permits dated August 24, 2015 for Building "C" and February 23, 2016 for Building "A" are collectively annexed hereto as <u>Exhibit 9</u>.)

226.  In furtherance of the Supervisor/Neighbor Deal and in exchange for eradicating the 39 parking spaces, Montal offered Plaintiff a form of "reimbursement" through the promised Planning Board and ZBA approval of the 84-units previously blocked by the Town.

227.  Montal also offered to Plaintiff as a quid pro quo other benefits itemized by Montal.

228.  Although Montal was neither a member of the ZBA nor Planning Board, it was clear and is well known in the Town that Montal had the power to deliver the votes of both purportedly "independent" Town boards.

37

229.  Montal also dangled approval of narrower and shorter parking spaces and the benefits for Hearthstone of DOT surplus funding for public sidewalks just like she had arranged for the Blueberry Commons project and Town Square.

230.  Montal further assured Plaintiff it would receive waivers from the Planning Board and tax incentives from the Town as is done for other developers.

231.  Additionally, Montal dangled fast approval of a rental project on Summit Avenue, a different property owned by Plaintiff's principal.

232.  Again, Montal expressed no hesitation about her ability to deliver the foregoing.

233.  Although Plaintiff viewed Montal's proposed "arrangement" as a condition to the continued development of Hearthstone, Connectivity refused to accede to Montal's illegal "deal" while continuing to vocally express Plaintiff's outrage at the Town's effort to coerce an uncompensated taking.

234.  Of course, based on the Town's *modus operandi* of constantly shifting the goal line for the development of the partially constructed and already approved Hearthstone development, it is now appears that even if Connectivity had acceded to remove the 39 parking spaces the Town illegally took when the next shoe dropped (this time with a ZBA "condition" eliminating the 39 spaces) , the Town would have simply manufactured another reason why Hearthstone could never proceed.

235.  Plaintiff ultimately was forced into another Article 78 to recover the taken 39 parking spaces.

**The Town Illegally Ties its Performance of Ministerial
Non-discretionary Tasks and Duties Regularly Performed for Other
MU-1 Developers and Mandated by the Town Code
To Plaintiff's "Donation" of the 39 Spots and a Public Sidewalk**

236.  On or before April 22, 2016, the Town by its DPW, demanded as an illegal quid pro quo that Plaintiff agree to build at its expense a public sidewalk on Augusta Avenue in order to receive DPW's pro forma sign off on the sewer relocation.

237.  This demand was illegal, quasi-criminal and patently extortionate.

238.  The already approved original Site Plan and First Amended Site Plan had no such sidewalk condition imposed by the Planning Board.

239.  A department of public works employee does not make "demands" of this nature without the full support of Town policy-making officials.

240.  On or about April 7, 2016, the Building Inspector of the Town confirmed his approval of the Building Permit Application and plans for Building C[6] but refused to issue the permit (a ministerial task given the Inspector's approval of the application and plans)ascribing blame to the Town Attorney, unless Plaintiff agreed to eliminate from its private property the already approved 39 parking spaces targeted by Montal and referenced in the Supervisor/Neighbors Deal.

241.  Plaintiff's engineer, Leonard Jackson, confirmed both of the above illegal quid pro quo's insisted upon by DPW, the Town Attorney and the Building Inspector in his letter to the Building Inspector dated April 22, 2016, marked Exhibit 10.

242.  In pertinent part, Mr. Jackson declared at Exhibit 10 with respect to DPW's sidewalk "condition":

---

[6] Subsequently, the Building Inspector swore that he did not even receive Plaintiff's plans and application until some time in 2017.

4950835.v2

"The sewer line relocation plan was developed in conjunction with the DPW during the past four (4) months with this office. The DPW has approved the plan. There are no outstanding issues from an engineering perspective. Nevertheless, the DPW has recently added conditions to receiving a sign off, i.e., that the client must agree to add a sidewalk along Augusta Avenue (which will cost approximately $250,000.00 to build). This sidewalk was not required by the Planning Board site plan approval nor is it on the signed site plan. No new conditions can be added at this date. This is highly improper because my client already has a signed map."

243.  With respect to the 39 spot "stick-up" he stated at <u>Exhibit 10</u>:

"On or about April 7, 2016, another attorney for my client contacted the town regarding the submitted plans for a building permit for Building "C.". The Building Department approved of the plans but will not issue a permit unless my client agrees to new conditions to satisfy neighbors requests, i.e. the elimination of 39 parking spaces. This is highly improper and contrary to law. My client should not be imposed upon with this request by the Town in this manner. These new requests are not required on an approved project and no new conditions can be added at this date."

### Plaintiff publicly opposes the Town's oppressive tactics, leading to Town retaliation

244.  Plaintiff's principal, Mr. Menche, has frequently spoken out at public meetings concerning the Town's use of coercive pressure aimed at capitulation.

245.  At one Town Board meeting, Mr. Menche declared his intent to battle the Town's lawlessness, stating as follows:

The way I personally, and the way this project in general, have been treated over the past seven years is unconscionable. I have done nothing wrong, but none the less I have been singled out for harsh treatment. The Hearthstone project is a beautiful project that requires far less variances and is far less dense than other similarly situated projects that this Town has approved. The community needs this project.  Nonetheless, the Town has never missed an opportunity to create arbitrary and capricious barriers in the hope that with enough delay and with enough pressure, I will not capitulate to their demands.  My parents and my in-laws survived concentration camps, and they taught me not to get slaughtered, but you need to stand up for your rights and for the community preservation of our constitutional privilege and not to live under tyranny.

246.  Mr. Menche further vocally alleged that the Town was concocting "laws" as it went along and enforcing same selectively as to only Connectivity.

247.  His public expressions and frequent resort to litigation to protect Plaintiff's rights precipitated the Town to retaliate against Plaintiff with greater intensity and frequency.

248.  For example, on or about August 7, 2017 at a Town Board meeting at Town Hall, Mr. Menche passionately voiced similar outrage concerning the Town's misconduct directed toward Plaintiff.  At the end of the meeting, the Acting Supervisor Mr. Ullman yelled at Mr. Menche for speaking up and told him that this public grievance against the Town is just going to "delay your project."

249.  The very next day, the Town issued Plaintiff a Stop Work Order for Hearthstone in connection with minor work that had been performed six weeks earlier.

250.  The temporal proximity of the Stop Work Order to Plaintiff's vocal accusations of misconduct against the Town is further unmistakable evidence of retaliatory motive and action herein because of Plaintiff's exercise of rights protected by the First Amendment.

### The Town has retaliated against Plaintiff<br>because of its refusal to make demanded political contributions

251.  For many years, Plaintiff has refused to make the substantial political contributions solicited by Montal's agents, the Town Supervisor's Chief of Staff and longtime chair of the Town's Democratic party.

252.  Plaintiff's failure to make those contributions is one of the primary reasons the Town has prevented—for over 8 years and counting—Plaintiff from completing Hearthstone.

253.  There is no doubt that if Plaintiff had contributed to Montal's Democratic Party $10,000 ± in 2013, there would have been the same type of special treatment afforded to Mr. Tauber's Monsey Mall, Mr. Gross/Ullman's 14-16 Main Street and Mr. Brachfeld's Town Square projects.  Since 2014, Messrs. Gross and Ullman have contributed approximately $11,000 to the Town's Democratic party.

254.  After approval of its project the Town by Montal conditioned Plaintiff's use of its property upon coerced taking of its private property pursuant to a proposed illegal "reimbursement" scheme refused by Plaintiff.

255.  The Comparator Chart and allegations of this complaint, infra, identifies politically connected developers who have contributed to Montal's preferred candidates or groups.

256.  Many of the contributors used several different spellings (misspellings) of their names, different corporation names, and incorrect home addresses, begging the question of what these developers were trying to hide.

257.  Since 2012 Joseph H. Brachfeld, the developer of the similarly situated "Town Square" development located in the Town, has donated the sum of more than $80,000 to the Town's Democratic Party.

258.  The Town's favoritism of the Town Square Retail (MU-1) and nearby Town Square Office (CS), and contrasting punishment of Plaintiff, based on political contributions is evident based on the incredibly expeditious timeframe of 7 months within which the Town approved the development of Town Square Office and the torturous, more than 8-year process through which the Town has dragged Plaintiff regarding Hearthstone.

259.  Specifically, the Town Square Office development is composed mainly of a proposed seven (7) story office building—by far the tallest office building, at 75 feet, ever to be approved in the Town.

260.  In fact, prior to the 7-month approval of Town Square (75'), the tallest office building approved in the Town was one building with only three stories, or 30' stories allowed under the Town Code.

42

261. Nevertheless, the Town Zoning Board of Appeals granted Town Square Office significant area variances—without imposing any conditions as it did to Plaintiff and without a zone change.

262. In so doing, the Town also "overlooked" the applicable parking requirements, stating only that the Town's and Town Square's professionals agreed that parking was sufficient without the need to get a variance. The Town Code has laws and procedures regarding parking; to wit: Board approval is required - certainly as to Plaintiff.

263. To allow for less parking, the Town and Town Square Office also "collaborated" to reduce the FAR by allowing deduction of common space and mechanical rooms where only walls and staircases may legally be deducted.

264. Also, unlike Mr. Brachfeld who met on the same day with the CDRC and Planning Board and received same day County GML comments, Plaintiff had to wait a full year after CDRC approval and still failed to be seen even once by the Planning Board regarding Hearthstone.

265. For frame of reference, upon approval by the CDRC, a project is referred to the Planning Board.  On average it takes approximately three months after referral to appear before the Planning Board.

266. An approval in seven (7) months for such a monstrous project with major variances but without a zone change and with no conditions imposed, no mitigation for the huge variance granted even considered, and preferred access to the Planning Board is exactly what money, in the form of political contributions, buys in the Town.

4950835.v2

267.  Conversely, refusing to make such contributions has yielded for Plaintiff over eight years of delay and four "successful"[7] Article 78 proceedings.

268.  The Town's highly preferential treatment of Monsey Mall, an MU-1 project with similarly situated development to Plaintiff, further demonstrates the Town's retaliation against Plaintiff for not making sizable political donations in the form demanded—in sharp contrast to Monsey Mall's Michael Tauber.  (See also Comparator Chart at Exhibit 6.)

269.  Since 2011, Monsey Mall's principal, Michael Tauber, has contributed approximately $100,000 to the Town's Democratic party.

270.  More than $25,000 of this sum preceded the Monsey Mall Site Plan Approval.

271.  In exchange for the substantial payments made by Mr. Tauber f/b/o Monsey Mall before the Planning Board's Site Plan approval, in temporal proximity to the forthcoming submission to that board, Monsey Mall easily received approval with a SEQRA Negative Declaration for its development of 69 units on 3.25 acres.

272.  Meanwhile, Plaintiff is still unable to build its project on 6.65 acres, and the highest total number of units permitted is 56, with 53 is as of right!

273.  Also, in vivid contrast to Monsey Mall, the Town abruptly issued a proposed SEQRA Positive Declaration with respect to Hearthstone when Plaintiff presented its 84-unit plan.

274.  The Comparator Chart reveals that none of the other MU-1 projects besides Plaintiff's was subject to any conditions imposed by either the Planning Board or ZBA.

---

[7]The Town's constant moving of the goalpost renders Plaintiff's Article 78 successes pyrrhic victories. Plaintiff, having liquidated already $18 million to hang on cannot afford to win more Article 78s.

4950835.v2

275.  Instead, all the other projects are owned by developers who have contributed very substantial sums to solicitations by Montal and her agents, and/or are otherwise connected to the Montal machine.

### 'PAY TO PLAY' DEFINED

276.  As used in the SAC, the phrase "pay to play" is intended to mean that development approvals and Town Facilitation thereof are directly tied to:  (i) The making of solicited political contributions by developers with the "wherewithal and incentive" to contribute and/or (ii) The ability and commitment to deliver solicited blocs of votes which are valued as "money in the bank" and the key to political survival in Ramapo and/or (iii) Following the "orders" with respect to the form of donation solicited by political leaders who keep their power pursuant to (i) and (ii) above.

277.  Montal is not an elected official and keeps her kingship position by getting all those around her elected.

278.  At all times relevant herein Montal has led the Town's pay to play system.

279.  Those who pay like the MU-1 Comparators in Exhibit 6, supra, and follow orders from Montal prosper; those who do not, namely Plaintiff, and challenge (by speech or resort to judicial remedies) the corrupt status quo, retaliation against their projects (and against the principal as well if a Town resident and/or owner of other property in the Town) follows in response.

280.  The Town, at the direction of Montal, has very clearly retaliated against Plaintiff's principal as well with messages "explaining" that the retaliation is because of Plaintiff's legal challenges and, *inter alia*, vocal publicization of judicial decisions and vocal claims of unequal treatment.

281.  The Town in previous lawsuits has adopted the same tactics, punishing those that resist.

282.   Beyond the stark difference of treatment by the Town of Monsey Mall, Town Square, A&B Market and 14-16 Main St. and other similarly situated contributing developers as compared to Plaintiff, the Town's "pay to play" policy is readily apparent from an email solicitation dated September 29, 2014 penned by Montal and targeted to developers and their consultants.

283.   In this desperate solicitation entitled "Help Needed – "Red Alert," which was part of an emergency campaign to raise $170,000 in <u>one</u> week to keep the Town" developer friendly," Montal wrote:

> In one week we need to raise $170,000. Thus far we have commitments for $130,000…We are only asking those who have the ***wherewithal*** and the ***incentive*** to make sizable contributions as we do not have time for a grass roots campaign…We really need your help. ***As I mentioned most of the developers are contributing between $10,000 and $20,000***.

A copy of Montal's email is annexed hereto as <u>Exhibit 11</u>. (Emphasis added.)

284.   Montal's plea for "developers" with the "wherewithal" and "incentive" to donate at least $10,000 to $20,000 cements the inference that official approvals from the Town for developers are "for sale" – so long as you contribute to the favored political party.

285.   The nexus in a document penned by Montal of political contributions and <u>developers</u> with the "<u>wherewithal</u>" and "<u>incentive</u>" to donate is, realistically, the closest evidence one could hope to find to support the inference of the Comparator Chart at Ex. 6, to wit:  that official Town action favorable to developers is "for sale" in Ramapo as long as you are in good standing with the Montal machine.

286.   During Plaintiff's endless nightmare of dealings with the Town, Plaintiff has been directly solicited by individuals acting on behalf of Montal for political contributions with the explicit pitch that donating will help Hearthstone proceed.

46

287.  Plaintiff refused to contribute under those circumstances.

288.  And not only did Plaintiff refuse, Plaintiff contributed in 2015 directly to whichever candidate it preferred, an act which drew immediate vindictive retaliation.

289.  In fact, Plaintiff's direct contribution to a candidate of Plaintiff's choice sent Montal's agents into a rage. They indicated that Plaintiff would be severely punished for such independent exercise of free choice—a threat on which the Town continues to follow-through, with Hearthstone now languishing in its ninth year.

290.  Specifically, one of Montal's minions, Isaac Lebovitz, at numerous meetings with Plaintiff in his father's Monsey home and Jacob Wachshall numerous times at Cong. Ohr Hachaim at 18 Forshay Rd, Monsey, New York after morning prayers lectured Plaintiff that every contribution must go through Montal and it would benefit your project to contribute.

291.  Plaintiff was also asked directly to contribute cash for taxis and buses and was pressed at the end of 2016 to support a Town Judge.

292.  Prior to any election, including as recently as 2020, Plaintiff was lectured to "be smart and support our needs."

293.  Plaintiff was informed that every contribution must go through Montal's PAC, so the Town Board members and other elected officials are beholden to Montal.

294.  Mr. Wachshall has also expressed that he wants to partner with Plaintiff's principal on another project that has been languishing for at least seven years that Montal and the Town Supervisor do not want to consider for development.

295.  In 2015-2016 at her home in Suffern, NY, Montal solicited donations from Mr. Menche for Friends of Alan Simon for Spring Valley, Friends of Shmuel Tress (ZBA member

4950835.v2

running for Town Board) and Friends of Michael Rossman (current Town Board Member) and others.

### The Difference In Treatment Of The Politically Influential And Donor-Applicants With The Wherewithal To Take Advantage of The Incentive System As Compared To Plaintiff Is Like Night And Day

296. There are other well-known connected developers in Ramapo whose project approvals raise eyebrows because they involve approval of unheard of density such as the Gross/ Ullmann Bluefield Extension of 24 units on only one acre. Similarly Mr. Tauber's feat on Monsey Mall was only one reward as his record reveals $100,000 in donations and his resume lists the Ramapo Affordable Housing Developer selection for its 132 unit Elm Street development without public bidding and public records reveal his ownership of over 7 units and another unaffiliated ownership acquired more than 15 of the "affordable housing "units which was the very purpose in the first place of this affordable housing municipal project. Quite obviously Monsey Mall and the specific payments in temporal proximity are the tip of the iceberg in Ramapo. Discovery can connect other Tauber benefits with additional large payments in close proximity thereto.

297.  Other methods of donations, contributions, favors, barter and efforts to conceal the real party making the contribution abound and as relevant here many have been itemized.

298.  Plaintiff knows of and alleges for example that a senior member of the Town administration was granted the use of a multimillion luxury home overseas. These favors come with expectations and understandings as to reciprocity.

299.  Among the major contributions with substantial amounts located by Plaintiff are many from consultants, contractors and third parties with no apparent connection to the local candidates. In short, the existence of efforts to conceal the true identity of the donors and amounts only adds to the inference of impropriety here. For example, Mr. Berel Karniol gave in 2014 and 2015 and stopped because his substantial contributions in temporal proximity to his high profile

4950835.v2

and controversial development applications were publicized and he looked foolish trying to explain away his having contributed $40,000 merely because "someone asked him."  Nonetheless, he continues to get preference and actually told a potential investor on his new major project in Ramapo, "I can get anything in Ramapo and you will gain by that."

300.  Per Rockland County Legislator Charles Falciglia, another similar major developer, Joseph Kazarnovsky, cut five checks totaling $20,000 to the local party just after he contracted to purchase a $32 million site. Clearly he has an expectation (or understanding) regarding the use of the just acquired land. In fact the Town itself paid for a very costly study called the Northeast Comprehensive Plan. His plans for this Northeast Corridor have been teed up with much work and cost paid for by the Town. This is highly unusual as was called out by the County Legislator and certainly not done for others except for a Joseph Brachfeld i.e., one of the other large donors.

301.  Plaintiff actually has similarly situated land called Summit which is in the Southeast and the Town has gone out of its way to hinder all efforts by plaintiff to proceed. Unlike Messrs. Brachfeld and Kazinovsky, Plaintiff barely secured one meeting with the supervisor and then no follow up. The Town assured Plaintiff that any sale of town land near Summit would be offered to Plaintiff first as it abuts to his property and he gets first rights, and only upon refusal does the neighbor get to buy the surplus property. After writing a letter to the supervisor and Montal he was reassured that it is his but the Town did otherwise.  The Town then sold the strip needed by Plaintiff to another without any notice to Plaintiff. The Town has not met with Plaintiff further on Summit. Instead, Plaintiff is treated like a leper or pariah and all requests to meet are disregarded.

302.  Plaintiff was promised a Southeast Comprehensive plan to allow Summit small apartment rentals, but none have been scheduled after years of delay.  Yet, the Town Square Office

was approved in 7 months without a Southeast Comprehensive plan, without a zone change, without having to donate land to the Town for a park, and no conditions were imposed.

303.  The large donor developers and those with political influence are clearly subject to different rules. In fact, one developer has solicited investors based upon his bold but very open boast that he can obtain whatever he wants from the Town. His track record of project approvals with very liberal terms backs up his bravado.

**<u>Town officials have treated Plaintiff with animus and personal hostility</u>**

304.  That Paul Gdański of DPW was among the many Town officials who exhibited intimidation tactics and personal animus to Plaintiff. Specifically, he yelled at Plaintiff and threatened Plaintiff's principal that if he did not immediately bring him a Site Plan he would call the D. E. C. Plaintiff followed his instructions and delivered site plans the same day.  Yet, Gdanski sicced the DEC upon Plaintiff anyway.

305.  Additionally, Mr. Gdanski challenged Plaintiff's engineer over an identical plan that he himself and the same DPW department had just approved for the project across the street from Plaintiff approximately two years earlier.

306.  Again, what was perfectly fine for all others, the Town denied for Plaintiff while fighting Plaintiff and its highly regarded professionals tooth and nail and abusing and mistreating Plaintiff throughout.

307.  The Town Supervisor and other Town officials including Deputy Town Attorney Michael Klein screamed at Plaintiff's principal; in Klein's case, uncontrollably.

308.  Plaintiff has routinely had to wait <u>four</u> hours to merely file plans with a clerk (sometimes being forced to return the next day) and get the transmittal stamped; since the Town has "lost" documents too often for Hearthstone for it to be accidental.

4950835.v2

309. The Town has routinely and continuously refused to perform even the most ministerial talks with respect to Hearthstone, while the red-carpet treatment is given to developers that contribute, keep quiet and do not pursue judicial relief like Plaintiff has herein.

310. Town officials have threatened Plaintiff and its principal with reporting of Plaintiff's project to State authorities like the DEC and OSHA and have in fact acted on such threats.

311. The Building Inspector (as a result of a DPW demand sparked by the baseless complaints about the size of one of the Buildings at Hearthstone) required Plaintiff to survey the Property a <u>second</u> time.

312. Since Plaintiff rebuffed Montal's terms Plaintiff learned, as described with precise factual detail herein, that Montal had the power which she abused under color of law to the severe detriment of Plaintiff.

**As part of its payback, the Town stalls for months on Connectivity's application for approval of its Second Amended Site Plan to incorporate the First ZBA Conditions**

313. As promised, at the direction of Montal, the Town and its various agencies retaliated again against Connectivity (<u>after approval</u>) for direct support of a political candidate, for publicly speaking out against the Town's tactics, for pursuit of judicial remedies and for not making sizable political contributions (in the form required) upon demand.

314. The Planning Board, Town Attorney, and Department of Public Works ("DPW")struck next at the July 26, 2016 hearing on Plaintiff's Second Amended Site Plan.

315. In particular, the Planning Board and Town Attorney recanted their commitment to treat Connectivity's ministerial amended application as a "miscellaneous" administrative item.

316. So too, the DPW improperly refused to classify the relocation of the sewer pipe to its original location as a "field change" or administrative matter, even though both the Building

Inspector and initially the Deputy Town Attorney, Mr. Berman, had already correctly determined that it was merely a field change.

317.  Moreover, the Planning Board itself had already treated the prior sewer relocation in the typical expedited fashion with their waiver of public hearing and approval of the First Amended Site Plan, with the clear approval of these same three Town officials.

318.  As a result, the Planning Board adjourned the matter, but,while it adjourned other matters on the July 26, 2016, calendar for less than a month to August 23, 2016, the Planning Board intentionally adjourned Connectivity's site plan application for another three months to October 2016.

319.  Then, at the October 2016 meeting, the Planning Board advised Connectivity that it now deemed the Second Amended Site Plan a "Revised" Site Plan requiring a formal application and not just a "design" change as they had previously opined at the July 26, 2016 meeting.

320.  Requiring a further application or new "revised" one for what should never have been a matter requiring a formal Planning Board application and hearing was ridiculous.

321.  Given that this oppressive action was accompanied by several other blatant failures of the Town to perform ministerial tasks involving no discretion, Plaintiff immediately pursued judicial relief.

**The Planning Board imposes illegal
conditions on the Second Amended Site Plan**

322.  On January 10, 2017, almost one year after Connectivity submitted its application for the ministerial approval of the Second Amended Site Plan (with the de minimis ZBA resolution

52

conditions extensively delayed by the Town and the sewer relocated to the original approved location), the Planning Board held a public hearing.

323. Following the closure of the public hearing, the Planning Board approved the Second Amended Site Plan, but, despite the mixed-use zoning which contemplates both commercial and residential use, the Planning Board added "conditions" prohibiting commercial vehicles from accessing the rear of Building "C" which faces Treetop Lane and required the planting of expensive trees instead of "landscaping" along the buffer with Treetop Lane (collectively the "Planning Board Conditions").(A copy of this Resolution is annexed hereto as Exhibit 12.)

324. The Planning Board Conditions were totally unrelated to the minor changes involving the sewer line relocation and incorporation of the First ZBA Conditions.

325. The Planning Board Conditions were imposed contrary to law and the Town Attorney's recommendation.

326. Nothing related to the de minimis amended site plan or "revised" site plan (using the semantics game the Town maliciously played to foist more delay upon plaintiff), could ever have led to a no commercial parking ban condition.

327. A fortiori, this condition on an already approved mixed use development which is based on both residential and commercial shared space is an oxymoron.

328. Then, in seeking to stymie Hearthstone in every way conceivable, upon the advice of the Town Attorney, the DPW refused to sign the Second Amended Site Plan, a ministerial requirement without discretion, even with the Planning Board Conditions, forcing Connectivity to commence an Article 78 proceeding to compel the ministerial execution of the approved Site Plan by DPW and the Planning Board.

4950835.v2

329.   Defendants' baseless and vindictive actions also included:(a) Declining to issue (or even process) the Building "C" building permit applied for in February 2016 which had been approved, (b) refusing to issue a sewer permit,(c) prohibiting Connectivity from continuing to install site improvements, including drainage improvements while refusing to perform necessary and routine drainage inspections, and (d) ignoring Connectivity's FOIL requests aimed at discovering what was behind, and who was orchestrating, the Town's policy to bury Hearthstone.

**Connectivity prevails in its first two Article 78 proceedings challenging, *inter alia*, the Planning Board Conditions, the Town's refusal to issue a building permit, <u>refusal to sign the Second Amended Site Plan and refusal to inspect drainage improvements</u>**

330.   Connectivity commenced successive Article 78 proceedings against the Town seeking, *inter alia*, annulment of the Planning Board Conditions and an order compelling (a)the Planning Board Chairman to sign the Second Amended Site Plan following the Court ordered DPW signature, (b) the Court Ordered issuance of the building permit for Building "C" after an Order of Mandamus against the Building Inspector compelling him to review the "sitting" application (c) compliance with the FOIL requests the Town willfully ignored, and (d) mandamus to compel the Town's DPW to conduct long-overdue drainage inspections.

331.   By Decision and Order dated October 16, 2017, in two Article 78 proceedings combined for Decision, the Supreme Court, Rockland County, granted all the relief requested in Connectivity's petitions to the extent it was not mooted(just a few months before the court decision, both DPW and the Town Attorney agreed that it's a "field change") by the eleventh hour Town reversal of its always indefensible "position" that the sewer relocation required formal Site Plan amendment procedures. (A copy of the October 16, 2017, Decision and Order, hereinafter referred to as the "2017 Article 78 Decision," is annexed hereto as <u>Exhibit 13</u>.)

54

332.  As there never was a good faith colorable basis for any planning board hearing on the de minimis site plan amendment at issue and the minor technical changes were approved at <u>two</u> CDRC meetings, the Court easily recognized the blatant procedural and substantive irregularities imposed upon Plaintiff.

333. Thus, the 2017 Article 78 Decision annulled the procedural transgressions, explaining that on an application for an amended site plan "only those site development plan elements proposed to be modified or changed"—here, there really were none—"need be presented, except where such modification or changes have a material and substantial impact on the balance of the site development plan and functioning of the site."

334.  Next, the Court addressed the substance noting that three years earlier all of these "issues" were addressed at the proper time i.e. before the October 21, 2014 Site Plan Approval:

> In the instant matter, the Planning Board granted final site plan approval on October 21, 2014, and presumably could have and/or did consider issues such as commercial traffic, noise, fencing and screening, and other community concerns at such time.  Likewise, at that time, it could have required the planting of "trees," as opposed to "landscaping," on the property line bordering Treetop Lane, as it specifically did with respect to the property line with Augusta Avenue and the green recreation area designated "Area A" on the map.  Respondents chose not to do so. The March 8, 2017, decision also makes clear that the engineer testified that the plan reflects the ZBA's resolution of approval showing fences and landscaping along the Treetop property boundary and trees on the August side, and that during at least two CDRC meetings, there were no suggested changes to the plans from the Town Staff.  In fact, the CDRC approved the landscaping plan as submitted by Petitioner on January 22, 2017.

> (<u>Exhibit 13</u>.)

335.  Lastly, in its holding annulling the Planning Board Conditions, the court concluded:

> [T]he record itself does not provide any factual support for the changes required by the Planning Board. The imposition of conditions which have no objective factual basis in the record, but instead rest on "subjective considerations such as general community opposition" are improper, arbitrary and capricious . . . In the instant matter, the community objections were not supported by any of the [Town's] consultants and/or are contradicted by the negative SEQRA declaration previously adopted by the Board.

(Id.) (Citations omitted.)

336.  The 2017 Article 78 Decision also addressed a  litany of additional legal violations by the Building Inspector, Department of Public Works, Town Clerk and additional Planning Board failures and refusals to perform.

337.  Specifically, the court: (a) Noted that the Town (PB) had failed "to offer any explanation for their refusal to sign the amended site plan"; (b) Directed the Town (PB) "to sign [the Second Amended Site Plan] within ten (10) days..."; (c) Recorded that the Town (Building Inspector) had further failed "to offer [even to the Court] any explanation for why [it has] not issued a decision on the building permit other than that the site plan has not been signed[8]"; (d) Directed the Building Inspector to make a determination on the building permit application within 30 days; (e) Concluded that the Town (DPW) failed "to offer an explanation for why they have refused to conduct inspections of drainage improvements required to be installed as depicted and approved on the initial site plan approval and amended site plans" and ordered such inspections shall be made forthwith so that construction may resume and (f) Determined the Town (Clerk) had no basis for ignoring Plaintiff's FOIL searches and thus directed compliance therewith (emphasis added).

338.  Although plaintiff submitted its building permit application and architectural plans in February of 2016 for review and approval, and while the 2017 Article 78 Decision directed the Building Department to make a determination on the building permit within 30 days (so by November 2017), the Building Department – even in the face of the Court Order – did not issue the building permit until September 2018.

---

[8]The Court also observed that the Town had offered no explanation for why Plaintiff's site plan had not been signed See Exhibit 13.

4950835.v2

339.  This added an unconscionable delay totaling approximately 34 months from the date Plaintiff applied for a building permit to the date of issuance.

340.  In addition, three years elapsed from the Town's initial Site Plan Approval in October of 2014 until the 2017 Article 78 Decision Order directing the Planning Board to sign the Second Amended Site Plan.

341.  Without a signed Second Amended Site Plan, Connectivity was unable to receive utility permits.

342.  Further, the Town stopped issuing building permits, effectively bringing all development progress to a complete and illegal stop.

343.  Rather than being deterred by the 2017 Article 78 Decision, though, to date the Town has persisted and escalated in its unlawful and retaliatory conduct.

344.  Specifically, the Town in or about 2018 – 2019 engaged in the hideous repetition of the same illegal tactics with the ZBA, Planning Board and Building Inspector putting the brakes on the approved project.

345.  This Town conduct was appalling and conscience shocking in the context of this record, in sharp contrast with the regular Town process and the special treatment accorded to the favored developers in the Town with the "wherewithal" and "incentive" to heed Montal's call to ante up.

346.  Adding to the unconscionable predicament Plaintiff found itself in more than four years after its Site Plan Approval in October of 2014, Plaintiff should never have been forced to appear for public hearing before the Planning Board, the "conditions" imposed by the ZBA and Planning Board were so obviously pretextual and unrelated to the matters before the board

(although "spot on" with the Supervisor/Neighbor's Deal and Montal's demands) they do not pass the straight face test.

347.  Lastly, the Planning Board's unfathomable project denial in 2019 is the icing on the Town's "cooked" cake.

348.  As this endless runaround continued, unfortunately, the Town's scheming compelled Plaintiff to bring its next Article 78 to overturn the next illegal decisions of the Town's boards.

**The Town maliciously imposes higher permit fees
on Connectivity than on similarly situated projects**

349.  In further targeting Connectivity for unequal treatment, the Town (a) assessed Connectivity with higher fees for permits as compared to the other Comparators and (b) misrepresented Connectivity's filing date of February 2016 in an attempt to fraudulently overcharge fees to Connectivity by using an unlawful fee schedule which applied only to applications filed after June 1, 2017.

350.  Specifically, beginning in 2016, the Town changed its fee schedule three (3) times over the course of just over a year (December 2016 – February 2018), when it had not previously revised its fee schedule since 1995.

351.  In addition, the Town charged Connectivity a foundation permit fee in 2016, when the Building "C" foundation was constructed, and then again charged a full foundation permit fee in 2018 for the same (basement) foundation but this time under the higher 2017 fee schedule. It did the same for Building "A".

352.  Thus, as part of its strategy to maliciously bury Plaintiff the Town is unconscionably and maliciously delaying the approved project while it raises Plaintiff's Property

4950835.v2

taxes and forces payment of the latest and higher fee schedule, while Plaintiff cannot use the Property.

353.  Lastly, for permits the Town applies its most recent and highest fee schedules, despite the clear fact that <u>but for</u> their illegal conduct and delay (as established by the State Court decisions) the prior and much lower fee schedules would have applied.

354.  Most egregiously, even though Plaintiff had submitted its building permit application and plans in or about February 2016 (and on two other occasions in 2016 when the Town claimed it had lost the prior filings—a total of <u>three</u> submissions in 2016), in 2017 the Town charged Plaintiff a much higher commercial construction fee schedule that did not become effective until June 2017 and which commercial rate is <u>five</u> times the residential rate.

355.  The Town even tried to apply the much higher new commercial fees schedule to the residential portions of Hearthstone's Building, even though they are residential and not commercial. Eventually the Town refunded this illegal charge.

356.  These "games" are not played with other favored developers.

357.  This entire episode is yet another glaring example of the Town's abuse of power selectively and maliciously applied to Plaintiff in its efforts to coerce payment of higher fees under false pretenses.

358.  Along the way the Town Building Inspector falsely represented in a sworn Affidavit the date Plaintiff's architectural plans were filed, claiming that the plans and building permit application filed 3 times in 2016, were not filed until September 2017.

359.  Incredibly, the Building Inspector swore in an Affidavit forming a part of the record in the Article 78 decided <u>after</u> the commencement of this action (see <u>Exhibit 14</u>, infra) that

4950835.v2

Plaintiff's Building "C" architectural plans were not submitted until September of 2017 in order for the Town to collect the higher fee schedule effective June 2017.

360.  This Affidavit was false and the proof of its lack of veracity was overwhelming, namely, filing proof in February of 2016 and multiple follow-up references in letters from Plaintiff's counsel and engineer.

361.  Further, in the 2017 Article 78 record of complains about the Building Inspector's failure to review these plans in 2016, not once did he or the Town <u>ever</u> claim they didn't have the plans or a complete application in 2016.

362.  This intentional misconduct by the Building Inspector speaks volumes as to the Town's bad faith, abuse of power and malicious Town-wide policy toward Plaintiff.

363.  Indeed, in a Decision and Order dated May 24, 2021 annexed hereto as <u>Exhibit 14</u>, the state court ruled that the Town illegally overcharged Plaintiff for the Building "C" building permit fee by trying to invoke an erroneous 2017 application filing date in order to apply to Plaintiff a much higher fee schedule.

### In October 2017, Connectivity applies for a Third Amended Site Plan to address <u>an invented new interpretation of the Zoning Law by the new Building Inspector</u>

364.  Plaintiff's approved foundation structural construction plans for Hearthstone depicted Buildings "A" and "B" as sharing a common basement.

365.  Despite sharing a basement (given the required need for a second exit), from the outset of the application process, Plaintiff and the Town deemed Buildings "A" and "B" to be two separate buildings, and were approved as such.

366.  Consistent with this interpretation, the Building Inspector issued separate foundation permits for Buildings "A" and "B" and each of Building "A" and "B" was approved for the as of right 16 residential units.

367.  The foundation structural plans clearly depict an underground connection between Buildings A and B.

368.  Since no provision of the Town Zoning Code compels a contrary determination, there was no conceivable legal basis to ever revisit or overturn the original Building Inspector's zoning code interpretation or the ZBA's and Planning Board's approval in 2014 of Buildings "A" and "B" as separate buildings allowing for 16 units in each Building.

369.  A fortiori, when the foundations were already constructed, and the prior Building Inspector had already made the contrary interpretation.

370.  The First Amended and Second Amended Site Plan was approved by the Planning Board as well with "A" and "B" as separate buildings.

371.  The Court's Order at Exhibit 13, supra, had also directed the Planning Board to sign the Second Amended Site Plan with "A" and "B" as two buildings.

372.  Nevertheless, in or about the spring of 2017, the Town's new Building Inspector, Ian Smith, informed Connectivity that the already approved Buildings "A" and "B" were going to now be treated by him as one building, and not two as already approved.

373.  This major change in the classification of the approved Site Plan Buildings A and B was not reduced to writing in an interpretation of the Zoning Ordinance by the Town  Building Inspector.

374.  Although Connectivity requested that Mr. Smith substantiate the legal basis for his determination in writing, he never did so.

375.  As a result of this abrupt and manufactured new decree, Connectivity was forced to apply for yet another "amendment," this time to the Second Amended Site Plan. It was also

compelled to seek another variance from the ZBA to allow for 32 units in what was now being considered a "single" building.

376.  This whole incident with the new Building Inspector was highly unusual and a further irregularity in the "special" process applied to Plaintiff.

377.  The change of classification of the approved Buildings "A" and "B" to one building had no coherent explanation or code citation. It was yet another ploy to stop the project.

378.  To the extent this change applied to Plaintiff  was a new "interpretation," Plaintiff had an already approved Site Plan and the prior building inspector's interpretation was final.

379.  Because it was again being forced unlawfully by the Building Inspector and Town Attorney to return to the ZBA, in or about October 2017 Connectivity applied to the Planning Board for a Third Amended Site Plan to reflect, *inter alia*, the following minor changes for which variances would be required yet again:

a.  32 residential units in the now one Building (formerly "A" and "B") as mandated per Inspector Smith's new order, a ministerial change having no impact on the layout, footprint, or placement of the same two buildings already approved for 16 units apiece;

b.  A total of 24 smaller residential units, rather than 16 larger units, using the same footprint in Building "C," for a total of 56 units at Hearthstone, only three more than the 53 units Connectivity was always entitled to as-of-right under the Zoning Law (8.4 units/acre);

c.  Eight (8') foot soundproof fence instead of a six (6') foot fence to accommodate the Neighbors' and Montal's request for additional screening; and

d.  A 25% reduction in parking spaces (453 to 342), a waiver the Planning Board was authorized to grant as of right, and an uncontroversial request considering the mixed-use nature of the development and the fact that the ZBA on average routinely granted 48% reductions to the MU-1 Comparators and other commercial projects pursuant to a waiver without referral to the ZBA.

4950835.v2

380.  Because of the absence of MU-1 general use conditions on its site plan, Monsey Mall and 14-16 Main St. were also not required to seek any variance to construct more than eight (8) units per acre or sixteen (16) units per building. Accordingly, the Town approved Monsey Mall's plan for 69 units in one building without even requiring any variance.

381. Using the residential density granted to Monsey Mall and 14-16 Main St. as guidelines, but for the highly unequal treatment and irregular process applied to only Hearthstone, Plaintiff would have been entitled to somewhere between 140± units using Monsey Mall as a comparator and approximately 163 units using 14-16 Main Street as a comparator based on the same or substantially similar variance percentages applied to these comparators.

382.  Of course, for Plaintiff the Town restricted Hearthstone to 56, with smaller units in Building C.

383.  Although the proposed amendments were minor, the Planning Board delayed hearing the application for ten months by procedurally treating the Third Amended Site plan as a brand-new application requiring a "new" SEQRA determination.

384.  This decision was particularly egregious considering that on July 10, 2013 the Town Board had issued a Negative Declaration determining that 56 residential units did not pose any "significant adverse impact on the environment."

385.  Finally, on August 21, 2018 by a unanimous 5-0 vote, the very same Planning Board adopted a Negative Declaration, concluding that the amendments and requested variances would not have a significant adverse impact on the environment, including with respect to traffic and neighborhood character.

386.  At meetings conducted in August and September 2018, the CDRC also did not raise any concerns.

63

387.  The Planning Board next referred the matter to the ZBA to consider the modest variances.

<b>In granting the variances, the ZBA imposes<br><u>several irrational and retaliatory conditions</u></b>

388.  Although Connectivity applied to the ZBA in September 2018 for approval of the variances, the ZBA did not hold a public hearing until January 31, 2019, adding a needless four-month delay, while Town Square was able to conclude everything on their massive project in 7 months with preferential treatment very apparent.

389.  At that public hearing, the Neighbors, represented by counsel, appeared *en masse* to oppose Connectivity's application for variances that would, ironically, benefit the Neighbors— *i.e.*, less parking, smaller residential units in the same footprints, and a higher fence.

390.  The public hearing was ultimately adjourned for another month and a half to March 14, 2019 after a neighbor bogusly asserted that Plaintiff's surveyor's boundary was wrong—a private property line dispute over which the ZBA has no jurisdiction.

391.  This 6-week delay only increased Plaintiff's professional fees.

392.  At the March 14, 2019 hearing, the ZBA continued the Town's discrimination and arbitrary and capricious conduct against Connectivity by coupling the variances that the Board members themselves opined were not substantial with several invalid conditions that were not substantively related to the variances sought.

393.  Most strikingly, the ZBA required Connectivity to fulfill the parking space and landscaping promises St. Lawrence had illegally made <u>long</u> after site plan approval in February 2016 to the Neighbors and, *inter alia*, Montal had demanded in February and November of 2018.

394.  First, the ZBA mandated that Connectivity <u>eliminate</u> the 39 parking spaces behind Building "C"—the same 39 spaces that in February 2016 St. Lawrence had promised the

64

Neighbors the Town would eradicate and that former Town Attorney Klein and Montal tried to strongarm Mr. Menche into removing (the "39 Spot Condition"), while dangling before Plaintiff the same "carrots."

395. With respect to the elimination of the 39 parking spots, this latest "condition" was a repeat of the Building Inspector's Building C Building Permit ransom demand made in 2016, which Mr. Jackson complained about in writing and which had already caused a 34 month delay in the inspectors from non-discretionary code obligation to review and decide all building permit applications within 30 days and, of course, great loss to Plaintiff.

396. Second, in flouting the 2017 Article 78 Decision striking the Planning Board's condition that Connectivity plant one row of Leyland Spruce evergreens along the entire Treetop Lane property line, the ZBA now required that Connectivity plant two rows of Leyland Spruce evergreens along the entire Treetop Lane property line (the "Evergreen Condition").

397. The ZBA thus made good on the Town's vow in the Supervisor/Neighbor's Deal that the Town would "establish the first 20 feet as a buffer with evergreen trees that are high enough and dense enough to completely block [the Neighbors'] view of the 8-foot fence behind it."

398. Given that the earlier condition which tried to slap Plaintiff with arbitrary new landscaping burdens had been tossed by the Court in 2017, there was no good faith basis to believe that a second bite at the apple would be countenanced.

399. The other conditions imposed were: (a) To provide 10 extra feet of buffer along the Property/Treetop Lane border, which would cause Connectivity to move the existing wall 10 feet forward at significant expense; and (b) Dedication of fifteen parking spots to the east of Building "C" for residential parking only. (Collectively with the 39 Spot Condition and Evergreen Condition, the "Second ZBA Conditions.")

400.   As she did at the initial January 31, 2019 ZBA Meeting, at the March 14, 2019 ZBA Meeting the ZBA's own counsel, Alyssa Slater, Esq., cautioned the ZBA against imposing conditions that were unrelated to the variances sought in the Third Amended Site Plan.

401.   Yet, the ZBA imposed the Second ZBA Conditions in spite of the advice of counsel and the ruling of the 2017 Article 78 Decision which had already overturned the Planning Board's conditions to the Second Amended Site Plan that were also unrelated to the *de minimis* amendments sought.

402.   In particular, at the March 14, 2019 hearing ZBA members Berkowitz and Lefkowitz at the start of the meeting discussed stripping Plaintiff of the 39 spaces and increasing the buffer—exactly as agreed in the St. Lawrence/Neighbors' Deal struck three years earlier:

Berkowitz: - - I'm not certain we're gonna *[sic]* take away some spaces, but if we take away some of the spaces, and I believe we will—we . . . . Mr. Lefkowitz, you have an idea? (emphasis added).

Lefkowitz: We should take away the spaces.

Berkowitz: My comment was predicated on our conversation that we remove some of the parking to increase some of the buffer.

403.   It is clear from Mr. Berkowitz's first statement at the opening of the session that, prior to the meeting, he and the ZBA were determined or instructed, or both, to remove the 39 spots.

404.   While the ZBA granted for similarly situated MU-1 developments Town Square (retail – 2016), Monsey Mall (2012), A&B Market (2014) and 14-16 Main St. (2019) much larger variances, the ZBA did not impose any conditions on them in connection with their huge variances.

405.   Monsey Mall, A&B Market and 14-16 Main Street were not required to ever seek per unit area variances from the MU-1 requirements. (Other details are defined in the Comparator Chart at Exhibit 6, supra.)

66

4950835.v2

406.  Despite, *inter alia*, Building "C" having the same footprint as it did five (5) years earlier when three of the six ZBA members previously granted variances for Hearthstone, the ZBA unanimously imposed the illegal Second ZBA Conditions.

407.  The ZBA instituted the Second ZBA Conditions even though its members agreed that the smaller 56 units "won't cause a detrimental effect to the neighborhood – or it's not substantial" and even admitted that smaller units translate to "less kids and younger kids."

408.  Under the circumstances acknowledged by the ZBA the imposition of such major "conditions' on admittedly minor variances arising from the inspector's changed interpretation was transparent and unconscionable.

409.  The 39 Spot Condition eliminated $2 million in value of already approved property from Plaintiff's fully approved Site Plan already partially improved under duly issued permits. (See additional foundation and building permits issued to Plaintiff before the Second ZBA Conditions on 3/14/2019 marked Exhibit 15.)

410.  Hoping to end the Town's relentless abuse, prior to the ZBA's adoption of the Second ZBA Variances, Connectivity had even offered to "voluntarily" eliminate the portion of the 39 spots that faced Treetop Lane, but Monal insisted on all or nothing.

411.  The Town rejected Connectivity's proposal, with Montal making Connectivity's "choice" clear: Remove all 39 spots and take the "reimbursement" deal, or, suffer the consequences.

412.  The 39 Spot Condition was imposed in furtherance of the Town's abuse of power and Town policy premised upon illegality, inequality and a taking of private property.

413.  The Town's attitude and abuse of power aimed at Plaintiff was like the wild west with the Town lawlessly doing as it pleased without explanation (see Exhibit 13, supra.).

67

414. The Town was at all times well aware that the New York Eminent Domain Procedure Law provides a legal mechanism for condemnation of privately owned real property for public purposes and payment of just compensation i.e., if the Town desired to take the 39 spaces from Plaintiff's approved site plan it had a legal remedy assuming of course a public purpose.

415. Here, what Plaintiff has suffered all other Ex. 6 MU-1 Comparators have escaped.

416. Given the volume of substantive and procedural differences in treatment and uniquely harsh and targeted illegal obstacles constantly thrown Plaintiff's way including after each successful legal challenge (with repetition of the same illegal actions and continuous, repetitive refusals to perform ministerial non-discretionary tasks) the Town's illegal policy toward Plaintiff became firmly ensconced and permanent.

417. The Town's actions herein were in derogation of law and in frustration of Plaintiff's investment-backed expectations.

### The Planning Board wrongfully denies approval of the
### Third Amended Site Plan incorporating the Second ZBA conditions

418. Akin to Connectivity's coerced February 2016 application for Second Amended Site Plan Approval, the Planning Board similarly failed to treat Connectivity's application for approval of the Third Amended Site Plan incorporating the variances and Second ZBA Conditions as "miscellaneous" expedited plan adjustments, instead, absurdly and irregularly requiring Plaintiff to undergo a formal application process and public hearing.

419. On May 14, 2019, the Planning Board held a public hearing on the Third Amended Site Plan application.

420. The Planning Board's scope of review was limited solely to the proposed amendments contained in the Third Amended Site Plan.

4950835.v2

421. Dennis Lynch, Esq., the Planning Board's attorney, reiterated to the Planning Board the limited scope of review, stating: "My opinion is that you're bound by your prior precedent" and "my opinion is that you can only do what's before you."

422. <u>Yet the Planning Board contumaciously denied the application by a unanimous 6-0 vote, in the ultimate act of defiance of Plaintiff's rights.</u>

423. Even though virtually nothing about the previously approved Hearthstone had changed over the course of five (5) years (except irregular and irrational conditions and restrictions imposed by the Town <u>only</u> against Hearthstone and no other Comparator) and the acquisition of vested rights by Plaintiff's substantial construction, all three of the Planning Board members who remained from the Board that in 2014 unanimously approved the Original Site Plan (and First and Second Amended Site Plans) voted to deny the Third Amended Site Plan.

424. This project denial was very obviously predetermined, based upon the outside interference of the highest and most powerful policy making officials in the Town, and made in retaliation for Plaintiff's speaking out and fighting to preserve Plaintiff's rights by petitioning for redress.

425. The vindictive basis for the Planning Board's denial is exposed when considering that on August 21, 2018 the very same Planning Board adopted a Negative Declaration by a unanimous 5-0 vote with regard to the Third Amended Site Plan, and then, only a few months later, unanimously rejected the exact same plan!

426. The entire ZBA and Planning Board treatment of the third Amended Site Plan is another example of the application of two utterly different codes, laws, rules, regulations, customs and practices of the Town. One for Plaintiff and another for the MU-1 Exhibit 6 Comparators who made substantial political contributions to Montal's supported candidates, committees and events.

427.  The irreconcilable positions of these same Planning Board members regarding Hearthstone, in contrast to the Comparators, is striking.

428.  In a very transparent effort to defend a clearly premeditated and retaliatory denial, Planning Board member Gobioff speciously declared: "You can always say no at final, you always have that right at final to say no.

429.  The Third Amended Site Plan was always a ministerial and *de minimis* amendment of limited jurisdiction i.e. and nothing about it was "final" as Gobioff speciously posited.

430.  On this record, with the continuous movement of the finish line, there is no "final" to anything herein – not to the approved and signed Site Plan, not to Plaintiff's "vested rights" and not to the State Court orders and decisions the Town continues to accumulate herein.

431.  The fabricated pretexts upon which the Planning Board cast its denial are exposed below.

## Pretext No.1: The phantom bus stop on Route 59

432.  First, the Planning Board claimed that Hearthstone (already approved by the PB in 2014) was "unsafe" because to get to the school bus stop children were purportedly going to have to cross "an entire parking lot with stores."

433.  The foregoing was blatantly false as years ago all professionals including the Town's (and of course the negative declarations) recognized that there were no safety issues and it was specifically confirmed before the October 2014 site plan approval that children would not be picked up on Route 59.

434.  This pretext was an utter fabrication unmoored from the record and was not any "new" issue raised by the de minimis amendment.

435. The bus stop is in the same place it always has been since Connectivity initially applied for site plan approval in 2012 and was approved in 2014: On Grove Street, a residential road behind the Buildings. In fact, from the outset Hearthstone was praised for its unique and safe design whereby children walk through a park area to reach their bus.

436. There are many sites that allow school buses to turn around on site which is very dangerous, and those other projects with such bus turnarounds were approved by the same Planning Board which concocted the sham excuse above to camouflage its illegal denial.

437. By using the "bus stop" as a reason to deny the de minimis amendment, the Planning Board did exactly what the state court in the 2017 Article 78 Decision declared it could not: Use an application for an "amended" the site plan to address purported issues that were (or could have been) considered before October 2014 site plan approval if they were legitimate.

438. In all prior applications and hearings before the same board this "bus stop" was never an issue.

439. Here, Plaintiff's plan reflecting the same bus stop was repeatedly reviewed and approved by the same Planning Board and the CDRC numerous times without any objections.

440. Similarly, at all times the same exact bus stop formed a material aspect of all prior Negative Declarations including the Planning Board's own most recent Negative Declaration dated August 21, 2018.

441. The Planning Board's deviation from its own Negative Declaration is but further evidence that the Town's highest policymakers were "calling the shots," and the Planning Board was only too happy to make up any concocted "reason" to stop Plaintiff.

442. Like the ZBA and its 39-spot Condition, the Planning Board was clearly following the Town's official policy to maliciously beat Plaintiff into submission.

443.  Like all of the prior illegal acts by the Building Inspector, DPW, Montal and St. Lawrence, et al, the 39-spot Condition and Planning Board Denial was not an innocent mistake nor was Plaintiff merely an unlucky subject of coincidental and innocent errors.

444.  In sharp contrast to Plaintiff, for the easily approved 14-16 Main Street, school children will have to cross a very dangerous exit from Monsey Mall; yet this crossing was approved without a care in the world.

445.  For Monsey Mall, the school children walk through the commercial parking lot to get the bus. Yet, for Mr. Tauber this too was approved by the town Planning Board without any concern.

**Pretext No. 2: The traffic light over which the Planning Board has no jurisdiction and which the DOT, Town Board, Planning Board itself and CDRC had already determined was of no moment**

446.  For the next pretextual rationale the Planning Board tried to hide behind DOT's decision not to allow a traffic signal on Route 59 in connection with Hearthstone.

447.  The possible installation of any traffic light was always conditioned upon and "subject to approval" by the DOT because the DOT has exclusive jurisdiction over Route 59 and decisions regarding its signalization.

448.  When the Property was initially rezoned in 2013 to MU-1, the Town Board issued a Resolution approving the rezoning subject to "[i]nstallation of a traffic light at the site entrance on Route 59 . . . subject to approval by the" DOT.

449.  In exercising its sole jurisdiction, by letter dated July 2017, the DOT related that it had: "Concluded that, as proposed, the benefits of a signal at this location [the Property entrance on Route 59] would be outweighed by the disadvantages. Consequently, a traffic signal cannot be approved at this time." (the "DOT Decision.")

4950835.v2

450.  At all times the Town's professionals and boards knew that the likelihood of DOT allowing a traffic light for Plaintiff's project was slim.

451.  Based on the DOT Decision and reports from Connectivity's traffic expert and the Town's own planning consultant concurring that ingress to and egress from the site would "function satisfactory without a traffic light signal and without turning restrictions," on June 7, 2018 (before this pretextual excuse) the Town Board adopted (a) an Amended Negative Declaration for Hearthstone without a traffic light and (b) a Resolution annulling and deleting the Rezoning Resolution condition that a traffic light be installed at the entrance to the Property off of Route 59.

452.  Incredibly, it took eleven (11) months for the Town Board to issue the Amended Negative Declaration and Resolution, with it doing so only after Connectivity commenced a third Article 78 proceeding to compel such action.

453.  Nevertheless, given that on June 7, 2018 the Town Board amended its original rezoning resolution to eliminate a traffic light as part of Hearthstone with its own Negative Declaration finding no adverse environmental impacts and the Planning Board agreed with the Town Board and issued its own Negative Declaration adopted on August 21, 2018, these two binding decisions should have eliminated the traffic light as a subject before the Planning Board.

454.  However, at the May 14, 2019 Planning Board public hearing, the Neighbors produced an "expert" (an architect) alleging that Hearthstone presented unsafe traffic issues. In response, Attorney Lynch emphasized to the Planning Board that the Neighbors' so-called traffic/safety proffer was neither expert testimony nor probative evidence.

455.  With the traffic light becoming an unexpected and improper focus at the hearing, Attorney Lynch reminded the Planning Board of their lack of jurisdiction over the traffic signal,

declaring, "the traffic light was something that I believe the applicant has asked DOT to approve. DOT, as I understand, did not approve. My opinion is that that issue is not before you."

456.   Indeed, in the 2017 Article 78 Decision, the Supreme Court had already determined that the Planning Board's improper consideration of issues beyond the scope of a de minimis amendment to a site plan was ultra vires.

457.   The Court explained the plain language of the Code limits the scope of review to only the amendment unless there is a rational finding that the change has a substantial and material impact upon the entire Site Plan.

458.   No such finding could be made with respect to the DOT Decision given the Town Board and Planning Board's own Negative Declarations.

459.   The pretextual nature of this excuse could not have been more clear.

### Pretext No. 3: Smaller residential units

460.   On August 21, 2018, the Planning Board adopted a Negative Declaration for the Third Amended Site Plan which called for 56 residential units, three more units on its 6.65 acre site than the as of right unit count.

461.   On March 14, 2019, the ZBA granted a variance permitting 56 smaller residential units, finding that the smaller units "won't cause a detrimental effect to the neighborhood" and would lead to "less kids and younger kids."

462.   Consequently, the number and size of units were fully conforming at the time of application to the Planning Board.

463.   Yet, in denying Connectivity's application, the Planning Board disregarded the entire record—including its own Negative Declaration— feigning that "it's unclear" that smaller units "are actually appropriate at this site" and they "may not be what's best for this town."

464.  Ironically, in support of another project known as "Avon Gardens," which received major area and use variances, Montal testified before the Planning Board that "the area has a need for more housing for young, smaller families. This will provide that housing without harming the neighborhood." That project was of course approved, with huge <u>use</u> <u>and</u> <u>area</u> variances without a zone change or any conditions.

465.  So too the Planning Board's own Negative Declaration with regard to the smaller limits only adds to the irrational premeditated denial determination made by the Planning Board in bad faith.

466.  Connectivity's 56 units were already fully conforming based on the prior ZBA variance and finding that the additional units had no impact whatsoever.

467.  Consequently, this purported basis was obviously fictitious and dishonest.

468.  In response to the Planning Board's bad faith denial of the Third Amended Site Plan, Connectivity brought its fourth Article 78 proceeding against the Town, this one challenging the Third Amended Site Plan denial and seeking to invalidate the Second ZBA Conditions.

469.  The full public record of the four Article 78 proceedings in Supreme Court, Rockland County, filed under Index Numbers 001261/2016, 000561/2017, 032491/2018 and 032893/2019, respectively, are incorporated by reference and relied upon in support of this action.

470.  The comprehensive Article 78 record of all four Article 78 proceedings exposes the endless runaround the Town has manufactured herein from which there is no escape for Plaintiff.

**The state court again reverses the Planning Board and the ZBA,**
<u>**approving the Third Amended Site Plan and annulling the Second ZBA**</u>
<u>**Conditions**</u>

471.  By Decision and Order dated May 13, 2020 (the "2020 Article 78 Decision"), the Rockland County Supreme Court annulled the Planning Board's denial of the Third Amended Site

4950835.v2

Plan and annulled the Second ZBA Conditions. (A copy of the 2020 Article 78 Decision is annexed hereto as Exhibit 16.)

472.  In so doing, the state court pointedly noted that the decisions of the Planning Board and ZBA "demonstrate that . . . the boards may have been influenced by outside factors."

473.  In annulling the Planning Board's denial of the Third Amended Site Plan, the Court recognized that the Planning Board had ignored its own August 21, 2018 Negative Declaration "concluding that the proposed variances created no undesirable changes and no adverse physical or environmental impact."

474.  In further addressing the Planning Board's wrongful denial, the state court highlighted that the primary reason Connectivity had to even seek area variances in connection with its Third Amended Site plan was because of Building Inspector Smith's new "interpretation" that the already approved and always connected Building's "A" and "B" had to be reapproved as one building.

475.  And just as it did in the 2017 Article 78 Decision when it invalidated the Planning Board Conditions, in annulling the Second ZBA Conditions the state court again found that "the conditions were unrelated to the impact of the amendments and not based upon any evidence in the record."

476.  All told, approximately two and a half years elapsed from the submission of the Third Amended Site Plan through issuance of the 2020 Article 78 Decision, during which period Plaintiff could again not develop Hearthstone.

477.  And, as described below, more than another year later, because of the Town's continued violation of law, Plaintiff still has been unable to proceed.

**The Town Delays the Required Signing of the**
**<u>Judicially Approved Third Amended Site Plan</u>**

478.  Based on the state court's approval of the Third Amended Site Plan, on May 14, 2020, Connectivity attempted to have the Building Inspector perform the ministerial task, as required by the Town Code, of signing the Third Amended Site Plan.

479.  But Connectivity was rebuffed by Building Inspector Smith, who informed Connectivity that, despite the Court's Order, he would not review the site plan for signature until he received "direction" from the Town Attorney's office.

480.  Thus, the Town further unlawfully delayed execution of the Third Amended Site Plan approved by the State Court's Order.

481.  Throughout this odyssey of even attempting to obtain the most recent signed site plan to file same with the County Health Department, Plaintiff has been continuously stymied and stonewalled by the Town.

482.  The County Health Department will not issue its standard utility permit for water, electric or gas until the Building Inspector and Planning Board sign the Third Amended Site Plan.

483.  The Health Department always requires that the most current plan is signed and submitted to the County.

484.  The Town's constant refusal to sign the approved site plan also created a Catch-22 as to the County Health Department permit needed by Plaintiff.

485.  Connectivity has been waiting an astounding 7+ years for this utility permit delayed by the Town's misconduct.

486.  Further, the Building Department will not review building plans without a signed Site Plan—the very Site Plan that the Building Inspector and Planning Board have taken turns refusing to sign throughout this endless farcical process applied to Plaintiff.

4950835.v2

487.  By constantly requiring "new" applications for Site Plan "amendment", the Town has interfered with Plaintiff's investment-backed expectations.

488.  Adding insult to injury, even though Connectivity has been unable to use Hearthstone for the past eight years, recently the Town substantially increased the taxes on the Property.

489.  By constantly engaging in unlawful ultra vires review of a de minimis Site Plan Amendment the town has frustrated and defeated Plaintiff's investment based expectations.

490.  In addition, the Town's Assistant Building Inspector performed a very important framing inspection of Building "C," using a plan that was over two years old and not the Third Amended Site Plan approved by the State Court as required which was again deliberately not signed by the Town.

491.  The Building Inspector's use of a very outdated old site map even after the State Court ruled that the updated map was court approved, further illustrates the Town's bad faith policy toward Plaintiff.

492.  This fiasco was <u>not</u> another coincidental mistake; to the contrary, it was part of the Town's deliberate game as evidenced by the Town's failure to return with the correct plan to inspect for a full year despite repeated protests by Plaintiff.

493.  The use of an outdated plan facilitated the Town's pretextual rejection of Plaintiff's framing.

494.  The Town's use of an outdated site plan for a framing inspection is reminiscent of the former Town Attorney's instruction to a Town clerk to place Plaintiff's ZBA appeal in a file cabinet drawer where it remained accumulating dust without being processed for more than 18 months.

4950835.v2

495.  When Plaintiff was finally heard by the ZBA on that appeal, the ZBA impermissibly limited Plaintiff's evidence by denying Plaintiff's request for rebuttal and disallowing cross examination of Town witnesses.

496.  The Town thus took from Plaintiff the fundamental purpose of a ZBA hearing in the first place.

497.  Since then, the ZBA has not issued a decision for over one full year, thereby precluding application for Article 78 relief in the event of an adverse decision.

498.  The Town has perfected its techniques and ability to delay the project.

499.  To the Town these are all "jokes" to laugh about at Plaintiff's expense.

**The Town deliberately denies Connectivity
any forum for review of its Fourth Amended Site Plan**

500.  While Plaintiff pursued its Article 78 to overturn the denial and unlawful conditions of its Third Amended Site Plan, in an attempt to circumvent the Town's Catch-22 process, Plaintiff submitted to the Planning Board a Fourth Amended Site Plan that was virtually identical to the Second Amended Site Plan previously approved on January 10, 2017.

501.  Plaintiff's filing even included all the illegal Second ZBA Conditions including the 39 Spot Condition, without regard to the patent illegitimacy of same.

502.  Because the Fourth Amended Site Plan essentially matched the already-approved Second Amended Site Plan, save for minor technical changes like the move of Building B forward away from a neighboring property due to a failed land swap, the Planning Board should have approved it within weeks as a miscellaneous item since there were no issues requiring any public input.

503.  Had Plaintiff been treated like Town Square it would have been approved in one day at the very next Planning board meeting.

79

4950835.v2

504.  In Ramapo, however, one "preferred" developer (who has responded generously to the Town's incentive based political contribution policy) *can* be seen by the Planning Board the very same day as the CDRC in disregard of the applicable law without following required protocol, while another waits for over one year, despite both being referred by the same CDRC to the same Planning Board.

505.  But owing to a series of transparently dilatory tactics undertaken by the Planning Board and Town—including the last-minute removal of the application from agendas and delay in submitting Town consultant comments—in the year since Plaintiff submitted the Fourth Amended Site Plan the Planning Board failed to hold a single public hearing, let alone issue a decision, on Connectivity's application.

506.  This stands in sharp contrast to the Town's treatment of Town Square's entire site plan application, with respect to which Town Square appeared before the Planning Board, ZBA, and CDRC (and obtained County G.M.L. comments all in the same day) within 7 months on its way toward unanimous approval without conditions. Similarly, the connected Blueberry Commons developer achieved the same, seeing all three in one day.

507.  While Connectivity's application for the Fourth Amended Site Plan was ultimately rendered moot by the 2020 Article 78 Decision, the tortured episode involving the Fourth Amended Site Plan highlights the Town's malicious, abusive, and unconscionable conduct toward Hearthstone and Connectivity.

508.  The excruciating details of the Town's purposeful delay regarding the Fourth Amended Site Plan are set forth in the chronology prepared by Plaintiff's engineer, Leonard Jackson. (A copy of this chronology is annexed hereto as Exhibit 17.)

**Plaintiff has invested more than $15 million into construction
of the now halted project which sits on expensive unproductive land**

509.   Connectivity has spent more than $15 million on all aspects of developing Hearthstone.

510.   Annexed hereto as <u>Exhibit 18</u> are photographs depicting the partially completed exterior of both Building "A" (shown to the left) and Building "C" (shown to the right) under the approved 2014 Site Plan and foundation and building permits issued (either voluntarily or by Court Order) years ago.

511.   Annexed hereto as <u>Exhibit 19</u> are photographs depicting the interior and related site improvements of Buildings "A" and "C", respectively.

512.   But despite Plaintiff's investment in the Property and compliance with the law and numerous Court Orders that should have led to the completion of Hearthstone years ago, the Town has unlawfully stopped what should have been normal and very routine construction progress.

513.   As of July 2021, Hearthstone sits no closer to completion and final C of O's than it was five years ago—but much closer to financial ruin.

514.   To tangibly illustrate the abusive land use process inflicted by the Town upon Plaintiff, to address the Town's barrage of illegal and unprecedented requests, delays, and denials, Plaintiff has incurred more than $1.4 million in engineering fees with, inter alia, its engineer, Mr. Leonard Jackson, who has more than <u>five</u> decades of experience with similar and far more complex projects in the Town, more than $750,000 on traffic consultants, and legal fees for this Town runaround and Article 78 proceedings costing more than $900,000.

515.   Mr. Jackson has advised Plaintiff that had the Town treated Hearthstone fairly and customarily, his engineering fees would have been in the range of $220,000. Instead, his fees exceed $1,150,000 with no end in sight.

81

4950835.v2

516. Mr. Jackson publicly acknowledged the unprecedented special and irregular "process" of the Town created for Plaintiff in his public declaration to the Planning Board at its meeting on January 10, 2017:

"What is going on here is unprecedented, surely unfair and my client is not treated as other developers."

517. The Planning Board ignored Mr. Jackson's comments that were based on 50 years' experience in the Town. Plaintiff then "won" another Article 78.

### The Town's obstruction of Hearthstone continues unabated even more boldly and intensely utilizing the same old illegal tactics as before

518. Despite receiving all of the State court decisions annexed hereto and having to defend this action arising from its unconstitutional conduct, the Town remains emboldened in its bad faith effort to prevent the development of Hearthstone.

519. As of the date of this SAC:

i. Until very recently on wholly pretextual reasons, the Town refused to conduct an inspection of Building "A" and Plaintiff's professionals cannot comprehend how the Town can justify such a punitive position which is the equivalent of a stop work order on an entire approved project because, as an example, for illustrative purposes only, a 100' fence was not depicted on the site map, where this same fence was built in 2014 and underwent at least 6 board interactions and accompanying professional review and a minimum of 10 CDRC intensive reviews, with no one saying a word. In short, because of minutiae and *de minimis* as built site conditions required by the local public utility, by the Town and by normal everyday circumstances, the Town announced that it was stopping all inspections until it again forces Plaintiff to return to the Planning Board for yet another completely irregular and totally unnecessary "amended" site plan approval.

82

    ii.      Since September 2018, Building "C" has not passed a framing inspection, because, *inter alia*, when the Town finally did come to inspect, it used plans that were two years old and has, until a few weeks ago, refused to return; and

    iii.     For more than a <u>year</u> up until July 14, 2021 (including since the commencement of this action) the Town did not respond to any of the multiple communications from Plaintiff's engineers and architects exercising their best efforts to secure from the Town fair and equal treatment.

520.  On May 14, 2021, the Town's designated Outside Consultant met with Plaintiff's professionals at the site for an inspection and follow-up report.

521.  Plaintiff's professionals anticipated progress based upon the Outside Consultant's acknowledgment of the very <u>minor</u> nature of certain as built site conditions purportedly holding up approval of framing inspections.

522.  Then, on July 14, 2021, two months later, the Town's Outside Consultant issued a report confirming that although the items identified were <u>minor</u>, he determined that yet another application to the Town's Planning Board is required as a condition precedent to continued inspections.

523.  On this record, return again to the Planning Board was and is another red line Plaintiff cannot cross.

524.  The development of Hearthstone thus remains at a complete standstill by virtue of the Town's malicious actions and inaction.

525.  In this case, returning to the Planning Board, or, Plaintiff's principal's standing atop times square on New Year's Eve, will <u>not</u> bring an end to the Town's constant moving of the finish line and disparate treatment.

526.    Plaintiff has always been ready willing and able to diligently complete the entire Hearthstone development as approved in October of 2014 and but for the Town's unconscionable catch 22 process which derailed the normal construction progress contemplated in 2015 Plaintiff would have so proceeded.

527.   Since the court ordered Amended Site Plan Approval ordered by the State Supreme Court herein Plaintiff and all of its very experienced consultants have been unable to ascertain if there is anything Plaintiff could ever do that would end Plaintiff's nightmare with the Town and/or mitigate its damages

528.   The Town's avaricious thirst for Plaintiff's destruction herein cannot be assuaged.

529.   Even Plaintiff's agreement to demolish any of the minor as built site not to the Town's liking, and construction pursuant to the Court Approved Site Plan #70 less a minor bumpout (an irrational proposal which Plaintiff has seriously proposed to satisfy an irrational Town) will not and has not appeased the Town herein.

530.   The foregoing only adds to the overwhelming proof on this record of the futility of Plaintiff's efforts to use its fully approved Property and achieve its investment backed expectations.

531.   And it will remain that way until this Court compels the Town to cease (a) depriving Connectivity of its right to equal protection of the laws and substantive due process and (b) retaliating against Plaintiff for its exercise of its First Amendment right, and awards to Plaintiff damages for the Town's taking of the Property.

4950835.v2

## AS AND FOR A FIRST COUNT
**(Taking of Private Property in Violation of The**
**Fifth Amendment of The United States Constitution)**

532.  Plaintiff repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

533.  Defendant's discriminatory conduct detailed in this Complaint in furtherance of the aforesaid Town official policy has interfered with and defeated Connectivity's investment-backed expectations to date, and because of Defendants' conduct and policy, Connectivity has not been able to develop and use the Property for which Connectivity received Site Plan Approval on October 21, 2014.

534.  Defendant has imposed an over eight (8) year farcical process upon Plaintiff which constitutes a taking of Plaintiff's private Property.

535.  Connectivity has and had a constitutionally protected property right after Site Plan Approval to, *inter alia*, (a) reasonably use the Property and fully develop Hearthstone, which includes protected rights under Site Plan approved and Court approved Site Plan Amendments without the illegal conditions, (b) ZBA approvals without the illegal conditions, (c) duly processed permit review and permits conforming to code, (d) the performance of  ministerial non-discretionary duties required by Code and here by Court Order as well, and (e) the absence of illegal and unprecedented actions and directives by the Town including the Town Planning Board, ZBA, Town policymaking officials and those responsive to them, DPW and Building Department to deliberately cause Connectivity harm and delay.

536.  Defendant, acting under color of law, has taken and deprived Connectivity of its property rights without legal or factual basis, and without due process, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

4950835.v2

537. Through their discriminatory acts and conduct detailed in this Complaint in furtherance of the Town's official policy of preventing development of Hearthstone after Site Plan Approval, and after Court Ordered Amended Approvals, Defendant has taken the Property without just compensation.

538. Defendant's discriminatory conduct and abuses of power detailed in this Complaint, including post-approval imposition of the illegal and confiscatory ZBA and Planning Board Conditions, covert commitment to compel Connectivity to eliminate the already approved parking layout and 39 parking spaces coveted by the Town and install a larger buffer, premeditated and pretextual denial in bad faith of the Third Amended Site Plan, and intentional delay in deciding applications and issuing decisions as required by law, in furtherance of the Town's aforesaid official policy, have significantly devalued the Property and had an adverse economic impact on Connectivity.

539. Connectivity had the reasonable investment-backed expectation that it would be able to develop the Property for Hearthstone, a mixed-use development, especially after the Planning Board grant of Site Plan Approval in October of 2014.

540. The character of Defendant's actions in furtherance of the aforesaid Town policy are discriminatory, inequitable, and illegitimate.

541. Defendant's actions described in the Complaint constitute an illegitimate and inequitable attempt to prevent Connectivity from developing and using the approved Property.

542. Defendant has permanently prevented the development of Hearthstone through illegal means not applied to others pursuant to a Catch-22 process.

543. Defendant has rendered the Property economically unusable for the purpose for which it is zoned and for which site plan approvals were previously issued and vested rights

4950835.v2

acquired pursuant to lawful construction of partially completed buildings, completed foundations of buildings and infrastructure and Plaintiff's $15 million investment in reliance thereon.

544.  Defendant's actions have converted the Property for purported public purposes for which Connectivity is constitutionally entitled to just compensation for the taking of the Property.

545.  Defendant has not paid Connectivity just compensation for the regulatory taking.

546.  Connectivity should be awarded just compensation for the taking of its Property, together with all other damages deemed just and proper by the Court, including experts' fees, and attorneys' fees, interest, costs, and disbursements.

**AS AND FOR A SECOND COUNT**
**(Substantive Due Process)**

547.  Connectivity repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

548.  After the October, 2014 Site Plan Approval Plaintiff had a protected property interest in the Town officials and applicable Town Boards' performance of ministerial non-discretionary duties required by the Town's own code and at law.

549.  For example and without limitations the Town Building Inspector after Plaintiff's Site Plan Approval had no discretion with regard to the ministerial obligation to issue a decision on a complete duly filed application for a building permit within the time limit prescribed by code.

550.  The Town Planning Board Chairman has a ministerial non-discretionary duty to sign the Site Plan approved by the Planning Board.

551.  The DPW had a ministerial non-discretionary duty to inspect drainage improvements.

552.  The Planning Board had a ministerial non-discretionary duty to review and decide deminimis site plan amendment applications pursuant to the Town Code.

553.  The Building Inspector had no discretion to condition performance of his ministerial duties upon Plaintiff's agreement to a property restriction unrelated to the powers and duties of the Building Inspector.

554.  Town officials could not withhold performance of ministerial non-discretionary duties on Plaintiff's development for any reason or no reason.

555.  Connectivity possesses a protected property interest in the issuance of the Third Amended Site Plan Approval or, alternatively, the Fourth Amended Site Plan Approval and the variances granted by the ZBA in 2019 (the "2019 Variances") without the Second ZBA Conditions because it has obtained legally issued foundation permits, site plan approvals, variances, as well as approved and duly signed site plans.

556.  Connectivity has demonstrated a commitment to developing Hearthstone and constructing the structures and infrastructure authorized thereby, to the extent development was not stymied by Defendants.

557.  In this regard, Connectivity has expended more than $15 million on developing Hearthstone. Buildings "A" and "C" are already substantially built. The basement for Building "B" included the foundation cement and steel work. And most site work including drainage, sewer, retaining walls, and even some paving is complete.

558.  Based on the substantial work performed and applicable law, Connectivity has and had a constitutionally protected property right to reasonably use and develop Hearthstone, with a protected right to the Third and Fourth Amended Site Plan and the 2019 ZBA Variances without the illegal Second ZBA Conditions as declared in the 2020 Article 78 Decision.

559.  Connectivity has a constitutionally protected right to be free from predetermined, pretextual and continually changing reasons for the denial of approvals and ministerial permits or

4950835.v2

imposition of costly and illegal variance and site plan conditions motivated solely by the official Town policy to prevent development of Hearthstone and harm Plaintiff.

560.  Plaintiff also has a constitutionally protected right to be free from illegal and unprecedented actions and directives by Town policymaking officials and boards and those responsive to them including the Planning Board, ZBA, DPW and Building Department aimed at deliberately causing Connectivity harm and delay.

561.  Connectivity's applications for variances and the Third and Fourth Site Plans fully complied with applicable law and their approval was supported by the record and virtually assured but for the denial of substantive due process.

562.  Based on the record before the ZBA and the nature of the variances sought, the ZBA lacked any discretion to impose the Second ZBA Conditions, and the state court so held.

563.  Based on the record before the Planning Board, the Planning Board lacked any discretion to deny Connectivity's application for approval of the Third Amended Site Plan, and the state court so held.

564.  The Town's Planning Board's and ZBA's conduct in depriving Connectivity of approval of the Third Amended Site Plan and the Fourth Amended Site Plan and issuing the Second ZBA Conditions was so outrageously arbitrary as to be a gross abuse of governmental authority.

565.  The Town's conduct in depriving issuance of the Third Amended Site Plan after its approval in the 2020 Article 78 Decision was so outrageously arbitrary as to be a gross abuse of governmental authority.

566. The Town's earlier and virtually identical misconduct in failing to sign the previously approved Site Plan (including after being ordered to do so by the State Court in the

89

2017 Article 78 Decision) was so outrageously arbitrary as to be a gross abuse of governmental authority.

567.   The Town's discriminatory acts as set forth in this Complaint were performed under the municipal and/or governmental policy of the Town in that discriminatory practices of municipal officials were so persistent and widespread as to constitute a custom or usage with the force of law.

568.   The conduct alleged herein is arbitrary and capricious in the strict sense.

569.   The conduct alleged herein is oppressive in a constitutional sense.

570.   The conduct alleged herein is irrational and not designed to advance a legitimate governmental interest and shocks the conscience.

571.   The conduct alleged herein violates Connectivity's substantive due process rights.

572.   But for the Town's unlawful, irrational, and arbitrary delay, denial of the Third and Fourth Amended Site Plans, refusal to issue the Third Amended Site Plan even after it was approved by the State Court, imposition of the Second ZBA Conditions, and illegal and unprecedented actions and directives (including by the DPW and Building Department) aimed at deliberately causing Connectivity harm and delay, all undertaken under the aforesaid Town policy, Connectivity would have been able to lawfully develop and complete Hearthstone long ago.

573.   The actions of the Town as aforementioned have severely and adversely economically impacted Connectivity in that Connectivity has been prevented from completing Hearthstone while, at the same time, being required over a period in excess of eight years to pay the carrying costs of the Property without receiving income while the construction costs increased by virtue of the unreasonable delays, unprecedented stops and starts and selective and illegal conditions imposed by the Town.

4950835.v2

574.  Connectivity's losses attributable to the Town's misconduct total not less than $40 million, excluding interest.

575.  The Town's discriminatory acts described in this Complaint have been improperly and maliciously motivated, and involve an intentional plan to permanently deprive Connectivity of its ability to reasonably use the Property in an economically viable manner.

576.  Plaintiff has been intentionally and maliciously treated differently from others similarly situated exactly as threatened by Montal and the other Town officials identified herein and in the Article 78 record.

577.  Accordingly, Connectivity asks that the Court direct the Town and its agents, employees, and representatives to permit completion of the Hearthstone project in the ordinary course and under law without disparate or irrational treatment of Connectivity and Hearthstone (the "Permanent Injunctive and Declaratory Relief").

578.  The Court should also award Connectivity damages against the Town for violation of Connectivity's substantive due process rights in the amount of not less than $40 million, together with interest, Connectivity's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b), and such other relief that the Court deems equitable and just.

## AS AND FOR A THIRD COUNT
### (Equal Protection – Class of One)

579.  Connectivity repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

580.  Connectivity has the right to be treated like any other property owner in the Town in accordance with the regular and normal practices of the Town and provisions of law as applied within the Town.

4950835.v2

581. The Town's illegal acts and other misconduct as described in this Complaint deprived and continue to deprive Connectivity of its right to equal protection of the laws.

582. The Town's discriminatory acts were performed under the municipal and/or governmental policy of the Town in that discriminatory practices of municipal officials were so persistent and widespread as to constitute a custom or usage with the force of law.

583. Connectivity has been intentionally treated differently from others similarly situated.

584. The Town's discriminatory conduct and acts described in this Complaint have infringed upon Connectivity's rights by, *inter alia*, (a) discriminating against and targeting Connectivity and its project Hearthstone for disfavor; (b) imposing additional conditions and costs on Connectivity that have never been imposed on similarly situated property owners or developers, including through illegal and unprecedented actions and directives by the Planning Board, ZBA, DPW and Building Department aimed at deliberately causing Connectivity harm and delay; (c) plotting with neighbors and threatening Connectivity with further delay unless it surrendered entirely to the Town's unreasonable and extortionate demands including specifically a $2 million uncompensated taking of Plaintiff's private property pursuant to the deal directed by Montal; (d) compelling only Hearthstone's compliance with general use bulk table requirements applicable to the MU-1 Zone and illegal conditions overturned by the Courts and not applied to others including the Comparators in Exhibit 6, supra, (e) applying invented and ultra vires land use "regulations" in an unlawful and discriminatory manner; (f) manufacturing new interpretations of the Town Zoning Code to further embroil Connectivity in a repetitive, protracted and farcical land use process; (g) denying use and customary development with more units and more commercial space as are routinely granted to other developments in the Town as demonstrated in Exhibit 6, supra;

4950835.v2

and (h) "losing" submitted permit applications thereby requiring surveys to be redone and repetitive submissions of plans and applications (i) falsely and maliciously overcharging Plaintiff for excessive fees including the Building C Building Permit fee overturned by the state court and (ii) applying a farcical Catch-22 process with continuous moving of the goalpost and mock missions from which there is no escape.

585.   The Town, acting under color of law, has treated Connectivity differently than the Comparators set forth in Exhibit 6, supra based on bad faith political motives.

586.   As repeatedly held by NYS Supreme Court, Rockland County, and as is evident from the record, including Exhibit 6, supra, there was and is no rational basis for the difference, let alone the stark difference, in treatment of Connectivity when viewed in context of the very basic and repeated disregard of the law by the Town.

587.   Based on the allegations set forth in this Complaint, the Town's selective treatment of Plaintiff was malicious, willful and shocks the conscience.

588.   The Town has applied its facially neutral policies regarding, *inter alia*, mixed-use development, issuance of building permits, and issuance of site plan approval and variances, in an intentionally discriminatory manner to Plaintiff.

589.   The conditions imposed by the Town Board (including a traffic light outside of their jurisdiction) with the knowledge of the extremely unlikely DOT approval, ZBA and Planning Board were ultra vires, unauthorized, unrelated to the applications before the boards, irrational, unsupported by any evidence in the record, illegally related to previously disposed of issues, and were imposed as part of ultra vires ZBA and Planning Board actions way beyond the legal (and very limited scope) of minor "changes" normally treated administratively to punish Connectivity

for its refusal to capitulate to every single one of the Town's demands, for its outspoken complaints and pursuit of judicial redress, and to force Connectivity to abandon the project.

590. Defendant's disparate treatment of Connectivity as aforementioned was and is irrational.

591. Defendant's disparate treatment of Connectivity as aforementioned lacks any legitimate basis for such dissimilar treatment.

592. Defendant's disparate treatment of Connectivity as aforementioned was undertaken for improper motives unrelated to any legitimate public purpose.

593. Defendant's disparate treatment of Connectivity as aforementioned was undertaken with the intent to inhibit or punish the exercise of constitutional rights by Connectivity.

594. Defendant's actions as aforementioned constitutes a class-of-one equal protection violation of the Equal Protection Clause.

595. Accordingly, Connectivity asks that the Court issue the Permanent Injunctive and Declaratory Relief.

596. The Court should also award Connectivity damages against Defendant for violation of Connectivity's right to equal protection of the laws in the amount of not less than $40 million, together with interest and Connectivity's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b) and such other relief that the Court deems equitable and just.

## AS AND FOR A FOURTH COUNT
### (Equal Protection – Selective Enforcement)

597. Connectivity repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

4950835.v2

598.  As set forth in this Complaint, compared with the Comparators, Connectivity has been selectively treated by Defendants.

599.  Defendant's selective treatment of Connectivity was and is based on a malicious and bad faith intent to injure Connectivity and prevent development of Hearthstone.

600.  Defendant has treated Connectivity differently than the Comparators, which are similarly situated in all material respects to Connectivity as described in this Complaint.

601.  Defendant has singled out Connectivity for an impermissible motive not related to legitimate governmental objectives, including personal or political gain and retaliation for the exercise of constitutional rights.

602.  The selective treatment imposed on Connectivity was under color of law and pursuant to accepted municipal policy, practice, custom and procedure.

603.  Defendant's disparate treatment of Plaintiff as aforementioned lacks any legitimate basis for such dissimilar treatment.

604.  Defendant's actions as aforementioned violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.

605.  Defendant's actions as aforementioned constitute selective enforcement in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

606.  Accordingly, Connectivity asks that the Court issue the Permanent Injunctive and Declaratory Relief.

607.  The Court should also award Connectivity damages against Defendant for violation of Connectivity's right to equal protection of the laws in the amount of not less than $40 million, together with interest, Connectivity's attorney's fees and costs incurred in the prosecution of this

action under the provisions of 42 U.S.C. § 1988(b), and such other relief that the Court deems equitable and just.

## AS AND FOR A FIFTH COUNT
### (A Claim For Retaliation In Violation of the First Amendment)

608.  Connectivity repeats and realleges all the allegations set forth above of the Complaint with equal force and effect as if set forth at length and verbatim in this Count.

609.  Montal is the de-Facto leader of, and most powerful individual in a position of power and influence in, the Town.

610.  This is the worst kept secret in the Town.

611.  Montal establishes Town policy and charts the direction of the Town as the long-term Chief of Staff to the Supervisor, Director of Purchasing, and Chairwoman of the local Democratic Party.

612.  Montal is vested with the power to hire and fire and without her support it is virtually impossible for a Democrat to be elected or appointed in the Town to office.

613.  In the last Town Board elections Yedudah Weissmandel (also a member of the Town School Board), backed by Montal, received 95% of the vote and the Town Justice backed by Montal received 99%.  All of the above were and are directly selected by Montal.

614.  The selection by Montal of the Democratic Party candidate is always elected because of the bloc voting in the Town.

615.  Mr. Weissmandel and others were hand-picked by Montal for election to the East Ramapo School Board Ward System election and the status quo maintained.

616.  Despite the recent Court imposed Ward System of voting for East Ramapo School Board in the Town, intended to provide for representation and education to all, Montal's hand-picked candidates were again all elected.

617.  Montal clearly devised a means of circumventing the Ward System in the Town School Board elections given the fact that all of the <u>same</u> previously elected members of the East Ramapo School Board were re-elected again.

618.  Montal has demonstrated that she has the ability to control the Town's bloc vote.

619.  Montal is responsible for the financial support of developers and their professionals and consultants.

620.  Montal has directly appealed to the Town development community for substantial political contributions and has solicited large sums from such community directly and indirectly.

621.  Montal has run many elections for many candidates using her home address.

622.  Having been previously criticized for very transparent solicitation of developers with the "incentive and wherewithal" to make major contributions at her behest (see <u>Exhibit 11</u>, supra), in connection with the scandal ridden previous Ward system referendum, she now operates through agents and assistants for the same political contributions she previously solicited personally and very boldly.

623.  In seeking such contributions specifically from real estate developers to keep the Town "developer friendly," Montal prepared a written entreaty which signaled the benefits to developers achievable in the Town through such contributions. (*See* <u>Exhibit 11</u>, supra.)

624.  In response to Montal's written solicitation, she raised the targeted amount of more than approximately $130,000 expeditiously.

625.  The $130,000 collected by Montal's solicitation and the expenses are nowhere reflected in State filings as, upon information and belief, are required.

626.  The required state court filings for the PAC 63 Is Enough are not on file.

627.  Since 2012, Plaintiff has been frequently solicited by or on behalf of Montal for political contributions.

628.  On each occasion, the individual soliciting the contribution raised an unmistakable quid pro quo of favorable official action on Hearthstone in exchange for Plaintiff's contribution.

629.  Plaintiff observed the actual benefits that accrued to other developers of MU-1 projects as detailed in Exhibit 6, supra, and this SAC from such political contributions made at the request of or on behalf of Montal.

630.  The Comparators Chart at Exhibit 6, supra graphically reveals that Hearthstone, which is situated on a much larger parcel of land (6.655 acres) than Monsey Mall (3.25 acres), and which also has a far smaller development Floor Area Ratio (which is less dense and less utilized) than Monsey Mall, was barely approved for its as of right maximum residential density (56 units approved vs. 53 units as of right), whereas Monsey Mall was approved for a density of almost three times its maximum permitted number of units or 69 units.

631.  The developer of Monsey Mall is Mr. Michael Tauber ("Tauber").

632.  Tauber contributed at the behest of Montal the total sum of approximately $100,000 ± as outlined in the SAC, with substantial sums before the Monsey Mall approval.

633.  A comparison of how the Town has treated Plaintiff and Hearthstone with how the Town has treated Tauber and Monsey Mall reveals that Tauber and Monsey Mall have reaped significant favorable treatment because of sizable political contributions, and that Plaintiff has been penalized for its refusal to make the requested political contributions.

634.  Tauber also benefitted with other projects after Monsey Mall as are detailed in the Comparator chart at Exhibit 6.

4950835.v2

635.  There is no other plausible explanation for the vastly different treatment and clearly official "favors" revealed by Exhibit 6, supra.

636.  Another similar MU-1 developer is Mr. Joseph Brachfeld ("Brachfeld").

637.  Brachfeld is the owner of and/or is affiliated with the project known as Town Square.

638.  Mr. Brachfeld, the owner of Town Square and Evergreen, is, upon information and belief, believed to have a business partnership with Montal in Fireside Restaurant in the Town Square.

639.  Mr. Brachfeld responded affirmatively to Montal's entreaties by political contributions in the total sum of at least $80,000 as specifically detailed in the SAC.

640.  As described in this SAC and Exhibit 6, supra, the Town has favored Town Square because of Mr. Brachfeld's substantial political contributions.  To date Mr. Brachfeld has at least two other developments approved with major variances.  On those projects highly irregular and questionable variances were granted with FAR calculations irreconcilable with the code – all in record time without conditions.

641.  None of the favored  contributors identified ever faced the "regulations" foisted upon Plaintiff and none ever received a Positive Declaration as a means of official retaliatory action.

642.  None has endured the purposefully wrongful code interpretations, refusal to perform ministerial duties, the baseless decisions, or painstaking permit reviews and inspections by the Building Department that Connectivity has.

643.  Montal was very clear and direct: Plaintiff could have had fast approval of 84 units in exchange for giving up or donating to the Town the already approved 39 spots. As per the

4950835.v2

Comparator Chart guidelines, 84 units is actually a low count but far better than the 56 Plaintiff was singularly held down to. See Exhibit 6, supra, and contrast with similarly situated MU-1 developers Monsey Mall and 14-16 Main Street.

644. Defendant's refusal to pay in cash or in other ways to stop the Town's abuse has been a retaliatory process.

645. As set forth in this SAC, Defendant has retaliated against Plaintiff for Plaintiff seeking judicial relief from both this Court and the state court.

646. As set forth in the SAC, Defendant has retaliated against Plaintiff for Plaintiff's vocal accusations of selective treatment.

647. The making of political contributions is intended to be a form of free speech in the same way that citizens are intended to be free to express their preference for political candidates.

648. The freedom to not make solicited political contributions and to make contributions directly and not be forced to contribute through one "kingmaker" is also a form of free speech.

649. Tying monetary contributions to favorable and unfavorable official action on the use of one's private property is per se an abridgment of free speech.

650. As described in this SAC, Plaintiff's free speech was unlawfully abridged by the implicit and explicit threats made by and on behalf of the Town by Montal of official (favorable and unfavorable) action tied to Plaintiff's agreement or refusal to quietly follow "orders" and "pay to play."

651. In retaliation for Plaintiff commencing this action to redress the Town's wrongs, the Town, by Montal, retaliated for such exercise of free speech and the privileged allegations of this Complaint against the Town by the filing by Montal of a summons alleging defamation against

4950835.v2

Plaintiff's principal, individually, a member of the same local community, in the local Bet Din. A copy thereof is annexed hereto as Exhibit 20.

652.  Given Montal's position in the Town, her retaliatory summons in response to the privileged allegations of this Complaint against the Town should be attributed to the Town herein, the only defendant in this action.

653.  This Bet Din summons was clearly meant to ostracize Plaintiff in the community and punish Plaintiff for seeking judicial intervention in this Court against the Town.

654.  When Plaintiff voluntarily made a political contribution directly to a candidate's committee and not under the auspices of Montal's agents, he was chastised by Montal's agents and warned not to ever do that again.

655.  The Town's official promotion of developers who make the political contributions "requested" and retaliation against Plaintiff for the refusal to do so is a violation of Plaintiff's first amendment rights.

656.  The Comparator Chart at Exhibit 6, supra, juxtaposes the benefits afforded similarly situated developers who complied with Montal's demands and/or "incentive" based solicitations for contributions and the benefits deprived Plaintiff for its refusal to capitulate to Montal's demands directly and indirectly for contributions.

657.  The benefits and special privileges received by similarly situated MU-1 developers who contributed proves that "paying" is directly related to obtaining positive outcomes for zoning applications from the Town.

658.  This pattern is discernible from the special treatment and tangible benefits after large contributions have been favored with project approval with extraordinary project approvals often in record time.

101

659.  Not only were the benefits extended to the Comparators withheld from Plaintiff, the Town exacted punitive actions time and again for Plaintiff's exercise of his free speech rights.

660.  The coordinated and perfectly orchestrated punishment from all Town agencies was to send the message and punish Plaintiff for its exercise of first amendment rights at end to send a retaliatory message.

661.  The right to express one's political views is a material component of free speech.

662.  Plaintiff vocally expressed its political views that the Town was selectively, corruptly and illegally targeting it and Hearthstone for irrational and unequal treatment as compared to other Comparators, including Monsey Mall.

663.  The very next day a Stop Work Order was imposed ostensibly for work performed 6+ weeks earlier.

664.  Among many retaliatory punishments exacted for, inter alia, pursuit of judicial redress and vocal airing of grievances by Plaintiff, the Town illegally overcharged Plaintiff for its building permit fees by misrepresenting the date of Plaintiff's building permit application filing in order for it to apply after the effective date of a significantly higher fee schedule.

665.  The Town has chilled Plaintiff's resort to and exercise of its first amendment rights.

666.  The Town has punished Plaintiff for its exercise of rights protected under the First Amendment and caused substantial and concrete financial injury to Plaintiff in the form of the uncompensated taking and other damages in the total sum of $40,000,000 without interest.

667.  The Town's selective mistreatment of Plaintiff was motivated or substantially caused by Plaintiff's exercise of its right of free speech.

668.  The Town's retaliation presents a Hobson's choice of a coerced capitulation by reason of financial asset depletion, or, bankruptcy and loss of the approved project. (See list of $18 million of liquidated assets annexed hereto as <u>Exhibit 21</u>.)

669.  Plaintiff has been proximately injured by the Town's violation of Plaintiff's rights under the First Amendment.

**WHEREFORE**, Plaintiff **CONNECTIVITY SYSTEMS, LLC** respectfully asks for:

1.      On Plaintiff's First Count, issuance of an Order awarding to Plaintiff damages against the Town as just compensation for the taking of Plaintiff's Property in the sum of $40 Million, together with interest at the lawful rate from the date of the taking of Plaintiff's Property; and Plaintiff's attorney's fees.

2.      On Plaintiff's Second, Third, Fourth and Fifth Counts, the issuance of an Order (a) directing the Town and its agents, employees, and representatives to permit completion of the Hearthstone project in the ordinary course and under law without disparate or irrational treatment of Connectivity and Hearthstone, and (b) awarding to Plaintiff compensatory damages against the Town in the amount of not less than $40 million, together with interest and Plaintiff's attorney's fees and costs incurred in the prosecution of this action under the provisions of 42 U.S.C. § 1988(b); and

3.      On all Counts, awarding to Plaintiff such other, further and different relief as to the Court may seem just and proper.

Dated:    White Plains, New York
              October 4, 2021

4950835.v2

**CUDDY & FEDER LLP**
*Attorneys for Plaintiff*
*Connectivity Systems, LLC*
445 Hamilton Avenue - 14th Floor
White Plains, New York 10601
(Tel.) (914) 761-1300


By: _____/s/  Joshua J. Grauer_____
Joshua J. Grauer (JG4594)

104